IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE GILLETTE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| v. | ) | C.A. No. 15-1158-LPS-CJB |
| | ) | |
| DOLLAR SHAVE CLUB, INC., *et al.*, | ) | ███████████████████████ |
| | ) | |
| Defendants. | ) | |

## JOINT MOTION TO REDACT TRANSCRIPT (D.I. 182)

OF COUNSEL:
Mark J. Abate
Steven J. Bernstein
Alexandra D. Valenti
Tyler Doh
GOODWIN PROCTER LLP
620 8th Avenue
New York, NY 10018
(212) 813-8800

Jennifer A. Albert
Charles T. Cox Jr.
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
(202) 346-4000

Elaine Herrmann Blais
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Jack B. Blumenfeld (No. 1014)
Rodger Smith (No. 3778)
MORRIS, NICHOLS, ARSHT &
  TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
*Attorneys for Plaintiff*

OF COUNSEL:
Charles K. Verhoeven
Terry L. Wit
Morgan W. Tovey
James D. Judah
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600

F. Christopher Mizzo
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
(202) 879-5000

Dated: November 28, 2016

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Defendant*
*Dollar Shave Club, Inc.*

Defendant Dollar Shave Club, Inc. ("DSC") and Plaintiff The Gillette Company ("Gillette") (together with DSC, the "parties") respectfully jointly move the Court to redact certain limited portions of the transcript from the October 28, 2016 discovery teleconference, the disclosure of which would cause a clearly defined and serious injury to DSC and/or Gillette. The grounds for this motion are fully set forth below, and the requested redactions are reflected in the transcripts attached as Exhibit A (highlighted) and Exhibit B (redacted).

1. During the October 28 teleconference, the parties discussed ███████████ ████████████████████████████████████████████████████████████████ ████████ which has been produced and designated by DSC as "Highly Confidential – Outside Counsel's Eyes Only" in this case. *See, e.g.*, Ex. A at 17:4-9-17, 20:5-7, 25:24-26:1, 26:15-27:1, 27:20-25, 28:4-6, 29:14, 37:1-14, 37:17-22, 27:24-38:4, 38:14-20, 44:18-21, 45:3-13, 45:15-18, 45:21-23, 46:1-2, 46:23-47:1. Specifically, the parties discussed ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ *See, e.g., id.* at 19:18-20:1, 25:16-20, 27:20-25, 28:9-10, 29:8-12, 31:20, 32:6-7, 32:18-19, 32:22-23, 34:5-8, 36:4-7, 36:14-16, 36:21-37:1, 38:7-12, 39:22-40:17, 43:15-44:4, 44:7-8, 44:10-13, 46:4-11, 47:8. Finally, the parties discussed ████████████████████████████████████████████████████████████████ *See, e.g., id.* at 45:14.



2. ███████████████████████████████████████

███████████████████████████████[1]

3. ███████████████████████████████████████

████████

4.      Although "[t]he public has a common law right of access to judicial proceedings and records," this right "is not absolute[.]" MOSAID *Techs. Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 507 (D. Del. 2012).  "Every court has inherent supervisory power, and the Third Circuit has held that courts may exercise that power to deny access to judicial records, for example, 'where they are sources of business information that might harm a litigant's competitive standing.'"  *Id.* (quoting *Littlejohn v. BIC Corp.*, 851 F.2d 673, 677-78 (3d Cir. 1988)).  For example, this Court has allowed redaction of "sensitive information, deemed irrelevant to [the] litigation by the Court, and that is not a matter of public record[.]" Virgin *Atl. Airways Ltd. v. Delta Airlines, Inc.*, C.A. No. 11-61-LPS-CJB, D.I. 173 (D. Del. July 7, 2013) (Ex. C).

5.      A party seeking to redact a judicial transcript must establish good cause, which requires a specific showing "that disclosure will work a clearly defined and serious injury to [that party]."  *Id.* (quotation marks and citations omitted).  "Assessing whether good cause exists to seal a judicial transcript generally involves a balancing process, in which courts weigh the harm of disclosing information against the importance of disclosure to the public." *Id.* at 507-08.  In conducting this balancing process, courts in the Third Circuit may consider a variety of factors, including "whether disclosure will violate any privacy interests" and "whether the case involves

---

[1] To limit the distribution ███████████ the parties have refrained from attaching it here, but will provide a copy to the Court upon request.

issues important to the public." *Id.* at 508 n.2 (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-91 (3d Cir. 1994)).[2]

6.    The parties seek to redact those portions of the transcript ████████ ████████████ which – if disclosed to the public – would reveal competitively sensitive information about ██████████

7.    With respect to █████████████████████



██████ *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1225 (Fed. Cir. 2013) (district court abused its discretion when it refused to seal information that could give a party's "suppliers an advantage in contract negotiations"). This is an unreasonable burden to impose ██ ████

8.    Similarly, the parties seek to redact those portions of the transcript relating to ██ ████████████████████████████

9.    Moreover, although the public may have a general interest in the outcome of this litigation, the public has no interest whatsoever ████████████████ ████████████████

*See LEAP Sys., Inc. v. MoneyTRAX, Inc.*, 638 F.3d 216, 222 (3d Cir. 2011) (affirming district court's refusal to unseal portions of a transcript that reflected the terms of a confidential settlement agreement, noting that "[t]he parties are private entities, their dispute has no impact on the safety and health of the public, and their settlement agreements demonstrate a clear intent to

---

[2] The remaining *Pansy* factors have no bearing on this motion. *See id.*

maintain confidentiality").  The fact that this sensitive information was discussed in a transcribed proceeding does not transform it into a matter of public interest.

10.    Given the serious risk of competitive harm and the lack of any public interest in the confidential details of ████████████████████████████████████ the parties have established good cause to redact the limited portions of the transcript highlighted in Exhibit A.

WHEREFORE, the parties respectfully request that the Court grant this motion and direct the Clerk of the Court to docket the redacted transcript attached as Exhibit B.

|  |  |
|---|---|
| | */s/ Rodger Smith* |
| OF COUNSEL: | Jack B. Blumenfeld (No. 1014) |
| Mark J. Abate | Rodger Smith (No. 3778) |
| Steven J. Bernstein | MORRIS, NICHOLS, ARSHT & |
| Alexandra D. Valenti | TUNNELL LLP |
| Tyler Doh | 1201 North Market Street |
| GOODWIN PROCTER LLP | P.O. Box 1347 |
| 620 8th Avenue | Wilmington, DE 19899 |
| New York, NY 10018 | (302) 658-9200 |
| (212) 813-8800 | jblumenfeld@mnat.com |
| | rsmith@mnat.com |
| Jennifer A. Albert | *Attorneys for Plaintiff* |
| Charles T. Cox Jr. | |
| GOODWIN PROCTER LLP | |
| 901 New York Avenue, N.W. | |
| Washington, DC 20001 | |
| (202) 346-4000 | |
| | |
| Elaine Herrmann Blais | |
| GOODWIN PROCTER LLP | |
| 100 Northern Avenue | |
| Boston, MA 02210 | |
| (617) 570-1000 | |

<table>
<tr><td>

OF COUNSEL:
Charles K. Verhoeven
Terry L. Wit
Morgan W. Tovey
James D. Judah
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600

F. Christopher Mizzo
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
(202) 879-5000

Dated: November 28, 2016

</td><td>

*/s/ David M. Fry*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Defendant*
*Dollar Shave Club, Inc.*

</td></tr>
</table>

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE GILLETTE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-1158-LPS-CJB |
| | ) | |
| DOLLAR SHAVE CLUB, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **[PROPOSED] ORDER**

At Wilmington this _____ day of _____, 2016, having considered the parties'
Joint Motion to Redact Transcript (D.I. 182), IT IS HEREBY ORDERED that the motion is
GRANTED.

The Clerk of the Court shall docket a public version of the transcript containing the
redacted material (Exhibit B).  The Clerk of the Court shall keep the original, unredacted transcript
permanently under seal.

_____
United States Magistrate Judge

# Exhibit A

# REDACTED IN ITS ENTIRETY

# Exhibit B

REDACTED - PUBLIC VERSION

1

███████████████████████

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -

    THE GILLETTE COMPANY,
 4                                    :    CIVIL ACTION NO.
              Plaintiff,              :
 5                                    :
                   v.                 :
 6                                    :
    DOLLAR SHAVE CLUB, INC.,          :
 7                                    :    15-1158-LPS-CJB
 8            Defendant.
                             - - -
 9
                          Wilmington, Delaware
10                        Friday, October 28, 2016
                          Telephone Conference
11
                             - - -
12
    BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
13
    APPEARANCES:                      - - -
14

15            MORRIS NICHOLS ARSHT & TUNNELL, LLP
              BY:  RODGER D. SMITH, II, ESQ.
16
                  and
17
              GOODWIN PROCTER, LLP
18            BY:  MARK J. ABATE, ESQ., and
                  ALEXANDRA D. VALENTI, ESQ.
19                (New York, New York)

20                    Counsel for Plaintiff

21
              SHAW KELLER, LLP
22            BY:  KAREN E. KELLER, ESQ.

23                  and

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

REDACTED - PUBLIC VERSION

2

1    APPEARANCES:   (Continued)

2

3              QUINN EMANUEL URQUHART & SULLIVAN, LLP
             BY:  TERRY L. WIT, ESQ.
4                 (San Francisco, California)

5                 and

6              KIRKLAND & ELLIS, LLP
             BY:  F. CHRISTOPHER MIZZO, ESQ.
7                 (Washington, District of Columbia)

8                        Counsel for Defendant

9

10

11

12

13

14

15

16                        - oOo -

17              P R O C E E D I N G S

18              (REPORTER'S NOTE:  The following telephone

19   conference was held in chambers, beginning at 2:08 p.m.)

20              THE COURT:  Good afternoon, everybody.  This is

21   Judge Stark.  Who is there, please?

22              MR. SMITH:  Good afternoon, Your Honor.  Rodger

23   Smith at Morris Nichols on behalf of the plaintiff Gillette.

24   I'm joined by my co-counsel, Mark Abate and Alexandra

25   Valenti, both from Goodwin Procter.

REDACTED - PUBLIC VERSION

3

1            THE COURT:  Okay.  Thank you.

2            MS. KELLER:  Good afternoon, Your Honor.  Karen

3    Keller from Shaw Keller.  With me today is Terri Wit from

4    Quinn Emanuel and Christopher Mizzo from Kirkland & Ellis on

5    behalf of Dollar Shave Club.

6            THE COURT:  All right.  Thank you.  And I have

7    my court reporter here.  And for the record, it is our case

8    of The Gillette Company versus Dollar Shave Club Inc., Civil

9    Action No. 15-1158-LPS-CJB.

10           This is the time we set to talk about the

11   discovery disputes.  Each side raised disputes.  I want to

12   start with those that were raised by the defendant Dollar

13   Shave or DSC.  So let me hear from DSC first, please.

14           MR. WIT:  Thank you, Your Honor.  This is Terry

15   Wit from Quinn Emanuel.  I'll be speaking on behalf of

16   Dollar Shave Club today.

17           Just as one preliminary issue, I wanted to note

18   that the parities' papers were filed under seal and certain

19   issues that they raised may be subject to the protective

20   order, although of course at least with respect to Dollar

21   Shave Club issue, we would submit that it is not subject to

22   the protective order.  In any event, I would anticipate

23   that one or both parties may seek to seal portions of the

24   transcript following the hearing pursuant to the Court's

25   procedures, in the meantime, thus would respectfully request

REDACTED - PUBLIC VERSION

4

1    that the transcript be treated as confidential until that is

2    done by one of the parties.

3              The issue that is raised by Dollar Shave Club

4    with in connection with today's call relates to Gillette's

5    wholesale designation of its initial infringement

6    contentions as "Highly Confidential - Outside Counsel's Eyes

7    Only."

8              The parties have met and conferred and reached

9    an impasse on that issue.  I won't restate all of the

10   information that is in our letter, obviously, and the

11   authorities that are cited therein but wanted to simply

12   call out for the Court a couple of high level points.

13             Obviously, it is Gillette's burden under the

14   paragraph 6 of the protective order to prove that its

15   infringement contentions contain information that is validly

16   subject to the protective order in terms of being a trade

17   secret or other confidential information that would cause it

18   harm if it was disclosed to the public.

19             What Gillette has redacted, however, from its

20   infringement contentions consists solely of legal

21   infringement positions that it is taking after an analysis

22   of DSC or Dollar Shave Club publicly available products

23   using a handful of well known methods used by everyone that

24   practices in this relatively small industry.

25             Examples would be the acronyms of the four

REDACTED - PUBLIC VERSION

5

1    testing methods that they used which relate to use of

2    electron microscopes in various capacities as well as that

3    Gillette may assert a Doctrine of Equivalents theory and the

4    legal arguments and descriptions of the images that are

5    related to those particular issues.

6                Now, in our view, we would note for the record

7    as we did in the brief that all four of the methods, Black

8    Bright Field Transmission, Electron Microscopy, Scanning

9    Transmission Electron Microscopy, Selected Area Diffusion

10   Patterns, and Energy Dispersion Microscopy have all been

11   used in this industry in the analysis of thin filmed

12   coatings on razor blades going back to the 70s and in fact

13   in some cases to the 60s, and we included some authority

14   discussing these very issues as an attachment to our letter

15   brief.

16               Now, arguing that the mere knowledge of fact

17   that Gillette chose these particular tests out of a handful

18   of five or six available scientific methods that can be used

19   to examine blades of this nature in our view is like saying

20   that if this was a medical case and Gillette had chosen to

21   examine a skull using an MRI and a CAT scan but not using

22   an x-ray or a PET scan that somehow that very selection of

23   which test Gillette used should be protectable information

24   which in our view is a bridge too far.

25               This is particularly true in the case of the

1    authority that we point to in the brief and *Constellation* as

2    well as the *Fractus* case from Texas that talk about the fact

3    that even if they have done this testing and even if at one

4    point it might be considered work product, for example,

5    once they plug that into infringement contentions that

6    they -- (audio lost) -- setting out their legal positions,

7    that information is no longer protected as against Dollar

8    Shave Club or the public, particularly given the strong

9    presumption favoring the common law right of public access

10   to court proceedings.

11          But backing up for one second to something that

12   we noted in the brief that I think is really an important

13   issue to place this entire dispute in context.  And that is

14   that Gillette's position in the context of its claim charts

15   is particularly unfair under these circumstances because it

16   seeks to use the protective order as a shield while at the

17   same time Gillette is speaking out to the public and the

18   media about the exact same information that is contained in

19   these claim charts.

20          Now, this was an attachment to our submission,

21   Exhibit F I believe it was, a letter that contains various

22   excerpts from the media.  And I won't recite all of those

23   but just to give a flavor for the Court.

24          When the complaint was filed, Gillette

25   explicitly and repeatedly represented to the public that

REDACTED - PUBLIC VERSION

7

1    Gillette had tested Dollar Shave Club's product and

2    discovered alleged infringement and intellectual property

3    theft in connection with that testing, specifically told

4    the Wall Street Journal that Gillette routinely tests

5    competitors, evaluated Dollar Shave Club's blades and

6    discovered the infringement.  They told Ricoh, the tech

7    publication, that Gillette regularly does market surveil-

8    lance and discovered in its most recent round of testing

9    what it believes to be patent infringement in razors and.

10   They told the Washington Post that through this market

11   surveillance, they, quote, spotted the stolen tech in all of

12   Dollar Shave Club razors.

13           Now, however, Gillette is claiming once having

14   put that into the public sphere and raised questions among

15   Dollar Shave Club's customers and vendors and others in the

16   industry, Gillette is claiming the very same test that it

17   touted to purportedly discover that alleged infringement

18   should be shielded from the public, the public shouldn't

19   be able to review that.  The Dollar Shave Club shouldn't

20   be able to share that information with its customers which

21   Gillette itself alleges infringe.

22           Gillette has alleged in the complaint that

23   Dollar Shave Club is contributing to the infringement of its

24   customers and yet its own infringement contentions can't be

25   shared with its customers because of its designation of this

8

1    information as Highly Confidential - Outside Counsel Only.

2           The bottom line is that without being able to

3    freely review Gillette's basis and its arguments, legal

4    arguments, after having examined these publicly available

5    products using basic scientific electron microscope testing

6    methods that have been in the art for 30 years plus, simply

7    makes it impossible for DSC to fully defend itself and it

8    rewards Gillette for gamesmanship.

9           Now, we all know that the standard here is that

10   the public has a great interest in seeing, ascertaining

11   the scope of Gillette's patent, particularly given the

12   contributory infringement allegations that are at issue

13   here.  And Gillette's response at best only characterizes

14   some sort of speculative injury when in fact the standard

15   is it has got to show that it has clearly defined serious

16   injury under *Pansy*, and the injury must be shown with

17   specificity.  It can't just be broad allegations of harm

18   that are unsubstantiated by specific example.

19           If you carefully parse their responsive letter,

20   all you see is it is a broadly alleged sort of harm that

21   somehow some competitor of Gillette may be able to glean

22   from the fact that it used a handful of a very small

23   number of available tests for this type of work, that it

24   used certain magnifications just as if somebody was doing

25   an MRI would use certain magnification is going to somehow

REDACTED - PUBLIC VERSION

1    to give it a competitive advantage.

2         The bottom line is that that falls far short

3    of what *Pansy* requires for shielding this information from

4    the public, especially given the important public interest

5    in knowing what the scope is that Gillette asserts of its

6    patent that the public itself can avoid infringement in

7    addition to the ongoing prejudice to Dollar Shave Club in

8    not being able to freely review the contentions both with

9    more than just the two employees that Gillette offered to

10   allow Dollar Shave Club to review them with but also its

11   customers and vendors and others folks that it has business

12   relationships with, again, in a case where they have alleged

13   that those customers, end use customers are directly

14   infringing on the basis of these very same infringement

15   contentions by using these products.

16        Fundamentally, we think that even the authority

17   that was cited by Gillette calls none of that into question.

18   The main authority that they rely on is this case *ExitExchange*

19   which, if you look at it, was only contemplating whether

20   claim charts can be confidential in general in the context

21   of what to include in a particular protective order as a

22   term the parties were arguing about.

23        If you go back and you read those opinions,

24   indeed, all that *ExitExchange* stands for is an unremarkable

25   proposition that, in sum, infringement contentions in

1    general could be confidential.  It could contain proprietary

2    information, and the fact that is possible, but not all of

3    them will.

4              THE COURT:  All right.  Mr. Wit.  Mr. Wit.

5              MR. WIT:  The point is the ones that are at

6    issue in this case do not contain any proprietary

7    information either of Dollar Shave Club or of Gillette --

8              THE COURT:  Mr. Wit.

9              MR. WIT:  -- or of Gillette.

10             THE COURT:  Mr. Wit.

11             MR. WIT:  And it hasn't met its burden thereby.

12             THE COURT:  Mr. Wit, do you hear me?  I'm trying

13   to ask you a question.

14             MR. WIT:  Yes, I can.  Certainly.

15             THE COURT:  We're going to need to move along.

16   But my question to you is you're relying on *Pansy* and the

17   case law.  The plaintiff says, well, you all negotiated the

18   specific order in this case.  Is it your contention that

19   even under the terms of that order, they should not be able

20   to, they have not met the language of the negotiated order

21   in this case for designating this stuff highly confidential?

22             MR. WIT:  Absolutely, Your Honor.  The protective

23   order doesn't take a position, one way or the other, as to

24   whether infringement contentions, infringement contentions are

25   protected or are not protected.  Paragraph 1 of the protective

1   order lays out what is protected in terms of information that

2   can be designated highly confidential and therefore is subject

3   to protection, and it involved things such as trade secrets,

4   and if you look into paragraph 2 of the order, information

5   that is especially sensitive such as confidential research and

6   development, financial technical marketing or other sensitive

7   trade secret information, et cetera.

8              It would be one thing, Your Honor, if Gillette had

9   developed its own proprietary testing methodology, right?  It

10  had developed a different type of electron microscope testing

11  to examine these razor blades.  Arguably, that could be a

12  trade secret that would fall within the protective order, but

13  it has not done.  So all it has is used publicly available

14  testing methods in a small universe of available testing

15  methods.  There are not many you can use to do this kind of

16  work.

17             It has used those to take pictures of publicly

18  available products and make legal arguments about them.

19  Our view is none of those fall under the protective order,

20  and if Gillette's view were accepted, basically any legal

21  argument in this case would be able to be sealed.

22             THE COURT:  All right.  Mr. Wit, are you

23  contesting that the specific combination of tests that they

24  chose to use here is not publicly known and is of technical

25  or commercial advantage, or do you concede at least that

REDACTED - PUBLIC VERSION

12

1    much?

2                MR. WIT:  I do contest that.  There is no

3    commercial advantage.  The particular combination of tests

4    that Gillette uses, in fact, I would argue that it's not

5    even really a combination.  What Gillette has done is they

6    used individual tests to test for different aspects of the

7    products, as any manufacturer in this industry would use

8    those tests.  There is nothing specific about adding one

9    test to another in this context that tells you any

10   additional information that you wouldn't get from running

11   the individual tests.

12                In other words, it's not like Gillette would run

13   one test and then apply a second level examination to it

14   that someone else in the industry would not know about.  It

15   is, Gillette's contention is that it is merely the selection

16   of the tests, again, four tests out of approximately a half

17   dozen that are available, that should be protected.  And we

18   simply take the view that that is not information that, in

19   effect, anyone else would not already know.  And, certainly,

20   Gillette has not articulated how it gives it any advantage

21   in the commercial state using those particular tests that

22   everyone in the industry uses.

23                THE COURT:  All right.  Thank you.

24                Let me hear from Gillette, please.

25                MR. ABATE:  Thank you, Your Honor.  This is Mark

13

1    Abate.

2           So as you pointed out, the parties did negotiate

3    the protective order.  It has a single tier of confidentiality.

4    And that is I think part of the reason why we're before you.

5           That was very specific as part of the negotiation.

6    We talked about whether to have a prosecution bar, and we

7    decided not to.  And the way we handled that is to have a

8    single tier protective order such that confidential material

9    would only be available to outside counsel, and that was hotly

10   debated, negotiated, agreed upon.

11          So the important point here about that is that

12   Dollar Shave Club is not just seeking to change the confident-

13   iality from one level of confidentiality to another.  They're

14   actually seeking to make these documents public, and we think

15   it's clearly not public information.

16          We use a specific battery of tests.  We use that

17   to analyze our own products, analyze competitors' products.

18   We view that as confidential to Gillette and subject to

19   the term of the protective order:  information that is not

20   publicly known that provides a technical or commercial

21   advantage, including R&D information.

22          And when I say Gillette, I'm not talking about

23   Gillette's outside counsel, I'm not saying that I designed

24   this test with an expert.  I'm talking about the in-house

25   people at Gillette, the technical employees at Gillette have

REDACTED - PUBLIC VERSION

14

1  decided in their work to use tests in a certain way to see

2  certain things in these films that other people may not have

3  noticed, and that is really what is going on here.

4          I would, Your Honor, if we have a moment, I'd

5  like to just refer to Exhibit A to our letter brief which is

6  an excerpt from the claim chart.  And I would just like to

7  look at one of these tests to show you what I'm talking

8  about.  And, specifically, I point out page 3 which is the

9  Bright Field Transmission Electron Microscopy Test.

10         And what we're showing here, you see on the

11 right, there are areas labeled AB&C.  A is the steel blade

12 substrate, and B and C are layers on top of that substrate.

13         Now, this is a very challenging test to do.

14 The reason why is because we actually cut the blade in half,

15 and these layers B and C are actually on the order of

16 angstroms thick, and an angstrom is a billionth of a meter.

17 So when you cut the blade in half, it is very difficult to

18 maintain those layers intact.

19         We do that, and then we take the electron

20 microscope and look at the image from the side.  And what we

21 see here very important.  You see where the areas A and B

22 meet?  Moving across to the left, there is like a light gray

23 line through the image, and that is the area dividing the

24 layer.

25         And this is important.  Let me turn to page 6.

REDACTED - PUBLIC VERSION

15

1    This is the augur test.  This is spelled like augur, but

2    it's pronounced awe-jay (phonetic).  We run a specific augur

3    test.  It is extremely sensitive.

4           You can see that the yellow line and the violet

5    line, there is a tremendous amount of scatter, but the

6    important thing is the middle of the graph at around

7    65 nanometers where we labeled B and C are intersecting, we

8    see the yellow and the violet crossover.  And we can see

9    that because we're doing a very specific type of augur test

10   with a very specific type of sensitivity.  And it turns out,

11   Your Honor, that that crossover coincides exactly with the

12   light gray line that we just saw in the x-ray on page 3.

13          So it's not tests in isolation, it is a

14   combination of tests.  It is a specific way of using tests.

15   I'm not saying Gillette invented the electron microscope or

16   Gillette invented augur testing.  They did not.  But they

17   use it in-house in a specific way that they feel gives them

18   a commercial advantage in the marketplace, and that falls

19   under the protective order.

20          Now, I would point out one last thing on the

21   augur test.  If we look at Exhibit G to Dollar Shave Club's

22   letter, that is the article where they say augur testings

23   has been around for a long time.

24          Certainly, augur testing has been around for a

25   long time, but if you look at the graphs on the third page

1   of that article, you will see that the lines are closer to

2   smoother curved.  In other words, they don't get the scatter

3   that I was showing in the Gillette augur test.  They're not

4   using the same type of sensitivity.  They're not looking for

5   the same type of information.

6           These are specific tests Gillette uses to show

7   specific aspects of these layers.  What they show are these

8   multiple layers in the DSC accused products demonstrating

9   infringement, and that is the information we're redacting.

10  And we redact some information from the center column in the

11  claim chart where we discuss those tests, but to the extent

12  the information in the center column is not related directly

13  to the tests, we don't redact it.  We have only redacted the

14  information where we actually are talking about the specific

15  tests.

16          I would point out a couple of other things.  I

17  think Dollar Shave Club hasn't pointed to anyone using any

18  of these tests the way we're using them.

19          I would also mention the *Constellation* case

20  that they're talking about that they rely on.  It is a very

21  different case, Your Honor.  It's based on a claim chart

22  that was constructed using images off the Internet, so it is

23  a very different type of case, not applicable here.

24          The *ExitExchange* case is a better case.  It

25  points to the idea that claim charts can be confidential if

REDACTED - PUBLIC VERSION

17

1    they contain confidential information, which they do here.

2              In terms of the gamesmanship, I would say what

3    is really going on here, Your Honor, is we're going to get

4    to the first issue at some point but █████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████

10   And that is really what is going on here.

11               █████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ███████████████████████████

18               THE COURT:  All right.  Let me ask you a few

19   questions.

20               You say, of course, there were negotiations

21   leading up to the protective order, but the protective order

22   you all came up with doesn't expressly address claim charts.

23   I believe, tell me if I'm wrong, and so why should I think

24   that part of what you all agreed to would have the impact

25   that you're asking for today?

1          MR. ABATE:  I believe that the protective order

2    does not address claim charts.  I believe that is correct,

3    Your Honor.

4          Well, it's just like any other pleading in a

5    case or document in a case.  If we file a brief and it has

6    confidential information, it can be redacted, and it's no

7    different than that.  That is how I would analyze it.

8          THE COURT:  Is it your view that we can get

9    through summary judgment and all the way through trial and

10   the public will never learn about the combination of tests

11   that your client has used in this case?

12         MR. ABATE:  Well, that is a very interesting

13   point you raise, Your Honor.

14         Going to issue one for just a moment, which

15   is the issue about core technical documents and technical

16   documents responsive to our materials, responsive to our

17   production requests.

18         We've asked for technical information.  It's

19   quite possible that we could prove infringement based on

20   technical information alone and not have to use these tests.

21   What happened was we were denied the technical information,

22   so we bought products ourselves from the stores in Delaware

23   and tested them, and that is the origin of this work.

24         We did not want to in any way ask for a leave

25   from the current schedule, so we found a way to provide

REDACTED - PUBLIC VERSION

19

██████████████████████████

1    infringement contentions as best we could in the time

2    allotted.  Had we been provided with technical discovery

3    from Dollar Shave Club, I don't think we would necessarily

4    need these tests because from the technical documents, we're

5    going to be able to see what we're seeing in these images.

6              THE COURT:  Talk about the public statements

7    that your client has made with respect to their case against

8    Dollar Shave.  Shouldn't that factor into the analysis here?

9              MR. ABATE:  I don't see that at all, Your

10   Honor.  Those statements are at a very high level.  It is no

11   different than what is in the complaint.  It says they're

12   infringing.  We believe they're infringing.  The complaint

13   was publicly filed.

14             There was a little more detail in one of the

15   statements where they say that we noticed a change in the

16   product.  In fact, we produced in this case public documents

17   -- not public, I'm sorry -- nonprivileged documents where

18   we did some testing.  ███████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████████████████████

24   ███████████████████████████████████████████

25   ███████████████████████████████████

1    ███████

2           So a combination of certain tests that we had

3    done which we now produced because they're not privileged,

4    they were internal tests but they're not privileged, because

5    they were done by our technical folks, ███████████

6    ██████████████████████████████████████████████████

7    ███████.  We put those two together, and we had the

8    infringement which was in the complaint.  So I just don't

9    see it in terms of the press statements.

10          THE COURT:  Mr. Abate, I'm just not sure that

11   your position accounts adequately for the public interest

12   and the presumption that litigation is open to the public

13   and the public has an interest in how court resources are

14   being used.

15          Can you help me square your position with the

16   public interest?

17          MR. ABATE:  Well, there is confidential

18   information here, so I would say we're allowed to keep

19   that confidential.  Gillette, Your Honor, is a tremendous

20   U.S. R&D organization.  They manufacture and distribute

21   razors from their facilities in Boston.  They have a

22   tremendous research organization.  I think it is in the

23   public interest to maintain that type of know-how and trade

24   secrets and confidential information when you have companies

25   like that, and it certainly is in other cases as well.

REDACTED - PUBLIC VERSION

21

1          THE COURT:  All right.  Thank you.

2          Mr. Wit, is there anything you want to respond

3     to, briefly?

4          MR. WIT:  Yes.  Just very, very shortly, Your

5     Honor.

6          Whatever the merits of Gillette's R&D

7     organization, my simple comment on that issue is they did

8     not develop these tests.  These are not proprietary tests

9     that they had used.  Nor are these tests that they have said

10    that they necessarily used with respect to every product

11    that they test when they do their market surveillance.

12          What we're talking about for present purposes

13    today are only tests that they have used to test Dollar

14    Shave Club as part of constructing a legal argument regarding

15    infringement.  We're not even talking about revealing what

16    is a standard form of testing that Gillette may use on lots

17    of different products in combination, if you even accept

18    Gillette's position that somehow the combination of tests

19    exert some magic conjuring into proprietary information

20    that didn't exist when the tests were individually had.

21          And with respect to, again, these are only

22    tests applied to these products in a case where Gillette

23    has argued that endusers that are buying Dollar Shave Club

24    blades are infringing, and we would contest have a right to

25    know.  As is explicitly set out in the *Constellation* case

1   that we cited to the Court, the public has a great interest

2   in ascertaining the scope of Gillette's patent as Gillette

3   interprets it, especially after its press releases, and to

4   not grant a monopoly on an invalid patent.  And there is a

5   quote in that case -- and I will wrap up after that -- that

6   says if the infringement contentions are de-designated, the

7   public can better ascertain what the patentee believes is

8   the scope of its patent, allowing the public to avoid

9   infringing activity and/or acquire a license.

10           The burden is not on Dollar Shave Club to show

11   that this information is not protectable, the burden is

12   on Gillette to articulate a clear and specific harm that

13   outweighs what the Supreme Court and numerous courts in

14   the Third Circuit and this District have said to be a

15   significant public interest in the maintenance of public

16   work proceedings.

17           THE COURT:  All right.  Thank you.

18           On this first dispute, it is I agree Gillette's

19   burden to show here that the infringement contentions should

20   be designated and remain designated as highly confidential.

21   Again, that burden is on Gillette, and I find that Gillette

22   has not met its burden.

23           The issue of which nonproprietary tests

24   Gillette chose to run for purposes of this case to at least

25   develop its infringement contentions to this point against

1    this defendant do not warrant the highly confidential design-

2    ation or the protection that comes with it.  I reach that

3    conclusion recognizing notwithstanding that the protective

4    order, arguably its definition of highly confidential is

5    arguably satisfied here.  I don't need to decide whether

6    it is in fact satisfied because to the extent necessary, I

7    would be prepared to amend that order to make clear that

8    these infringement contentions are not highly confidential

9    information and are not going to be protected as this case

10   goes forward.

11        I do think it is notable that the protective

12   order doesn't specifically address, as far as I can tell,

13   whether or not infringement contentions can and should be

14   designated highly confidential.  And it is an unusual thing

15   that the plaintiff is asking me to do.

16        The information is about the defendant's accused

17   product and what plaintiff is seeking to protect is how it

18   chose to choose again certain nonproprietary tests, tests that

19   are known to the public, in order to test the defendant's

20   product.  And I'm just not satisfied that Gillette has met

21   its burden to show that this should be permitted.

22        I see no persuasive showing of a specific injury

23   to the plaintiff on this record.  And,

24        By contrast, I believe that the public interest

25   in having access to this set of infringement contentions is

24

1    strong.  The public courts, the public's resources are being

2    used to resolve the parties disputes.  The presumption is

3    very strong, of course, that use of the courts and documents

4    filed with the court are to be public.  And my guess, this

5    is speculative because these contentions are not going to

6    stay sealed, but my guess is even if they were sealed, it is

7    highly unlikely that we would get through summary judgement

8    and then, after that, trial without it becoming known to

9    the public which tests Gillette used in this case and how

10   it used them in order to at least at this point assess

11   infringement.

12          Here, I do think that the public's interest in

13   access to this information is heightened by the record of

14   public statements that Gillette has made regarding its

15   competitor, the defendant DSC, and is further heightened by

16   the fact this is a patent infringement case and the public

17   does have an interest in knowing what it is the plaintiff

18   thinks it owns in its property right in the patent.  And

19   these contentions are clearly some evidence as to the scope

20   the plaintiff believes it has in its patent right.  And,

21          Finally, I think if I were not to rule in this

22   way, there would be some amount of prejudice to the defendant

23   in that it would be somewhat hamstrung in its ability to

24   prepare its defense as this case goes forward.

25          So that is my ruling on the issue raised by DSC.

███████████████████████

1   Let's move on now to the issues raised by Gillette.  And

2   we'll hear from Gillette first, please.

3          MR. ABATE:  Thank you, Your Honor.  So the first

4   issue has to deal with the technical document production by

5   Dollar Shave Club.

6          We're now close to 11 months into the case and

7   we're starting the *Markman* process in just a few weeks with

8   exchange of claim terms, and we do not have any discovery

9   into the technical issues at the heart of the case.

10          As I mentioned earlier, the patent deals with

11   coatings on the blade, and there is a sealed substrate with

12   coatings on top of that.  And the coatings on Dollar Shave

13   Club's blades and the processes by which the coatings are

14   applied are central to the case and Dollar Shave Club's

15   infringement.

16   ██████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████

19          For example, ████████████████████████████

20   ██████████████████████████████████████.  And we

21   believe those are called for by the Delaware default standard

22   on core technical documents, but they're also called for in

23   our own document requests.

24          Now, ███████████████████████████

25   ████████████████████████████████████████

26

1    █████████████████████████████████████████ And

2    they rely on the *Princeton Digital* case which is a recent

3    case by Judge Burke.

4            Your Honor, the reasoning in *Princeton Digital*

5    actually supports Gillette, as does the reasoning in the

6    case that is discussed in *Princeton Digital*, and that is the

7    *Avros S.P.A. v Krauss-Maffei Corp.* case, also a Delaware

8    case from 1986.

9            In *Princeton Digital*, the Court did not compel

10   a U.S. corporation to obtain technical documents from its

11   Japanese sister corporation, but there was no evidence in

12   that case that the Japanese sister corporation directed the

13   course of litigation and made important strategic decisions.

14   And that is a quote from *Princeton Digital*.

15           Here, ████████████████████████████

16   ██████████████████████████████████████

17   ███████████████████████████████████████

18   ██████████████████████████████████████

19   █████████████████████████████████████

20   ██████████████████████████████████████

21   ███████████████████████████████████████

22           On the next page, ██████████████████

23   ██████████████████████████████████████

24   ██████████████████████████████████████

25   ████████████████████████████████████

1        ███████         It has got the whole ball of wax.

2               Now, in the *Avros* case that I mentioned, the

3    subsidiary was required to produce technical documents from

4    a German parent corporation.  So we see in *Princeton Digital*

5    Judge Burke addresses *Avros* in great detail and he goes

6    through specifically in six details in *Avros* that the Court

7    relied on to show that the one company had to get documents

8    from the other.  And in *Princeton Digital*, only one of those

9    factors applied.

10              But here, in fact, four of those *Avros* factors

11   apply.  Four out of the six.  And I just want to take a

12   second to go through them.

13              And what I would suggest to Your Honor is we're

14   closer to *Avros* where the Court did require a subsidiary to

15   produce documents from a German parent than we are to

16   *Princeton Digital* where the Court did not require that type

17   of production.

18              So in *Avros*, one of the factors was that the few

19   technical documents produced by the subsidiary came from the

20   parent. ████████████████████████████████████████████████

21   █████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████

23   █████████████████████████████████████████

24   █████████████████████████████████████████████████████

25   █████████████████████████████████████████████

1        So that is factor one in *Avros*.

2        Factor two is litigation decisions were made by

3   the parent.

4        Well, that is the case here. ████████████████

5   ████████████████████████████████████████████████████

6   ██████████████████████

7        *Avros* factor 3 was the parent developed the

8   accused product.

9        That is true here. ████████████████████████████

10  ███████████████████████████████████████████████████

11       And the fourth factor in *Avros* that was

12  discussed in *Princeton Digital* is that the parent company

13  would receive a direct benefit from the decision in the

14  case.

15       And that is true here also because ███████

16  ███████████████████████████████████████████████████

17  ███████████████████████████████████████████████████

18  ███████████████████████████████████████████████████

19  ███████████████████████████████████████████████████

20  ██████████

21       So, again, we have four of the *Avros* factors

22  satisfied here.  Only one was satisfied in *Princeton Digital*

23  out of six total factors that were identified in *Princeton*

24  *Digital*.  So I suggest to you we're closer to *Avros* where

25  the production was required than we are to *Princeton*

REDACTED - PUBLIC VERSION

29

1  *Digital.*

2           In both of those cases, the Third Circuit test

3  was identified -- there were a couple of different tests

4  identified, but one of them is whether the litigating

5  corporation had acted with its sister in effectuating the

6  transaction giving rise to the suit and is litigating on

7  its behalf.

8           And that is true here.

9

10

11

12

13           THE COURT:  Mr. Abate.

14           MR. ABATE:

15           THE COURT:  Mr. Abate.

16           MR. ABATE:  Yes.

17           THE COURT:  What about the test as to whether or

18  not Dollar Shave has control as in the legal right to obtain

19  the documents on demand?  Are you contending that you have

20  that here?

21           MR. ABATE:  The test, well, it's control under

22  Rule 34 is required, but it doesn't require the legal

23  right to obtain documents.  It requires either a legal or a

24  practical ability to obtain documents.  That is stated in

25  *Princeton Digital,* and along with the case, we cited a case

REDACTED - PUBLIC VERSION

30

1    in our brief that states that as well, but it is also cited

2    in *Princeton Digital* that the practical ability can be

3    sufficient and that a party cannot hide behind this artifice

4    to prevent getting the documents.

5            So, for example, *Princeton Digital*, on page 2,

6    it's a test I mentioned.  The litigating corporation had

7    acted with its sister in effectuating the transaction giving

8    rise to the suit and is litigating on its behalf.  It

9    doesn't need absolute legal control.

10           Another test that *Princeton Digital* mentions is

11   alter-ego.  If alter-ego is established, certainly, you have

12   to produce the documents, but there is an alternative test

13   that the litigating corporation is acting in the transaction

14   and the litigation going forward on its behalf, and that is

15   true here.

16           I will also mention on this point, Your Honor,

17   that *Princeton Digital*, the specific facts in that case were

18   related corporations, but both *Princeton Digital* and *Avros*

19   recognize that a corporate relationship is unnecessary.  The

20   language used in *Avros* is "As long as there is sufficiently

21   close cooperation ..."  That is a quote from *Avros* at 129 and

22   130.  "As long as there is sufficiently close cooperation

23   between the party in the litigation and the foreign entity,

24   that is sufficient."

25           And that language is mentioned also in *Princeton*

█████████████████████████

1   *Digital* at pages 2 and 5.

2              THE COURT:  All right.  Mr. Abate, would

3   accepting your --

4              MR. ABATE:  Yes.

5              THE COURT:  Would accepting your position

6   require me to disagree with what this Court has said in

7   *Inline Connection v AOL* or in *Power Integrations v Fairchild*?

8              MR. ABATE:  I don't believe so.  I thought that

9   the *Princeton Digital* case was particularly well reasoned in

10  terms of dealing with all this precedent, and it looked to

11  *Avros* as being the leading case in the District and talked

12  about the specific factors there and how they apply.

13             So I think there is sort of a line.  There is a

14  line that is consistent with all these cases where we see in

15  this case the *Avros* factors, four of the six are satisfied.

16  It's not problematic in terms of the other cases that you

17  mentioned, *Inline* and the other.

18             THE COURT:  All right.  What would be wrong or

19  prejudicial about having you go through the Hague Convention

20  and seeking this directly from ██████?

21             MR. ABATE:  Thank you for asking that question.

22  Korea has opted out of the discovery provision of the Hague

23  Convention.  I'm sure that opposing counsel is aware of that.

24             The situation in *Princeton Digital*, Your Honor,

25  is that Judge Burke mentioned that the parties should go

1    through the Hague and get the documents from the Japanese

2    corporation that way.  But Japan had signed on to the

3    discovery provision of the Hague, Korea has not.  Korea has

4    not.

5              You might notice in Dollar Shave Club's letter,

6    they don't say -- ███████████████████████████████████████

7    ████████████████████████████.  They didn't say if we went

8    through the Hague, we would get the documents.  They say we

9    could go through the Hague.  But the fact is we won't get

10   the documents through the Hague because Korea has opted out

11   of that provision.

12             THE COURT:  All right.  So it is your

13   contention, Mr. Abate, you have no other way to get these

14   documents unless I agree with you on this issue; is that

15   right?

16             MR. ABATE:  That is correct, Your Honor.

17             One other thing I would add is it is really an

18   issue of timing at this point because ██████████████████████

19   ████████████  and there is a motion to dismiss for lack of

20   personal jurisdiction, but we expect it will be denied

21   because the stream of commerce theory applies here in Your

22   Honor's own cases; but nonetheless, ████████████████████████

23   ████  at some point down the road we'll get these documents,

24   so it is a question of timing.  Do we get them now or do we

25   get them later?

33

1          As I mentioned at the outset, we're faced with

2     the *Markman* process starting in just a few weeks, so we need

3     them now because it just helps identify what the terms are

4     that need to be construed to have an understanding of the

5     accused product.  That is the whole reason we have the early

6     exchange of core technical documents.

7               THE COURT:  All right.  We're starting to run

8     out --

9               MR. WIT:  So, Your Honor --

10               THE COURT:  All right.  Mr. Abate, we're

11     starting to run out of time.  I know you have a whole other

12     issue.  Do you want to spend a few moments on that one?

13               MR. ABATE:  Sure.  The second issue I can handle

14     relatively briefly.

15               We're looking for discovery of all their

16     products.  That is what our discovery request covers is all

17     their products.  And what they limit us to is the commercial

18     product named in the complaint.

19               Now, to the extent they imported a product and

20     haven't commercialized it, to the extent they have samples

21     of a product they manufacture that they're putting through

22     market testing, those are infringing acts, Your Honor.

23     Importation is infringement.  Testing is infringement, it's

24     a use.  And we're entitled to that.

25               That is really the difference with their *EPOS*

34

1   case that they cite.   *EPOS*, the manufacturer was resisting

2   the discovery and it had certain prototypes, and, in fact,

3   one prototype was called a pre-prototype.  So it was very

4   far from commercialization.

5                  That is not the situation here.

6

7

8                                    The fact that it is commercialized

9   doesn't matter.  That is an infringing product that has been

10  imported.  If they're doing market testing, that testing is

11  infringing.  If they're considering it for commercialization,

12  we want to know that as well because the product could be

13  released before the trial in this case which is 18 months

14  away.

15                 The point is that the difference between our

16  case and the *EPOS* case is we're talking about a fully formed

17  product in the hands of a distributor.

18                 THE COURT:  All right.

19                 MR. ABATE:  That is very different.  It can be

20  released at any moment, very different from a prototype.

21                 THE COURT:  All right.  Thank you.  Let me hear

22  from DSC, please.

23                 MR. WIT:  Thank you, Your Honor.  Again, this is

24  Terry Wit from Quinn Emanuel.

25                 With respect to my colleague, Mr. Abate, I think

REDACTED - PUBLIC VERSION

35

that he has misquoted Judge Burke's opinion in *Princeton Digital*.  I have the opinion in front of me.  It is very clearly says:  "In the absence of control by litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce," citing to the *Gerling* case.

In the next sentence, it says:  "In the context of Rule 34(a), our court has found the documents are in the 'control' of a litigating party if that party has the 'legal right to obtain the documents required on demand' from the nonparty corporation," going on to cite both *Inline Connection* and *Power Integrations*, which are the two cases that Your Honor mentioned, both of which explicitly rejected the practical ability test that Gillette seems to be relying on in making its arguments here.

With respect, I think that Gillette's position here would quite clearly call for the Court to disregard not just *Princeton Digital* but also *Inline* and *Power Integrations*.

I know that we don't have much time, but very briefly I will take up the issue that Mr. Abate raised with respect to the *Avros* decision.

Mr. Abate ignored several other factors that don't fall in his favor that were discussed in Judge Burke's opinion in the *Avros* case.

███████████████████████████████

1      No. 1, in that case, they were dealing with a

2    wholly owned subsidiary and exclusive seller of the parent

3    company's products in the United States, neither of which is

4    true here. ████████████████████████████████

5    ██████████████████████████████████

6    ██████████████████████████████

7    ██████████████████████████

8      He also ignored the second factor Judge Burke

9    cited on page star five of the opinion, which is there were

10   four members comprising the subsidiary's board of directors

11   that were all employees of the parent and two of them played

12   prominent roles in the management of the domestic company

13   that was the party in the case.

14      Again, it is not at all true here. ██████████

15   ██████████████████████████████████

16   ███████████

17      The third factor listed by Judge Burke was that

18   every one of the four documents that had been produced in

19   the case by the domestic litigant were produced -- or, I'm

20   sorry, were obtained from the files of the foreign entity.

21      That is also not the case here. ████████████

22   █████████████████████████████████

23   ██████████████████████████████████████

24   ██████████████████████████████████

25   ████████████████████████████████

1 ████████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████

9   ████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████

13        It is quite clear from any even cursory, let

14 alone detailed, review of ████████████████  that was

15 referred to by Mr. Abate that there is no right, legal

16 right or otherwise, certainly not a practical ability for

17 Dollar Shave Club ████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████

23        In addition, in the *Avros* case, although Mr.

24 Abate wants to argue that because ████████████████████

25 ████████████████████████████████████████████



1

2 ██████ there is no evidence, unlike in *Avros*, ██████

3

4 ██████ You know, there is no evidence in the record,

5 and again it is Gillette's burden to come forward with that.

6 Similarly, their last two factors regarding

7 the development of the accused products, ██████

8

9

10

11

12 ████

13 Effectively, Gillette's argument would put,

14 would effectively state a legal position that ██████

15

16

17

18

19

20 ████

21 So just as a very quick example to illustrate

22 the length of the argument that Gillette is trying to make

23 here:

24 If someone sued the local Verizon Wireless

25 retailer for patent infringement for sales of a Samsung

1   phone, for example, and Verizon had some product

2   specifications and quality control specs that were in its

3   supply agreements that allows them to know the size of the

4   phone, et cetera, Gillette's argument would require that

5   Verizon retailer to have control and access to and produce

6   Samsung's highly technical component manufacturing documents

7   as to how the phone was actually made.  The law simply does

8   not go that far.

9           With respect to the Hague Convention issue.  I

10  think that Mr. Abate oversimplified.  There are certain

11  reservations that the Republic of Korea has made with

12  respect to the Hague Convention that apply to document

13  discovery.  It is not clear whether if Gillette were to

14  submit a document discovery request whether that would be

15  enforced or not or whether the scope of it would be enforced

16  or not.  There are other provisions of the Hague Convention

17  reservations by Korea that apply to depositions that

18  Mr. Abate ignores.

19          In any case, the argument that he tries to make

20  with respect to the timing of the case and how *Markman* is

21  coming up, what I would note about that is very briefly that

22  Gillette has known for years that

23                              They never contested that.

24

25



And during the initial Rule 26 conference in

March,

In the seven months since then,

So clearly what we have here is a circumstance
where Gillette has known who has these documents, has sat on
any rights that it might have to seek them, is now seeking
to circumvent that by getting them through Dollar Shave Club.

With respect to the last issue, I think this
is a actually fairly straightforward issue regarding
non-commercialized future product.

To be clear, Dollar Shave Club has already

1   agreed to produce all documents that it might have relating

2   to past and present Dollar Shave Club razor products that

3   would have these coatings on razor blades.  The only issue

4   before the Court is whether Dollar Shave Club is also

5   required to produce relating to non-commercialized future

6   products that might be contemplated.

7           Now, as set forth in the briefing, existing

8   products are the support for Gillette's cases.  If you look

9   at the *Invensas* case that is cited and the *Kimberly-Clark*

10  case that is cited, in both of those cases, what was at

11  issue were existing or past products, not future products

12  that are still in research and development.

13          If you look at the cases cited by Dollar Shave

14  Club, including *Fenster Family Patent Holdings,* which Mr.

15  Abate ignored, as well as the *EPOS* case, those cases say

16  quite clearly in Delaware, the *Fenster Family* case found

17  when a product has not been finalized, remains in flux and

18  is still in stages of research and development, the other

19  side is not entitled to discovery.

20          And there is a basic reason for that.  It has

21  nothing to do with Gillette's infringement claims because no

22  product has been made that it can insert infringement on.

23          And in *EPOS*, you even have the physical

24  manifestation of the product, and the Court still found

25  because it had not been commercialized and put on the

1   market, the other side is not entitled to discovery of it.

2           Respectfully, this request is not seeking

3   products that might come out in the future.  Even if there

4   are any that are being contemplated, it is so overbroad as

5   to constitute a fishing expedition by one of Gillette's --

6   by Gillette into one of its main competitor's future plans

7   and has zero relevance to the infringement claims that have

8   been asserted actually in the case.

9           THE COURT:  Mr. Wit, it's now being alleged at

10  least today that if your client has imported or tested any

11  other products, that that is an act of infringement.  What

12  is response to that?

13          MR. WIT:  First off, Your Honor, I'm not aware

14  that that has actually happened, and it was not alleged in

15  Gillette's letter.

16          But, secondly, I think that the cases that

17  we cite in the brief, in the letter brief stand for the

18  proposition that even if a physical manifestation of the

19  product has been made, for example, the prototype that was

20  at issue in the *EPOS* case, that unless that product is being

21  commercialized for sale or has been sold, it is not relevant

22  to discovery in an infringement case.

23          THE COURT:  All right.  Thank you.

24          Mr. Abate, briefly, if you want to reply, you can.

25          MR. ABATE:  Your Honor, I would like to comment

REDACTED - PUBLIC VERSION

43

1    on the timing, and just state that it took us a very long

2    time to get this issue before the Court.

3            I know Mr. Wit talks about, he makes it sound

4    like we sat on our hands, but it was a tremendously long

5    time to get the issue before the Court.  There were a number

6    of delays, including the fact that, quite honestly, Your

7    Honor, Dollar Shave Club would not grant us an audience for

8    a meet and confer at certain times.  So we had to wait for

9    an oral meet and confer, and it took us a long time to get

10   here to present this issue to the Court.  And we are where

11   we are.  I mean I don't know what to say about that, but

12   that is exactly what is going on.  It's not that we delayed.

13           And one other thing I should mention on that

14   point.  Mr. Wit has said a number of times, not before Your

15   Honor the first time here but in front of Judge Burke,

16                                                    That is

17   just not the case, Your Honor.

18

19

20

21

22

23

24

25

REDACTED - PUBLIC VERSION

44

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ███

5        That did come along during this litigation, but

6 as I said, we have been working very hard to tee this issue

7 up for an awfully long time.  And, in fact, ████████████

8 ████████████████ before we got the issue teed up.  It took

9 us that long to get the issue teed up.  We were facing the

10 deadline for amending pleading, ████████████████████

11        So it is really just a timing issue.  ████

12 ████████████████████████████████████████

13 ████████████████████████ and I think it is

14 totally legitimate under the *Princeton Digital* case.  I

15 think that the way that Mr. Wit is reading those six factors

16 is far too limited.  They're laid out very clearly in the

17 case, and they apply here.

18 ████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████

21 ███████████████

22        THE COURT:  All right.  Mr. Abate.

23        MR. ABATE:  Dorco is --

24        THE COURT:  Mr. Abate, I have only got about

25 another minute.

45

1        MR. ABATE:  Yes.  Sure.

2        THE COURT:  I don't mean to interrupt.

3        You say ███████████████████████████████████

4   but Mr. Wit points out there is no evidence of that.  ████

5   █████████████████████████████████████████████████████████

6   ███████████████████████

7        MR. ABATE:  Well, ████████████████████████████

8   █████████████████████████████████████████████████████████

9   ████████████████████

10        They stated that in -- actually, I have more

11   evidence of that.  It's DI 16, Your Honor, at page 3.  There

12   is a reference to that ████████████████████████████████████

13   █████████████████

14        In the ███████████████████████████, there

15   is a long recitation about ████████████████████████████████

16   █████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████████

18   ████████████████████

19        THE COURT:  But does all of that --

20        MR. ABATE:  There is --

21        THE COURT:  I'm sorry, Mr. Abate, but ████████

22   █████████████████████████████████████████████████████████

23   █████████████

24        MR. ABATE:  Well, I believe that is what they

25   said in their -- it was a joint letter to the Court, DI 16.

1

2

3            THE COURT:  Do you have any reason to doubt the

4   representation that

5

6

7            MR. ABATE:  Well, I don't know the answer to

8   that.  They may have, but

9

10

11

12            THE COURT:  All right.  I'm just going to --

13   thank you.

14            MR. ABATE:  There were some here.

15            THE COURT:  All right.  Thank you.  I appreciate

16   the argument.  Let me give you my decisions.

17            With respect to the first issue raised by

18   Gillette seeking an order compelling production of core

19   technical documents, I'm ruling for the defendant, for DSC

20   on this one.

21            The burden is on Gillette, and I just find on

22   this record that the burden is not met.  I'm not persuaded

23   on this record that

24            I'm further not persuaded that

25

1 ███████████████

2           Relatedly, I'm just not persuaded at this

3 point on this record that the Gillette has met the test

4 articulated by decisions of this Court, for instance, in

5 *Princeton Digital*, *Inline* and *Power Integrations*.

6           Further, while I don't know the details of how

7 the Hague Convention works and to what degree it would allow

8 some discovery here directly from ████ given the status of

9 Korea's participation or not in that agreement, I do think

10 it is noteworthy that evidently there hasn't been an effort

11 to pursue that in all of the months that that could have

12 been done, so I can't definitively say that no relief could

13 be forthcoming from other channels.

14           So my decision is for the defendant on that one.

15           On the last issue, I do agree with the plaintiff,

16 and so my decision is for Gillette.  Specifically, if the

17 defendant has responsive information relating to products that

18 it has imported and/or is testing that is alleged as to be

19 potentially infringement, and the fact that those products

20 evidently may not yet be commercialized I don't think under

21 the circumstances here insulates them from production.  I

22 think to the contrary, at least in this case, such materials

23 are relevant, and I'm not seeing any other basis to deny the

24 relief requested.

25           I'm afraid I'm late for another matter.  Is

REDACTED - PUBLIC VERSION

48

1    there anything urgent I didn't address that we need to talk

2    about right now, Mr. Abate?

3                MR. ABATE:  No.  Thank you, Your Honor.

4                THE COURT:  And Mr. Wit?

5                MR. WIT:  No.  Thank you very much, Your Honor.

6                THE COURT:  Thank you all very much.  Good-bye.

7                (Telephone conference ends at 3:11 p.m.)

8

9          I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

10

11                          /s/ Brian P. Gaffigan
                          Official Court Reporter
12                          U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, David M. Fry, hereby certify that on November 28, 2016 this document was served on

the persons listed below in the manner indicated:

**BY E-MAIL**

| | |
|---|---|
| Jack B. Blumenfeld | Mark Abate |
| Rodger D. Smith II | Alexandra Valenti |
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | Stephen J. Bernstein |
| 1201 North Market Street | Tyler Doh |
| P.O. Box 1347 | GOODWIN PROCTER LLP |
| Wilmington, DE 19899 | The New York Times Building |
| (302) 658-9200 | 620 Eighth Avenue |
| jblumenfeld@mnat.com | New York, NY 10018 |
| rsmith@mnat.com | (212) 813-8800 |
| | mabate@goodwinprocter.com |
| | avalenti@goodwinprocter.com |
| | sbernstein@goodwinprocter.com |
| | tdoh@goodwinprocter.com |
| | |
| Elaine Herrmann Blais | Jennifer A. Albert |
| GOODWIN PROCTER LLP | Charles T. Cox |
| 100 Northern Avenue | GOODWIN PROCTER LLP |
| Boston, MA 02210 | 901 New York Avenue, N.W. |
| (617) 570-1000 | Washington, DC 20001 |
| eblais@goodwinprocter.com | (202) 346-4000 |
| | jalbert@goodwinprocter.com |
| | ccox@goodwinprocter.com |

*/s/ David M. Fry*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
dfry@shawkeller.com
*Attorneys for Defendant Dollar Shave
Club, Inc.*