IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE GILLETTE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-1158 (LPS) |
| | ) | |
| DOLLAR SHAVE CLUB, INC., DORCO | ) | |
| COMPANY LTD. and PACE SHAVE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF THE GILLETTE COMPANY'S
RESPONSIVE CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Mark J. Abate
Jeffrey A. Simes
Steven J. Bernstein
Alexandra D. Valenti
Tyler Doh
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
(212) 813-8800

Jennifer A. Albert
Charles T. Cox
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC  20001
(202) 346-4000

Elaine Herrmann Blais
Kevin J. DeJong
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
(617) 570-1205

March 20, 2017

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................1

II.   ARGUMENT ..........................................................................................................2

    A.   "Amorphous Material"....................................................................................2

        1.   The Intrinsic Evidence Supports Gillette's Construction .............................3

        2.   Defendants' Extrinsic Dictionaries Support Gillette's Construction............7

    B.   "Overcoat Layer of Chromium Containing Material" ............................................8

        1.   Defendants' "Intermediate Layer" Construction Imports
            Unsupported Limitations into the Claims......................................................9

        2.   There Is No Basis For Reading a Functional Limitation into the
            Claims ........................................................................................................12

    C.   "Doped With Another Element"...................................................................17

        1.   Defendants' "Small Amounts" Construction Imports Unsupported
            Limitations into the Claims.........................................................................17

        2.   There Is No Basis For Reading a Functional Limitation into the
            Claims ........................................................................................................19

III.   CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Dey, L.P.*,
   287 F.3d 1097 (Fed. Cir. 2002) ................................................................ 17

*Acromed Corp. v. Sofamor Danek Grp.*,
   253 F.3d 1371 (Fed. Cir. 2001) ................................................................ 18

*AIA Eng'g v. Magotteaux Int'l*,
   657 F.3d 1264 (Fed. Cir. 2011) ................................................................ 16

*Allvoice Computing v. Nuance Commc'ns*,
   504 F.3d 1236 (Fed. Cir. 2007) ................................................................ 12

*Avid Tech. v. Harmonic, Inc.*,
   812 F.3d 1040 (Fed. Cir. 2016) ........................................................... 6, 14

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013) .................................................................. 6

*Computer Docking Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008) ................................................................ 10

*Enova Tech. v. Initio Corp.*,
   C.A. No. 10-04-LPS, 2012 WL 6738398 (D. Del. 2012) ....................... 7, 14

*Eolas Techs. v. Microsoft Corp.*,
   399 F.3d 1325 (Fed. Cir. 2005) ........................................................ 9, 14, 15

*E-Pass Techs., Inc. v. 3Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003) ................................................................ 14

*Ericsson, Inc. v. D-Link Sys.*,
   773 F.3d 1201 (Fed. Cir. 2014) ................................................................ 13

*Forest Labs. v. Teva Pharm.*,
   C.A. No. 14-121-LPS, 2016 WL 54910 (D. Del. 2016) ...................... 6, 14

*Gillespie v. Dywidag Sys.*,
   501 F.3d 1285 (Fed. Cir. 2007) .................................................................. 6

*Goldenberg v. Cytogen, Inc.*,
   373 F.3d 1158 (Fed. Cir. 2004) .................................................................. 8

*Golight, Inc. v. Wal-Mart Stores*,
   355 F.3d 1327 (Fed. Cir. 2004) .................................................................. 6

*Grober v. Mako Prods.*,
   686 F.3d 1335 (Fed. Cir. 2012) ......................................................................... 9, 15

*Hill-Rom Servs. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014) .............................................................................. 14

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ................................................................................ 12

*Indacon, Inc. v. Facebook, Inc.*,
   824 F.3d 1352 (Fed. Cir. 2016) ........................................................................... 8, 10

*Inpro II Licensing. v. T-Mobile USA*,
   450 F.3d 1350 (Fed. Cir. 2006) .............................................................................. 10

*Intervet Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010) ........................................................................... 9, 13

*Key Pharm. v. Hercon Labs. Corp.*,
   161 F.3d 709 (Fed. Cir. 1998) .................................................................................. 2

*Mars, Inc. v. H.J. Heinz Co.*,
   377 F.3d 1369 (Fed. Cir. 2004) .............................................................................. 10

*Merck & Co. v. Teva Pharm.*,
   395 F.3d 1364 (Fed. Cir 2005) ...................................................................... 9, 12, 13

*Microsoft Corp. v. Multi-Tech Sys.*,
   357 F.3d 1340 (Fed. Cir. 2004) .......................................................................... 6, 16

*MIT v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006) .............................................................................. 19

*N. Telecom Ltd. v. Samsung Electrs. Co.*,
   215 F.3d 1281 (Fed. Cir. 2000) ......................................................................... 16, 17

*Ortho-McNeil Pharm. v. Mylan Labs.*,
   520 F.3d 1358 (Fed. Cir. 2008) ................................................................................ 4

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .............................................................................. 13

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) .............................................................................. 13

*Starhome GmbH v. AT&T Mobility LLC*,
   743 F.3d 849 (Fed. Cir. 2014) ................................................................................ 16

*TI Grp. Auto. Sys. v. VDO N. Am.*,
   375 F.3d 1126 (Fed. Cir. 2004) .............................................................................. 16

*Univ. of Pittsburgh v. Hedrick*,
    573 F.3d 1290 (Fed. Cir. 2009) ............................................................................................. 15

*Vanderlande Indus. v. I.T.C.*,
    366 F.3d 1311 (Fed. Cir. 2004) ............................................................................................. 19

*Ventana Med. Sys. v. Biogenex Labs.*,
    473 F.3d 1173 (Fed. Cir. 2006) ......................................................................................... 16, 17

*VirnetX, Inc. v. Cisco Sys.*,
    767 F.3d 1308 (Fed. Cir. 2014) ............................................................................................. 12

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................................................... 4, 19

**Rules**

37 C.F.R. 1.84(c) ................................................................................................................... 14

## I.      INTRODUCTION

Gillette has offered constructions that are supported by the entire intrinsic record—the claim language, specification and file history—and that are consistent with the meaning of the terms to a person of ordinary skill.  Defendants offer narrow constructions that are contrary to the intrinsic record and utterly detached from the meaning of the terms to a person of ordinary skill.  Nor have Defendants come close to meeting the high bar required to show clear and unmistakable disclaimers of claim scope.  The Court should adopt Gillette's proposed constructions as the constructions that are most true to the intrinsic record and the understanding of the claim terms to persons skilled in the art.

For example, Defendants ignore the plain and ordinary meaning of "amorphous" as referring to a material lacking long-range crystalline order, and argue that Gillette disclaimed materials other than those having no detectable crystal structures.  The claim language, specification, and file history do not support Defendants' proposed construction, nor do Defendants' expert declaration or their extrinsic general purpose dictionaries.  Defendants go further to suggest that Gillette clearly and unmistakably surrendered nanocrystalline material from the scope of "amorphous."  Not only did Gillette not surrender a claim scope encompassing nanocrystalline material during prosecution, but it expressly stated that "amorphous material" includes diamond-like carbon ("DLC"), which contains nanocrystalline material.  Defendants' construction would exclude DLC, a claimed embodiment, from the claim scope.

For "overcoat layer," Defendants seek to graft a functional limitation—promoting adhesion—onto an easily understood structural element.  Defendants also seek to limit the term to an "intermediate layer," which they contend must be "separate and distinct."  The terms "separate and distinct" do not appear in Defendants' construction, their expert's declaration or in the intrinsic record.

Finally, Defendants rely on extrinsic general purpose and electronic dictionaries in an attempt to limit "doped with another element" to "small amounts" of material.  There is no support in the intrinsic record for that limitation and technical literature describes doping in excess of "small amounts."  Defendants also incorrectly import a functional limitation into this term.[1]

## II.   ARGUMENT

### A.   "Amorphous Material"

Gillette's proposed construction of "amorphous material" as "a material lacking long-range crystalline order" is consistent with:  (1) the properties of DLC, a claimed embodiment of the '513 Patent; (2) Gillette's statements during prosecution distinguishing amorphous materials, which lack long-range crystalline order, from "crystalline materials," which have long-range crystalline order; (3) the definition of "amorphous" set forth in the Glossary of the PVD Handbook cited in the specification of the '513 Patent; (4) the definition of "amorphous" set forth in the prior art '648 patent included within the file history of the '513 Patent; and (5) numerous chemistry and materials science textbooks, technical articles, and the declaration of MIT Professor Dr. Ross, all of which explain that the ordinary meaning of the term "amorphous material" is a material that lacks long-range crystalline order.  D.I. 286 at 4-10.

Defendants' construction for "amorphous" has been a moving target, from "non-crystalline and non-refractory material containing carbon" (Nov. 14, 2016) to "material having no detectable crystal structure" (Feb. 3, 2017) to the proposal appearing for the first time in their opening brief—"material having no detectable crystal structures."  D.I. 288, Ex. G; D.I. 249,

---

[1]      Defendants spend much of their brief and tutorial previewing their invalidity arguments.  Invalidity is not before the Court at the claim construction stage.  *See Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998).  Gillette will respond at the appropriate time.

Ex. A at 1; D.I. 289 at 15.[2]   At the time of the Joint Statement, Defendants proposed a construction in the singular, "material having no detectable crystal *structure*," which refers to the inability to detect a repeating ordered arrangement of atoms in a material.   But Defendants have pivoted again and now propose a construction in the plural, "material having no detectable crystal *structures*," which seems to refer to the inability to detect individual crystals.   But Defendants' own expert and their intrinsic support do not even refer to a material having no detectable crystal *structures*.   *See* D.I. 290, ¶¶ 26, 29.   Defendants' new construction is also contrary to the claim language, would improperly exclude DLC as a claimed embodiment, and is based on a flawed reading of the file history and extrinsic general purpose dictionaries.

### 1.   The Intrinsic Evidence Supports Gillette's Construction

Claim 1 is directed to a razor blade with, *inter alia*, "a layer of hard coating on said cutting edge, said hard coating being made of amorphous material containing carbon."   Claim 2 depends from claim 1, and provides "wherein said hard carbon coating comprises diamond-like carbon material."   The specification refers to DLC as a preferred embodiment.   D.I. 249, Ex. B at 2:62-63.   Defendants admit in their opening brief that DLC "is amorphous," D.I. 289 at 2, and that DLC recited in claim 2 is "an amorphous carbon material," D.I. 249, Ex. A at 1.

DLC contains nanocrystals within an amorphous matrix.   *See* Ross Decl. (D.I. 287) ¶¶ 29-32, 48; Ross Supp. Decl. ¶ 9.[3]   Contrary to their admission that DLC is amorphous,

---

[2]   To address Defendants' new proposed construction, Gillette has submitted herewith a Supplemental Declaration of Dr. Caroline A. Ross ("Ross Supp. Decl.").   Exhibits 1-12 are attached to Dr. Ross's Declaration (D.I. 287) in support of Gillette's opening brief and Exhibits 13-17 are attached to Dr. Ross's Supplemental Declaration.   Exhibits A-E are attached to the Joint Claim Construction Statement (D.I. 249), Exhibits F-G are attached to the Declaration of Mark J. Abate (D.I. 288) and Exhibits H-L are attached to the Supplemental Declaration of Mark J. Abate ("Abate Supp. Decl.") submitted herewith.

[3]   Ex. 13, Lifshitz, *Diamond-like carbon – present status*, Diamond and Related Materials 8 (1999) at p. 1668 ("All DLC films are substantially amorphous, but some micro or nano-crystalline inclusions of all carbon forms can be found in the amorphous matrix."); Ex. 14,

Defendants now argue that the presence of a nanocrystal in an amorphous material renders such a material not "amorphous." *See* D.I. 290, ¶¶ 31-32. Defendants' proposed construction cannot be correct because it would not only exclude a preferred embodiment directed to DLC, it would nullify and render meaningless dependent claims directed to DLC. Ross Supp. Decl. ¶¶ 10, 11, 16, 17; *see Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (construction that excludes preferred embodiment "is rarely, if ever, correct"); *Ortho-McNeil Pharm. v. Mylan Labs.*, 520 F.3d 1358, 1363 (Fed. Cir. 2008) (rejecting construction that would lead to "nonsensical result of not covering [a disclosed embodiment] and rendering several other dependent claims meaningless").

Defendants' reliance on a sentence from a book cited in the specification, which Defendants claim provides a definition for "amorphous," is also misplaced. D.I. 289 at 17-18. The PVD Handbook states that "[a]morphous materials are those that have no detectable crystal *structure*," but Defendants now seek a construction with "no detectable crystal *structures*."

---

Bhushan, Nanotribology and Nanomechanics (2005) at p. 830 ("Hard amorphous carbon (a-C) coatings, commonly known as diamond-like carbon or DLC (implying high hardness) coatings, are a class of coatings that are mostly metastable amorphous materials, but include a micro- or nanocrystalline phase."); Ex. 15, Robertson, *Deposition of Diamond-Like Carbon*, Phil. Trans. R. Soc. London A. (1993) at p. 280 ("The DLC is found to consist of nano-scale mixture of diamond grains embedded in an [amorphous carbon] matrix."); Ex. 16, Bhushan, *Chemical, mechanical and tribological characterization of ultra-thin and hard amorphous carbon coatings as thin as 3.5 nm: recent developments*, Diamond & Related Materials 8 (1999) at p. 1985 ("The prevailing atomic arrangement in the DLC coatings is amorphous or quasi-amorphous with small diamond (sp3), graphite (sp2) and other unidentifiable micro- or nanocrystallites."), p. 1987 ("Hard amorphous carbon (a-C) coatings, commonly known as diamondlike carbon or DLC (implying high hardness) coatings, are a class of coatings which are mostly metastable amorphous materials but include a micro- or nanocrystalline phase."); D.I. 287, Ex. 9, Bhushan, *Characterization of chemical bonding and physical characteristics of diamond-like amorphous carbon and diamond films*, J. Materials Research, Vol. 7, No. 2 (1992) at p. 404 ("The structure of DLC is predominantly amorphous with no long-range order. However, STM and other studies have found evidence of small, ca. 2 nm *sp2*-bonded graphitic domains cross-linked by a small number of diamond-like *sp-3* bonds.").

4

D.I. 249, Ex. E at p. 487 (emphasis added).[4]   Defendants also ignore that the Glossary in the PVD Handbook defines "crystal structure" as "[t]he ordered arrangement of atoms in a solid material that is characterized by the spacing between atoms and the direction from one atom to another.  The crystalline structure is comprised of repeating groups of atoms called unit cells." Ex. 17 at p. 786.  Thus, the term "crystal structure" refers to the ordered arrangement of atoms, not a nanometer size structure in an amorphous matrix.  Ross Supp. Decl. ¶¶ 14-15.  Further, Defendants omit the actual definition of "amorphous" in the Glossary of the PVD Handbook which is consistent with Gillette's proposed construction.  *See* D.I. 286 at 8.

> Finally, the following statement during prosecution also supports Gillette's construction:
>
> The claims have been amended to recite that the hard coating is made of "amorphous material," and, so limited, exclude crystalline material.  Such amorphous material includes "diamond-like carbon" ("DLC"), as recited in dependent claim 4, and "amorphous diamond material," as recited in dependent claim 5.

D.I. 249, Ex. C at GILLETTE-DSC-0220771.  Thus, Gillette distinguished amorphous materials from crystalline materials.  As explained in Gillette's opening brief, a person of skill in the art would know that crystalline materials have long-range crystalline order, whereas amorphous materials do not.  D.I. 286 at 4-5 & n.4; *see* Defs.' Tech Tutorial, Slide 13 ("crystalline materials have molecules or atoms in highly ordered repeating patterns" and "amorphous materials do not have an ordered structure, they lack any regularity and do not have repeating patterns like the atomic arrangement of crystalline materials.").

Nonetheless, Defendants argue that Gillette disclaimed the presence of any nanocrystalline material in an amorphous material.  Under Federal Circuit law, "[w]hen the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for

---

[4]    The '513 Patent references a different section of the PVD Handbook.  D.I. 249, Ex. B at 2:67-3:4.

justifying the conclusion is a high one.   For prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."  *Avid Tech. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016).   There was no such disclaimer here because Gillette never stated that an amorphous material cannot include some *nanocrystalline* material.   *Id.* (the "demanding standard for finding a disclaimer is not met" where prosecution statements are "readily susceptible to a narrower reading than the one needed to support [a] disclaimer conclusion");  *Golight, Inc. v. Wal-Mart Stores*, 355 F.3d 1327, 1332 (Fed. Cir. 2004) ("Because the statements in the prosecution history are subject to multiple reasonable interpretations, they do not constitute a clear and unmistakable departure from the ordinary meaning of the term 'rotating.'").[5]

Moreover, Defendants fail to mention in their brief that in the very same passage that they rely on for an alleged disclaimer, Gillette expressly informed the Patent Examiner that the claimed amorphous material includes DLC.   D.I. 249, Ex. C at GILLETTE-DSC-0220771 ("Such amorphous material includes 'diamond-like carbon'").   DLC is an amorphous material with no long-range crystalline order that contains nanocrystalline material.   D.I. 249, Ex. A at 1; Ross Decl. ¶¶ 29-32, 48; Ross Supp. Decl. ¶ 9; *supra* n.3.   Defendants' argument does not meet the high bar for showing a disclaimer because Gillette expressly stated that "amorphous material" includes DLC, a claimed embodiment.   *See, e.g., Forest Labs. v. Teva Pharm.*, C.A. No. 14-121-LPS, 2016 WL 54910, at *7 (D. Del. 2016) (no prosecution disclaimer where claims

---

[5]      Defendants' cases are inapposite as involving clear disclaimers.  *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1096 (Fed. Cir. 2013) (applicant adopted examiner's characterization of claim); *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) ("statement unambiguously reflects Multi–Tech's own understanding of its inventions … as being limited to the transmission of data packets over a telephone line."); *Gillespie v. Dywidag Sys.*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("Mr. Gillespie clearly used 'outer' to refer to the outside surface of the bolt head, and pointed out that the cylindrical outside surface of the [prior art] bolt head rendered it [insufficient].").

were directed to embodiments that were contrary to the alleged disclaimer); *Enova Tech. v. Initio Corp.*, C.A. No. 10-04-LPS, 2012 WL 6738398, at *4 (D. Del. 2012) (defendants "failed to meet their heavy burden of showing a 'clear and unmistakable' disavowal" where "specification discloses an embodiment" that is contrary to the alleged disclaimer).   Moreover, Gillette's statement during prosecution that amorphous material includes DLC is consistent with Gillette's proposed construction.  Ross Decl. (D.I. 287) ¶ 40; Ross Supp. Decl. ¶ 10.[6]

### 2.      Defendants' Extrinsic Dictionaries Support Gillette's Construction

None of Defendants' extrinsic dictionaries supports a construction of "amorphous" as "no detectable crystal structures."  *See* D.I. 289, Exs. 5-7.  Indeed, Defendants have not provided a single dictionary that contains their proposed language regarding "detectable" crystal structures, whereas Gillette provided numerous materials science and chemistry textbooks that describe "amorphous" as lacking long-range crystalline order.  *See* D.I. 286 at 5 n.4; Ross Decl. (D.I. 287) ¶ 28, Ex. 1-6.  And Defendants fail to mention other definitions in their general dictionaries that support Gillette's proposed construction.   For example, the American Heritage College Dictionary defines "amorphous" as "lacking distinct crystalline structure," but Defendants omit that "crystal" is defined in the same dictionary as "a homogenous solid formed by a repeating three-dimensional pattern of atoms, ions, or molecules and having fixed distances between constituent parts." Ex. H at 335.  Likewise, the McGraw Hill Dictionary defines "amorphous" as "pertaining to a solid which is noncrystalline, having neither definite form nor structure," but Defendants omit that "amorphous solid" is defined as "a rigid material whose structure lacks crystalline periodicity; that is, the pattern of its constituent atoms or molecular does not repeat

---

[6]      Defendants also argue that during prosecution Gillette stated that amorphous hard coatings are advantageous because they do not face the problems that can result from crystal growth.  D.I. 289 at 16.  Gillette did not suggest that the nanocrystalline material present in an amorphous hard coating would frustrate the efforts to obtain the desired coating thickness and tip radius.  Nor does Defendants' expert provide any such assertion.  *See* D.I. 290, ¶ 28.

periodically in three dimensions." Ex. I at 82. The Academic Press Dictionary of Science & Technology defines "amorphous" as "not having crystals, not crystalline," but Defendants fail to mention that "crystal" is defined as "any homogenous solid that has a regularly repeating atomic arrangement…." Ex. J at 557. In short, extrinsic dictionaries reinforce that an amorphous material lacks crystalline order that repeats periodically (*i.e.*, lacking in long-range crystalline order) and do not exclude materials have some nanocrystalline material in an amorphous matrix.

### B. "Overcoat Layer of Chromium Containing Material"

A jury can easily understand the term "overcoat layer of chromium containing material." The plain meaning of "overcoat" is accessible to the jury—for example, an overcoat is worn over a suit. Further, the meaning of overcoat layer is readily apparent from other claim language. Each claim specifies that the "hard coating" is on a cutting edge and the "overcoat layer" is "on said layer of hard coating." Thus, the jury will be able to understand from the term "overcoat layer" and the other claim language that the "overcoat layer" is over (or on top of) the hard coating.[7]

Defendants' proposal that "overcoat layer" be construed to mean an "intermediate layer of chromium containing material that improves adhesion to the layer of hard coating" is wrong for several reasons. First, Defendants' proposal for an "intermediate layer" creates ambiguity as to the placement of the overcoat layer and improperly conflates "overcoat layer" and "interlayer," another term in the specification and claims. Second, Defendants' requirement that the "overcoat layer" "improves adhesion to the layer of hard coating" imports a functional limitation that is contrary to the claim language.

---

[7]     Defendants' reliance on *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1356-57 (Fed. Cir. 2016), and *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) is misplaced because those cases involved the claim terms "custom linking relationship" and "marker substance" that had no plain meaning.

### 1.    Defendants' "Intermediate Layer" Construction Imports Unsupported Limitations into the Claims

Defendants' proposed construction as an "intermediate layer" is ambiguous as it does not define the structural relationship between the "overcoat layer" and the hard coating. *See* D.I. 286 at 16-17. However, to the extent Defendants now contend that "intermediate" simply means that the "overcoat layer" is "between" the layer of hard coating and the outer PTFE layer, *see* D.I. 289 at 9-10, that position would be consistent with Gillette's proposed construction of a layer "on top of the layer of hard coating." Moreover, Gillette's construction is also consistent with its statement during prosecution that the "overcoat layer" is "between an amorphous hard coating material and a PTFE layer." D.I. 249, Ex. C at GILLETTE-DSC-0220810.[8]

Contrary to Defendants' argument, Gillette did not argue during prosecution that the invention or the "overcoat layer" limitation required an "intermediate layer." Rather, in the portion of the prosecution cited by Defendants, Gillette stated without referring to the invention or claims that there was no motivation to combine the prior art because "Hahn teaches directly bonding the PTFE to the hard coating, thus teaching away from any use of an intermediate layer as in Lane." D.I. 249, Ex. C at GILLETTE-DSC-0220812. Thus, Gillette did not narrow the plain claim language to an intermediate layer. *See Grober v. Mako Prods.*, 686 F.3d 1335, 1341-43 (Fed. Cir. 2012) (no disclaimer where statements "d[id] not unambiguously focus on the characteristics of the [claimed invention]" and instead focused on elements in the prior art); *Eolas Techs. v. Microsoft Corp.*, 399 F.3d 1325, 1337-38 (Fed. Cir. 2005) (no disclaimer where

---

[8]    Because other language in the claims provides that the "overcoat layer" is on the layer of hard coating and that the PTFE layer is over the overcoat layer, a construction that the overcoat layer is between the hard coating and the PTFE layers would introduce unnecessary redundancy into the claims. *Merck & Co. v. Teva Pharm.*, 395 F.3d 1364, 1372 (Fed. Cir 2005) ("A claim construction that gives meaning to all the terms of a claim is preferred over one that does not do so."); *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1289-90 (Fed. Cir. 2010) (criticizing construction that rendered a claim term redundant).

statements "did not distinguish the '906 invention based on these features, rather such features were merely included in language that outlined [prior art]"); *Computer Docking Station Corp. v. Dell, Inc.,* 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply … if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features.").[9]

Defendants also argue that "intermediate" means "separate and distinct."  D.I. 289 at 9. This new limitation is not in Defendants' proposed construction, their expert's declaration or the intrinsic record.  Nor have Defendants explained what they mean by "separate and distinct." This appears to be a blatant attempt by Defendants to rewrite the claim term to manufacture a noninfringement defense.[10]

The intrinsic evidence does not support limiting the "overcoat layer" to a "separate and distinct" intermediate layer.  For example, each independent claim uses the transitional phrase "comprising," an open-ended term signaling that the claim can include materials in addition to those recited.  *See Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004). Independent claims 1, 20 and 25 further recite "a layer of hard coating … being made of amorphous material *containing* carbon" and "an overcoat layer of a chromium *containing* material on the layer of hard coating."  "[T]he claim term 'containing' is [also] open-ended [and]

---

[9]     The *Indacon* case, relied upon by Defendants, is inapposite because there the applicants' characterized the claimed invention and distinguished it from the prior art during prosecution. 824 F.3d at 1357.  Likewise, in *Inpro II Licensing. v. T-Mobile USA*, 450 F.3d 1350, 1354-55 (Fed. Cir. 2006) the applicants characterized the invention in the specification.

[10]     Defendants contend that the Accused Products do not infringe because they include only two layers.  Although infringement is not before the Court at the claim construction stage, Defendants' Accused Products have three layers:  a layer of carbon containing material, a layer of chromium containing material and a PTFE layer.  *See* D.I. 130, Ex. 20, Att. A at 3-4, 6-10 (excerpts of Gillette's infringement claim charts showing layers of carbon-containing material and chromium-containing material at B and C in FIGS. 1A, 1B and 3 and a PTFE layer at D in FIG. 3).

does not exclude the presence of additional unnamed ingredients." *Id.* at 1377.  Thus, the hard coating layer can include materials in addition to the recited amorphous material *containing* carbon, for example, chromium.  Similarly, the overcoat layer of a chromium *containing* material can include materials in addition to chromium, for example, carbon.[11]  Thus, according to the claims, both the hard coating layer and the overcoat layer can be made from carbon and chromium and need not be chemically or compositionally "separate and distinct."

The '513 Patent specification also recognizes that the hard coating and overcoat layers can have overlapping or even identical compositions.  *See* D.I. 249, Ex. B, 2:52-61 (indicating that the "*carbon containing materials* [for the hard coating layer] *can be doped with* other elements, such as …*chromium*"), 3:8-10 ("*Overcoat layer* 18 is preferably made of chromium containing material, *e.g.*, chromium or *chromium alloys*…"), cl. 8 ("*overcoat layer* consists of a chromium containing alloy….") (emphasis added).

Defendants suggest that the claims should be limited to the Figure 1 embodiment.  D.I. 289 at 10.  However, because the claim language and specification allow for the hard coating and overcoat layers to have overlapping or even identical compositions, there has been no clear and unequivocal disavowal of claim scope.

Finally, Defendants assert that "Gillette used the term 'overcoat' to refer to an … interlayer, a separate and distinct layer."  D.I. 289 at 9.  But, the '513 Patent describes and claims the "overcoat layer" as a different component than the "interlayer."  *See* D.I. 249, Ex. B at 1:31-36, 54-57; 2:36-51 (overcoat layer 18, interlayer 14); claim 1 (reciting "an overcoat layer"), claim 11 (depending from claim 1 and "further comprising an interlayer").  Where, as here, the

---

[11]     As an example, a hard coating layer "containing carbon" can be made of 60% carbon and 40% chromium, and an "overcoat layer of a chromium containing material" can also be made of 60% carbon and 40% chromium.

inventors used two different terms and ascribed different meanings to the terms in the claims and specification, Defendants' attempt to conflate their meanings should be rejected.  *See Allvoice Computing v. Nuance Commc'ns*, 504 F.3d 1236, 1247-48 (Fed. Cir. 2007) (different terms in specification and claims have different meanings); *Merck*, 395 F.3d at 1372.

### 2.    There Is No Basis For Reading a Functional Limitation into the Claims

Importing a functional "adhesion" requirement into "overcoat layer," as Defendants propose, is contrary to the claim language and the specification.  The "overcoat layer" is a structural term and does not recite any function, let alone the function of promoting adhesion. *See* D.I. 286 at 15-16 and cases cited therein.[12]

Moreover, the '513 Patent recognizes multiple advantages provided by the overcoat layer, and claim 18 demonstrates that when the inventors wanted to claim a function of the overcoat layer, they did so.  Claim 18 recites the blade of claim 1 "wherein said cutting edge has less rounding with repeated shaves than it would have without the overcoat layer."  Nowhere do the inventors claim that the "overcoat layer" must improve adhesion to the hard coating layer. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) ("None of the claims mention [function], an omission we find significant" because "[h]ad the inventors intended this limitation, they could have drafted the claims to expressly include it.").

Defendants' proposed "adhesion" functional limitation would also render other claim language superfluous.  For example, claim 8 depends from claim 1, and further adds that the "overcoat layer consists of a chromium containing alloy compatible with [PTFE]."  As Defendants concede, in order to promote adhesion, a layer must be compatible with an adjacent

---

[12]    Defendants' reliance on *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1317-18 (Fed. Cir. 2014), is misplaced because there the claim term had no plain and ordinary meaning and the specification described the feature as "one of the primary inventive contributions of the patent" and it was "implicated in every embodiment."

layer.  *See* Defs.' Tech. Tutorial, Slide 19 ("the adhesive layer must be compatible with the layers on either side of it…it must provide sufficient adherence to both the hard coating layer and the outer lubricating layer.").  Adopting Defendants' proposed construction would render claim 8's requirement that the overcoat layer is "compatible with [PTFE]" superfluous because an overcoat layer that promotes adhesion to the hard coating layer will necessarily be compatible with the PTFE.  *See Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored."); *Merck*, 395 F.3d at 1372; *Intervet*, 617 F.3d at 1289-90.

Moreover, the intrinsic record does not indicate that the "overcoat layer" necessarily must improve adhesion.  Defendants mischaracterize the patent specification in stating that "the key advantage of the chromium coating overcoat layer is that it improves adhesion."  D.I. 289 at 10. Rather, as stated in the specification, "[e]mbodiments of the invention may include one or more of the following advantages."  D.I. 249, Ex. B at 2:13-14.  The specification refers to improved adhesion, reduced tip rounding, minimizing increases in cutting forces, maintaining excellent shaving performance and maintaining excellent shaving characteristics as benefits provided by the overcoat layer.  *See, e.g., id.* at 2:13-23, 3:5-8, 3:12-14, 3:41-45, 3:64-67.  The prosecution history reiterates those functions and also refers to "increased strength and wear resistance" as provided by the overcoat layer.  D.I. 249, Ex. C at GILLETTE-DSC-0220771, 0220810, 0220812.  It is inappropriate to import any or all of those functions into claims that do not recite a function.  *See Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1218 (Fed. Cir. 2014) (rejecting a construction that would import a function where specification did not require function and the claim limitation "has another purpose as well"); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1326-37 (Fed. Cir. 2005) ("written description … sets forth multiple objectives … confirm[ing] that the

term 'baffles' should not be read restrictively."); *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d

1364, 1370 (Fed. Cir. 2003) (rejecting limitation of claim "in light of perceived purpose" of

invention; *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371-73 (Fed. Cir. 2014).[13]

With no support in the specification, Defendants allege that during prosecution Gillette

disclaimed any "overcoat layer" that does not improve adhesion.  Defendants have not met the

high bar necessary to show a clear and unmistakable disclaimer.  *See Forest Labs.*, 2016 WL

54910, at *7; *Enova Tech.*, 2012 WL 6738398, at *4.

First, Defendants rely on handwritten notes on a drawing in the file history.  D.I. 289

at 11.  Contrary to Defendants' representation, the drawing is not "an original drawing of

Figure 1 of the '513 patent."  Rather, the original Figure 1 appears at GILLETTE-DSC-0220525,

D.I. 249, Ex. F.[14]  In any event, the notes have no bearing on the construction of "overcoat layer"

because prosecution disclaimer requires that the applicant's statements during prosecution

represent a clear and unmistakable disavowal of claim scope.  *Avid Tech.*, 812 F.3d at 1045.

There is no evidence that Gillette prepared the notes or even saw them during prosecution, much

less adopted them as a description of the invention.  An applicant cannot make a clear and

unmistakable disavowal of claim scope based on something in the file history that it did not see

or  have an opportunity to rebut.  *See Eolas*, 399 F.3d at 1337 (examiner's statement of reasons

---

[13]     Defendants' reliance on Gillette's Complaint is also misplaced.  Not only is the Complaint extrinsic evidence, but it too refers to a number of benefits achieved by the inventions and the overcoat layer.  *See* D.I. 98 at ¶ 28 (referring to improved adhesion, reduced tip rounding, minimizing increases in cutting forces and maintaining excellent shaving performance); D.I. 1 at ¶ 17 (same).

[14]     That page contains the original drawings as confirmed by the label appearing on the following page, D.I. 249, Ex. F at GILLETTE-DSC-0220525.1.  *See* 37 C.F.R. 1.84(c).  In addition, the page cited by Defendants provides "Print of Draw [] As Originally []," D.I. 249, Ex. F, GILLETTE-DSC-0220526, which indicates that it is not an original drawing, but rather a "Drawing print," a term used by the PTO to refer to copies placed in the file, MPEP 608.02, p. 600-82 (7th ed. July 1998).

for allowance "does not evince a clear disclaimer").  Moreover, the notes neither define the claim

term overcoat layer nor distinguish prior art and therefore do not constitute a disavowal.  *See*

*Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009) ("terse" examiner's

interview summary that did not define a claim term or distinguish prior art was not a "clear and

unmistakable disavowal").

Defendants also mischaracterize Gillette's statements during prosecution.  D.I. 289 at 12.

The statement concerning "an adhesion promoting layer II containing chromium" was made with

respect to the disclosure of the Lane prior art patent, not with respect to the claimed invention.

D.I. 249 Ex. C at GILLETE-DSC-0220811.  Gillette distinguished the claimed invention from

Lane based on Lane's lack of an amorphous hard coating layer.  *Id.*  Gillette did not equate

Lane's adhesion promoting layer II with the claimed overcoat layer.  Gillette's statement

characterizing the prior art does not constitute clear and unmistakable disavowal of claim scope.

*See, e.g.*, *Grober*, 686 F.3d at 1341-43 (no prosecution disclaimer where statements "d[id] not

unambiguously focus on the characteristics of the [claim invention]" and instead focused on the

elements in the prior art); *Eolas*, 399 F.3d at 1337 (applicant distinguished prior art based on a

feature other than the claim term for construction and therefore did not limit its scope).

With no support for their imported "adhesion" functional limitation in the intrinsic

record, Defendants look to extrinsic evidence for support.  D.I. 289 at 13-14.  Defendants point

to the prosecution of a Japanese application assigned to Gillette.  First, statements made during

the Japanese prosecution cannot be used to interpret the '513 Patent claims because the Japanese

application has different inventors than the '513 Patent, D.I. 289, Ex. 3 at PACE-037180 (not

including '513 Patent inventor Hahn), and the claims in Japan did not use the term "overcoat

layer," *id.* at PACE-037183-86 (claim language "protective film layer").  *See N. Telecom Ltd. v.*

*Samsung Electrs. Co.*, 215 F.3d 1281, 1296 (Fed. Cir. 2000) (rejecting statements in Japanese application that were "construing terms in different claims in a different application made to distinguish different references according to different legal standards"); *Ventana Med. Sys. v. Biogenex Labs.*, 473 F.3d 1173, 1184 (Fed. Cir. 2006) (no disclaimer during prosecution of a related application because of differences in claim language). Second, Defendants provide no factual or legal basis for concluding that the statement relating to the "concept of the invention" in the Japanese application is in anyway limiting. Improved adhesion was only one of several possible advantages of the invention mentioned in the Japanese application and during its prosecution. D.I. 289, Ex. 3 at PACE-037216 (referring to improved adhesion, reduced tip rounding, suppression of increases in cutting forces, maintaining excellent razor blade performance) (*citing* to Japanese patent specification at PACE-037189, PACE-037191). Third, Defendants fail to show that the Japanese application has any relevance to construction of the '513 Patent claims under U.S. patent law. *See AIA Eng'g v. Magotteaux Int'l*, 657 F.3d 1264, 1279 (Fed. Cir. 2011) (giving no weight to foreign prosecution history noting "our precedent cautions against indiscriminate reliance on the prosecution of corresponding foreign applications in the claim construction analysis."); *TI Grp. Auto. Sys. v. VDO N. Am.*, 375 F.3d 1126, 1136 (Fed. Cir. 2004) (statements in Japanese application did not constitute disclaimer noting "varying legal and procedural requirements for obtaining patent protection in foreign countries"). For the above reasons, the statements in Japan should be given no weight for the purposes of construction of the claims of the '513 Patent.[15]

---

[15]     Defendants' cases are distinguishable. In *Microsoft*, 357 F.3d at 1350, the Federal Circuit relied on statements made regarding the same claim term in related applications before the USPTO. Likewise, *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 858 (Fed. Cir. 2014), relied on statements made in a European application that defined the same claim language at issue. The Court "cautioned against indiscriminate reliance on foreign file histories" due to

Defendants also look for support for their functional "adhesion" requirement to statements made during prosecution of an unrelated U.S. patent application assigned to Gillette. D.I. 289 at 13-14.  This application is also not relevant.  It has a different specification, different claims, different inventors and is later in time.  *N. Telecom*, 215 F.3d at 1296; *Ventana*, 473 F.3d at 1173; *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1104-05 (Fed. Cir. 2002).  Defendants fail to explain how there could be a clear and unequivocal disclaimer or provide any authority for limiting the scope of the '513 Patent claims in such a situation.

### C.      "Doped With Another Element"

Gillette's construction of "doped with another element" as "with another element added" has direct support in the claim language, the specification's description of dopants as "additives," and use of the term "doped" in technical references related to DLC coatings.  Defendants, on the other hand, rely on irrelevant extrinsic electronics and general purpose dictionaries in an attempt to limit the term to "small amounts," and to graft on a functional limitation—"to modify certain properties of the coating"—that have no support in the intrinsic record.[16]

### 1.      Defendants' "Small Amounts" Construction Imports Unsupported Limitations into the Claims

The claim language does not limit the amount of an element that is added to the hard coating.  For example, claim 35 is directed to a razor blade with, *inter alia*, "a layer of a hard carbon containing material, doped with another element."  Claim 36 further adds that the element is a metal, while claim 37 further adds that the metal is chromium.  None of the claims set a limit on the amount of the doped element.

---

"the varying legal and procedural requirements for obtaining patent protection in foreign countries."  *Id.*

[16]      Defendants' proposed construction also seeks to limit the term to an element that is "introduced into the material," rather than added to the material, as described the specification. Defendants cite no evidence or even include argument as to why the term should be so limited.

Claim 19, which depends from claim 1, requires that the "hard coating … being made of amorphous material containing carbon" of claim 1 be "doped with another element." Defendants argue that the "dopant is introduced to the hard coating only in small amounts in order to maintain the amorphous characteristic of the coating." D.I. 289 at 20. Claim 19 does not limit the amount of dopant. If, in an accused product, a dopant is added in an amount that renders the hard coating of a razor no longer amorphous, then there may be an infringement issue concerning whether the separate "amorphous" limitation is satisfied. But that has no bearing on the meaning of "doped with another element." Moreover, Defendants' argument is improper because claims 28-38 refer to doping but do not require an amorphous carbon-containing material. *Acromed Corp. v. Sofamor Danek Grp.*, 253 F.3d 1371, 1382 (Fed. Cir. 2001) (term should be interpreted consistently throughout claims).

Neither the specification nor the file history set any limit on the amount of a doped element. As set forth in the specification, "[t]he carbon containing materials can be doped with other elements, such as tungsten, titanium or chromium by including these additives, for example in the target during application by sputtering" without limiting the amount of dopant. D.I. 249, Ex. B at 2:57-61. And the prior art '648 Patent in the certified file history states that dopants may be added to the carbon coating "even at concentrations as high as 50 atomic %." D.I. 249, Ex. C at GILLETTE-DSC-0220875, at 6:64-67.

Likewise, technical literature regarding doped DLC coatings does not limit the amount of dopant to "small amounts."[17] Indeed, the prior art uses the term "doped" interchangeably with

---

[17] Ex. K, Wu & Hon, *Thermal stability of diamond-like carbon films with added silicon*, Surface & Coatings Technology 111 (1999) at p. 134, 135, 137 (describing silicone-doped DLC, with doping up to 19.2%); Ex. L, Fan et al., *Z-contrast imaging and electron energy-loss spectroscopy analysis of chromium-doped diamond-like carbon films*, Applied Physics Letters,

"added," consistent with Gillette's proposed construction.  Ex. K, at 134, 135, 137 (referring to "[d]iamond-like carbon (DLC) films with added silicon content from 0 to 19.2 at %" as "silicone-doped films").  This technical literature demonstrates how a person of skill in the art understood the "doped" term.  *Vitronics*, 90 F.3d at 1584 ("[P]rior art ... whether or not cited in the specification or the file history ... can often help to demonstrate how a disputed term is used by those skilled in the art."); *MIT v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006) (technical references showed "what was known in the art at the time").

With no support in the intrinsic record for their proposed construction, Defendants rely on inapposite extrinsic definitions from an electronics dictionary and general purpose dictionaries.[18]  These dictionaries cannot be used to overcome the meaning of the "doped" term found in relevant prior art literature on carbon-based coatings.  *See Vanderlande Indus. v. I.T.C.*, 366 F.3d 1311, 1321 (Fed. Cir. 2004) ("[A] general-usage dictionary cannot overcome credible art-specific evidence of the meaning … of a claim term.").

### 2.    There Is No Basis For Reading a Functional Limitation into the Claims

Finally, Defendants seek to include the clause "to modify certain properties of the coating" to limit the type of dopant that is added to a coating.  This is an inappropriate attempt to graft on

---

Vol. 17, No. 18 (Nov. 1999) at p. 2740 (describing chromium-doped DLC, with doping up to 12%).

[18]    D.I. 289, Ex. 9 is from the inapposite technical field of electronics, in which dopants are considered "impurities."  There is no suggestion in the '513 Patent that the claimed dopants are "impurities."  Moreover, that dictionary does not limit the amount of dopant to any particular amount.  The general dictionaries that Defendants cite are equally unhelpful.  D.I. 289, Ex. 8 again introduces the concept of impurities.  It also does not limit the dopant to small amounts.  Instead, it recognizes that the dopant is "added usually" in minute amounts, recognizing that a dopant is not limited to small amounts in some contexts.  The definition relied on by Defendants in D.I. 289, Ex. 10 addresses additives in the food context.  That dictionary also defines additive as "characterized by addition"—a definition consistent with Gillette's construction.  The last general dictionary Defendants cite also includes a definition of "additive"—"marked by or involving addition"—that supports Gillette's construction.  D.I. 289, Ex. 11.

a "purpose" or functional limitation onto a structural element.  *See* cases collected in Gillette's Opening Brief, D.I. 286 at 15.

Neither the claims nor the specification limit the type of dopant to one that is added to "modify certain properties of the coating."  Defendants do not answer the question of what "certain properties" must be modified in order to fall within the scope of the claim.  Defendants' proposal—which implies that some properties may be modified, but not others—is vague, has no support in the intrinsic record, and should be rejected.  Moreover, Defendants rely on extrinsic electronic and general purpose dictionaries that are not relevant here.  *See supra* n.19.

## III.    CONCLUSION

Gillette respectfully requests that the Court adopt its proposed claim constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Mark J. Abate
Jeffrey A. Simes
Steven J. Bernstein
Alexandra D. Valenti
Tyler Doh
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
(212) 813-8800

Jennifer A. Albert
Charles T. Cox
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC  20001
(202) 346-4000

Elaine Herrmann Blais
Kevin J. DeJong
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
(617) 570-1205

March 20, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 20, 2017, upon the following in the manner indicated:

John W. Shaw, Esquire                                    *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
Andrew E. Russell, Esquire
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE  19801
*Attorneys for Defendants*

Charles K. Verhoeven, Esquire                           *VIA ELECTRONIC MAIL*
Terry L. Wit, Esquire
Morgan W. Tovey, Esquire
James D. Judah, Esquire
Kevin Smith, Esquire
John McCauley, Esquire
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
*Attorneys for Defendants*

F. Christopher Mizzo                                     *VIA ELECTRONIC MAIL*
Helena D. Kiepura, Esquire
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005
*Attorneys for Defendants*

Bao Nguyen, Esquire                                     *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
*Attorneys for Defendants*

Gegory S. Arovas                                    *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendants*

*/s/ Rodger D. Smith II*
_____
Rodger D. Smith II (#3778)