```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -
      THE GILLETTE COMPANY,
 4                                   :      CIVIL ACTION
              Plaintiff,             :
 5                                   :
                  v.                 :
 6                                   :
      DOLLAR SHAVE CLUB, INC., DORCO :
 7    COMPANY LTD., and PACE SHAVE, INC., :
                                     :      NO. 15-1158-LPS
 8            Defendants.
                                 - - -
 9
                          Wilmington, Delaware
10                     Tuesday, September 19, 2017
                          Oral Argument Hearing
11
                              - - -
12
      BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
13
      APPEARANCES:                   - - -
14

15              MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  RODGER D. SMITH, II, ESQ.
16
                     and
17
                GOODWIN PROCTER, LLP
18              BY:  MARK J. ABATE, ESQ.,
                     (New York, New York)
19
                     and
20
                GOODWIN PROCTER, LLP
21              BY:  WILLIAM M. JAY, ESQ., and
                     BRIAN BURGESS, ESQ.
22                   (Washington, District of Columbia)

23                      Counsel for The Gillette Company

24
                                 Brian P. Gaffigan
25                               Registered Merit Reporter
```

```
1    APPEARANCES:   (Continued)

2
                      SHAW KELLER, LLP
3                     BY:  DAVID M. FRY, ESQ.

4                         and

5                     QUINN EMANUEL URQUHART & SULLIVAN, LLP
                      BY:  TERRY L. WIT, ESQ.
6                         (San Francisco, California)

7                             Counsel for Dollar Shave Club, Inc.,
                              Dorco Company Ltd., and Pace Shave, Inc.
8

9

10

11

12                            - oOo -

13                     P R O C E E D I N G S

14              (REPORTER'S NOTE:  The following oral argument

15   hearing was held in open court, beginning at 3:03 p.m.)

16              THE COURT:  Good afternoon.

17              (The attorneys respond, "Good afternoon, Your

18   Honor.")

19              THE COURT:  I'll have you put your appearances

20   on the record for us, please.

21              MR. SMITH:  Good afternoon, Your Honor.

22              THE COURT:  Good afternoon.

23              MR. SMITH:  Rodger Smith from Morris Nichols on

24   behalf of the plaintiff Gillette.  I'm joined at counsel

25   table with my co-counsel from Goodwin Procter, William Jay,
```

1      Mark Abate, and Brian Burgess.

2                  THE COURT:  Welcome to all of you.

3                  MR. SMITH:  Thank you.

4                  MR. FRY:  Good afternoon, Your Honor.

5                  THE COURT:  Good afternoon.

6                  MR. FRY:  David Fry from Shaw & Keller on behalf

7      of the defendants.  With me today is Terry Wit from Quinn

8      Emanuel.

9                  THE COURT:  Welcome to you as well.

10                  MR. WIT:  Good afternoon.

11                  THE COURT:  You can have a seat for a moment.

12                  So we are here for argument on defendants DSC's

13     motion to recognize the automatic stay pending appeal.  I

14     assume that you are all aware that we got an order earlier

15     today from the Third Circuit that denied a motion to stay

16     filed by DSC in the Third Circuit.  I will certainly want to

17     know what you all think are the implications of that order

18     for the issue in front of me.  And we have 30 minutes a

19     side.

20                  So with that, we'll turn to defendants first.  I

21     think it's best if you start there with this development a

22     few hours ago.  What impact does it have?

23                  MR. WIT:  Certainly, Your Honor.  I am pleased

24     to do so, again appearing on behalf of Dollar Shave Club,

25     Dorco, and Pace, all three defendants today.

1          As the Court has indicated, there was a ruling

2    earlier this morning out of the Third Circuit on the motion

3    to stay.  The brief background to that is that, as the

4    Court is aware, as soon as -- after the Court's order

5    issued on August 7th, two days later, defendants filed a

6    notice of appeal to the Third Circuit.  Defendants believe

7    that under the *Ehleiter* case, that appeal automatically

8    divests this court of jurisdiction, and we notified Gillette

9    of that belief.  Gillette declined to agree with that

10   interpretation.  Accordingly, there was letter correspondence

11   with the Court about that issue.

12          The Court then ultimately ordered or allowed --

13   denied the request based on the letters, requested further

14   briefing, allowed it on an expedited basis, which we then

15   briefed.  And the Court scheduled oral argument for today,

16   September 19th, which is roughly six weeks after when we

17   filed the notice of appeal, give or take.

18          Under those circumstances, because it was not

19   clear to the defendants when the Court would be able to

20   actually issue a ruling in light of how busy the Court's

21   docket is and how busy the Court's calendar is, which we

22   acknowledge, also which is to say we appreciate you hearing

23   the motion even in light of those issues, there are consider-

24   able burdens on the defendants in continuing to proceed in

25   the District Court mainly related to discovery in terms of the

1    number of depositions, including the apex deposition of

2    Michael Dubin, the CEO of Dollar Shave Club, which is

3    happening down the street as we speak, as well as numerous

4    written discovery and other issues costing literally seven

5    figures a month in legal fees to litigate.

6              In light of the fact that we do not know when

7    there would ultimately be a ruling and the prejudice that was

8    being entailed by the defendants in having to continue both

9    in the District Court and in the Third Circuit, we filed an

10   emergency motion the day after receiving the calendaring for

11   the oral argument in the Third Circuit requesting interim stay

12   of this action until the Third Circuit would resolve the

13   ultimate motion to stay and hear the appeal.

14             As you saw this morning, the Third Circuit

15   denied that motion solely on the basis that the Court has

16   its hearing scheduled for today, which we're all here now

17   for.

18             Our belief is that based on the order, although,

19   of course, I can't speak for the Third circuit, it appears

20   to me from the text of the minute order that the Court, the

21   Third Circuit just hasn't had time to fully consider the

22   issues on the emergency motion to stay.  Today's hearing is

23   now upon us and felt that in light of the circumstances, it

24   might as well wait for what I assume and it may assume will

25   be an expedited ruling by the Court following today's

1    hearing at some point.  We acknowledge it's unusual.

2              THE COURT:  So you had two motions for a stay in

3    front of the Third Circuit:  an emergency motion for a stay,

4    and then an interim one.  So there is still a request for a

5    stay with them?

6              MR. WIT:  It was briefed as a single motion, you

7    know, one set of papers requesting a stay pending resolution

8    of the appeal and, in the interim, requesting a stay pending

9    resolution of that motion to stay.  And it's not entirely

10   clear to me which of those was denied.  Based on the order,

11   it could be both or it could be only the interim stay request

12   in light of the Court's reference to this hearing today.

13             Certainly, we acknowledge that it is unusual

14   obviously to proceed in both in the District Court and in

15   the Third Circuit on a motion to stay but, candidly, we felt

16   like we had no choice under the circumstances, and so that

17   is what we did.

18             THE COURT:  So in that briefing, did you make

19   the argument to them that the stay of these proceedings was

20   automatic and that this Court was divested of jurisdiction?

21             MR. WIT:  We did.  We made similar arguments

22   under the *Ehleiter* case as a precedent in support of the

23   interim stay as well as the motion to stay.

24             THE COURT:  I haven't reviewed the briefs, I

25   think they're under seal, but I reviewed the briefs in front

1     of me, and I take it they have similar arguments from what

2     you are saying.

3                 How can I conclude from today's order anything

4     other than that they have looked at that argument and they

5     have decided that I'm not divested of jurisdiction and that

6     whatever stay maybe should be entered is not an automatic

7     stay?

8                 MR. WIT:  Well, I think that based on the

9     reference in the minute order to the Court's hearing on

10    September 19th, the only way to read the order is to

11    understand that what the Court has held is that this Court

12    has jurisdiction to hear the pending motion, as it is doing,

13    not necessarily that the Court has reached an issue on the

14    merits of whether, for example, the *Ehleiter* is binding

15    precedent, whether the *Nken* Supreme Court case overruled

16    it or abrogated in any way or all the other issues that

17    are before the Court today in the briefing in this court.

18                THE COURT:  How could I, as a legal principle,

19    have jurisdiction to hear this motion today if you are

20    correct in your underlying argument that I was divested of

21    jurisdiction upon the filing of your notice of appeal?

22                MR. WIT:  Admittedly, it is a bit of a strange

23    posture, but the motion that is presently before the Court

24    was not a motion to stay, it was a motion to recognize that

25    there is an automatic stay in place, and that is another

1    reason why we didn't move for a discretionary stay.

2              In addition to that, our view is that the stay

3    is automatic.  But if you look at other Courts in other

4    Circuits that have considered this issue -- other District

5    Courts and other Circuits that have considered the issue,

6    it is often the case that this will come up in the context

7    of a motion to stay in the District Court after the Notice

8    of Appeal is filed and the Court retains its jurisdiction to

9    hear a motion to stay in the management of its docket under

10   that sort of procedural posture.

11             We were not able to locate a case within the

12   Third Circuit that explicitly dealt with that issue in terms

13   of how do you tee up a motion like that if the other side

14   does not recognize that the stay is divested, but that has

15   happened commonly as reflected in the opinions of the other

16   Circuits that are in the majority rule of the divestment.

17             THE COURT:  What is the status of the rest of

18   the appeal phase?  Have you done the briefing or is that

19   motion being transferred to the Federal Circuit?

20             MR. WIT:  So when the appeal was filed, there

21   was a Clerk Order that was issued, an Order to Show Cause

22   because the Clerk had noted this was a patent case, obviously,

23   as to why this case should not be transferred to the Federal

24   Circuit, requested briefing on the Order to Show Cause for

25   both sides.

1          Both side have filed their briefing.  Under the

2     *Medtronic* case, it is clear that the Third Circuit precedent

3     -- this was cited in our briefing as well.  The Third Circuit

4     has reached the conclusion that it has jurisdiction over FAA

5     motions to appeal whereas the Federal Circuit has reached the

6     opposite conclusion.

7          We briefed that issue.  The defendants have

8     briefed the -- not necessarily briefed the opposition of the

9     issue.  They recognize that the Third Circuit precedent is

10    binding, but they want to reserve their decision in the event

11    that it goes to an en banc review or to the Supreme Court, and

12    then the Clerk's Office referred the issue of jurisdiction to

13    the Merits Panel.

14         There has not been any schedule for briefing

15    on the merits as of this time, but those preliminary

16    jurisdictional papers have been filed as well as the typical

17    case opening papers.  There are motions to seal certain of the

18    papers involved in the motion that was denied this morning.

19         THE COURT:  Has anybody moved to expedite the

20    appeal?  And either way, if this case is stayed, when should

21    I expect that appeal to be done in your guess?

22         MR. WIT:  Neither side has moved to expedite

23    the appeal as of this time.  Our view is that because of

24    the stay issues that are on the table, that was the proper

25    course to take initially.  If the stay is denied in this

1     Court -- and/or if it's denied, it's reviewed in the Third

2     Circuit, then I would expect to move to expedite the appeal,

3     but neither side has done so at this point.

4               In terms of how quickly the appeal will be

5     resolved, you know, we're hoping for a short briefing

6     schedule to have it done before the arbitrability trial that

7     the Court has considered scheduling, the parties have said

8     they're available for in January, but we -- obviously, we

9     don't control the briefing schedule.  That will be set by

10    the Third Circuit.

11              THE COURT:  So I do want to talk about the

12    possibility of a discretionary stay.

13              MR. WIT:  Sure.

14              THE COURT:  Before we get quite to that, is it

15    your position in that light of the Third Circuit's order

16    today, I do have jurisdiction to consider a discretionary

17    stay or is it still your position I don't have discretion to

18    do that?  We're going to talk about whether I would exercise

19    that discretion, but I just want to first understand what is

20    the defendants' position as of now as to whether I even have

21    jurisdiction to do that?

22              MR. WIT:  Well, our view again is that the Notice

23    of Appeal automatically divests the Court of jurisdiction to

24    continue with the merits of the case.

25              This is a strange area of the law, candidly,

1    because when you look at the cases, as we said, we couldn't

2    find a case directly on point in the Third Circuit on this

3    particular issue.  These motions are often teed up in the

4    context of a District Court motion that is made after the

5    Notice of Appeal is filed even in the Circuits that have

6    adopted the Majority Automatic Divestment Rule, and those

7    motions often contain a motion for a discretionary stay.

8           So it seems to be, and there is law review

9    articles, including one from the ABA that we didn't include

10   in the papers because we thought it was additive, but to

11   say that the practice can be to file a motion, a dual motion

12   for a discretionary stay on top of a motion effectively to

13   recognize the automatic stay.

14          In this circumstance, we did not file a motion

15   for a discretionary stay both because we felt the automatic

16   stay was in fact automatic and because we had previously

17   filed a motion for a discretionary stay which was one of

18   the motions that rejected by the Court on August 7th, so we

19   didn't want to bombard the Court with yet more additional

20   paper on the issue.

21          That said, in light of the fact that the Third

22   Circuit has indicated that the Court should proceed today

23   and hear the motion that is on the table, whether that means

24   they will then consider it after it has been fully briefed or

25   what happens next, I think the Court probably does retain

1    jurisdiction at least in other Circuits where District Courts

2    have raised this issue.  That is, what has been held, we just

3    haven't seen that in the Third Circuit, and I am happy to talk

4    about those factors.

5              THE COURT:  Yes.  Let's assume for the sake of

6    argument, at least, that I have jurisdiction to exercise

7    discretion.  If I do that, why presumably should I stay the

8    case?

9              MR. WIT:  Let me shift to that now.  It is at

10   the back of my outline.

11             THE COURT:  Well, move it up.

12             MR. WIT:  Let me move it up.

13             The discretionary stay factors, they're

14   obviously well known to the Court, so I won't belabor the

15   point, but just do the wind up to the argument.

16             There is four elements:

17             You need a strong showing of a likely success on

18   the merits.

19             You need some sort of irreparable harm or injury

20   on the moving party; here, the defendants.

21             Third, you need to consider whether there is an

22   injury to Gillette, as the plaintiff here, if the stay is

23   entered.  And then,

24             Fourth, you consider the public interest.

25             And you balance those factors.  Historically,

1  the cases seem to indicate that the first two factors are

2  the most important, but it is a balancing test.

3            As those factors weigh into it here and taking

4  them in order:

5            On the first factor, showing likelihood of

6  success on the merits, we think that the Court's own order

7  of August 7th recognizes that.  If you refer to the order at

8  Pages 3 and 4 and Note 2, and then again on Page 10, there

9  are indications that the Court, although not obviously not

10  yet ruling on the issue because it found there was an issue

11  of material fact, it indicated that it found that the ITC

12  Tribunal opinion which held there was arbitrable issues

13  here and that it would assert jurisdiction and the claims

14  asserted in this litigation are encompassed by the covenants

15  not to sue in the settlement agreement that is at issue and

16  the arbitration clause.

17            The combination of fact that both the ITC has

18  already ruled that based on a more fulsome record than was

19  before Judge Burke or this Court, No. 1.  And,

20            No. 2, the Court's indication that there was a --

21  and this is a quote -- "a likelihood that the parties

22  contracted to resolve at least portions of their present

23  dispute outside of the federal court."

24            And we think that that certainly meets of standard

25  of showing there is at least some likelihood of success.

1    We're going to have a one ruling from a co-pending arbitration

2    where we did succeed, and Gillette's similar motion was

3    rejected or its position was rejected identical to what it is

4    asserting here.  And then we also have the Court's comments,

5    subject, of course, to the trial, if it is held.  We think

6    that meets the first element.

7              As to the second element --

8              THE COURT:  Yes.  Before you move on, I mean so

9    it is an unusual posture because, well, we denied the stay

10   request.  It was to set a trial to resolve these material

11   factual disputes.

12             In assessing the likelihood of success on

13   appeal, it seems to me, but straighten me out if I'm wrong,

14   that if the Third Circuit, looking at it, agreed with what

15   I said in my opinion, namely that the tribunal has a well

16   reasoned opinion to believe that at least some of this is

17   arbitrable, isn't it likely they would affirm me and say go

18   ahead and have that trial and figure out if all of it should

19   be arbitrated?

20             MR. WIT:  Well, that is, of course, possible.  I

21   don't know whether it's likely or not, but that is of course

22   one outcome.

23             THE COURT:  It is your burden to show it is

24   likely.

25             MR. WIT:  Right.

1              THE COURT:  When we say "success on appeal,"

2    presumably you have to do something to alter the order of

3    this Court.

4              MR. WIT:  Right.  And so our view -- and also in

5    some ways this gets to the notion of frivolousness; right?

6    There was a lot of, and actually no briefing really much on

7    the issue of frivolousness under the *Ehleiter* standard, but

8    there are somewhat overlapping issues.

9              The defendants' appeal is going to present at

10   least two substantial issues, if not more:

11             one is whether the Court erred in lacking -- in

12   finding that the tribunal lacked authority to determine its

13   own jurisdiction.  And,

14             Secondly, even if it was proper to make that

15   finding, whether the Court applied the wrong legal standard

16   by giving Gillette the benefit of all reasonable doubt and

17   inferences, basically summary judgment standard on the

18   revocation defense, versus applying a much more stringent

19   standard which is required by New York law that Gillette

20   prove out its defense that there is not an agreement to

21   arbitrate by clear and unambiguous evidence of a novation

22   or a waiver, whichever way you want to characterize their

23   revocation defense.  And that is particularly where New

24   York law says that any ambiguity on that issue should be

25   resolved in the movant's favor, meaning here the defendants.

1            So we think that -- and we recognize obviously

2   Your Honor disagrees with those issues or you wouldn't have

3   issued the order that affirms Judge Burke's order, but in

4   our view, certainly that doesn't render the appeal frivolous

5   to the extent that that is going to be considered by the

6   Court today, even though Gillette did not make that argument

7   under the automatic divestiture cases.

8            But we think for similar reasons, that is a

9   "thumb on the scale" in favor of meeting the likelihood of

10  success on the appeal.  These are issues that we felt like,

11  again subject to the Court's disagreement, were clear under

12  the New York law.  We feel like we have a strong appeal or

13  we wouldn't have taken it.

14            THE COURT:  Okay.  You can move on.

15            MR. WIT:  On the second element, which is the

16  irreparable injury, as I indicated before, defendants in

17  their view have a clear-cut arbitration agreement from

18  2008.  There was no fraud in getting it.  It covers this

19  case.  And as the ITC tribunal has found, the motions to

20  stay were filed some 15 months ago, shortly within I think

21  four days of when the arbitration was filed, in June of 2016.

22            We recognize again the Court has a very busy

23  docket and a very busy calendar, but we have now engaged

24  in 15 months of discovery.  There is another month of fact

25  discovery left before the close date.  During that time,

there is some 10 to 12 depositions including several third
parties that are coming.  There are multiple outstanding
written discovery requests, including each side having
served on 50 to 75 requests for admission in the last few
days.  There are multi-interrogatories that have to be
served, and there are others where one side or the other has
demanded other additional responses.

There are likely to be additional document
discovery issues and document production that the parties
continue to argue about.  Off the top of my head, I think
there are six or eight pending discovery requests, four
of which I think were already teed up in a letter to the
Court, which the Court held in abeyance until after this
particular hearing, and that is all just in the next month
in fact discovery in locations around the country as well
as potentially Korea.

At the same time, obviously, the parties are
winding up their expert discovery.  They're retaining
experts.  They're working through that.  The expert
discovery deadlines follow upon that.

So in addition to the parties' fact discovery as
well as the court having to adjudicate what are likely to
be many different disputes as things wind down, we have
the expert discovery as well as we have invalidity, final
invalidity contentions coming up as well as the rest of the

1    case after that.

2              And as I indicated before, every month that goes

3    by, the defendants are incurring over a million dollars in

4    legal expenses as this continues in derogation of their

5    arbitration rights.  So we find that harm to be significant,

6    and we think that it is irreparable, particularly in FAA

7    context where the entire purpose of the bargain was to avoid

8    being in the federal court in the first place.

9              THE COURT:  So the financial harm, of course,

10   could be repaired by Court order but the loss of the

11   arbitration or ability to have your dispute resolved in

12   arbitration presumably is irrevocable?

13             MR. WIT:  Certainly, and I focus on the

14   finances because they're easy to quantify, but there is much

15   distraction obviously to the clients that are involved here,

16   including Mr. Dubin's deposition today as the CEO, the

17   highest ranking official in Gillette/Proctor & Gamble,

18   scheduled to be deposed on December 6th.  There is a pending

19   to quash a subpoena they served on me personally in San

20   Francisco, so there is another federal court involved as well.

21             So there are distractions to the parties in

22   addition to the cost.  They have to collect these documents

23   that have to be prepared, et cetera.  Also, it's not just

24   the loss of the rights to proceed in the arbitration.

25   Everything that is produced in this case, whether it is fact

1   discovery or expert discovery, either will or can and, in

2   some instances, already has lead to an argument that it

3   should be used in the ITC arbitration, which, of course, has

4   very different rules than the federal courts do.  And there

5   are numerous cases we cited in the briefs, including the

6   *Ehleiter* case as well as the *Bradford-Scott* case in the

7   Seventh Circuit, and the *Levin* case in the Fourth Circuit

8   that talk about this is the very reason why we have an

9   automatic stay in those jurisdictions that have adopted it

10  is because of the collateral effects that happen when you

11  have to -- when you are forced to engage in litigation and

12  then those materials are then used in the arbitration or

13  sought to be used -- the language in at least one of the

14  cases is the classic it's "a bell that can't be unrung"

15  and that is a very real prejudice, particularly where the

16  parties have already talked about we have evidentiary

17  briefing coming up in the ITC on October 6th where our

18  statement of claim is due, and there will be probably

19  materials produced in this litigation and thereby further

20  briefing, as they submit a statement of defense in November,

21  and we reply.

22              As to the third factor, the injury to Gillette.

23              The main injury that Gillette highlights in its

24  briefing is that it has lost customers to Dollar Shave and

25  the defendants because it alleges those customers somehow

knew about the better or different coatings that allegedly
the defendants used.  Of course, we take issue.  In fact, we
don't use the coatings are covered by the patent.

But the central argument is they lost customers,
it will be hard to get them back, that they lost money as
a result of sales to those customers.  That is really the
thrust of their position in terms of the harm to Gillette if
a stay is entered.

Your Honor, our response to that is, first off,
it's far from clear that any loss of sales that has happened
in this case happened because of a change in blade coatings
of any kind or that someone shaving with these products
would even notice the difference -- that certainly hasn't
been proven by Gillette -- as opposed to perhaps the
reason that they have lost market share is because of the
inconvenience of having to go to the store to buy razors
as well their high prices.

Dollar Shave pioneered a new model that is
out in the media that is not a controversial proposition.
Gillette has tried to respond to that by founding its own
online shave club and doing other things.  None of those
issues in the market or lost customers have anything to do
with the blade coating that might be proven in this case.

Secondly, if Gillette found it was facing
irreparable harm in this case as opposed to harm that could

1    be rectified by damages if the case resumes after a stay, it

2    would have moved for a preliminary injunction.  It has not

3    done so.  It has not shied away from using every possible

4    procedural mechanism to keep this case going and to bring

5    the defendants into it.

6              We respectfully submit its failure to move

7    for a preliminary injunction is indicative of the lack

8    of inequitable injury that it has suffered and can't be

9    remedied.

10             With respect to No. 4, the public interest.

11             Both the Supreme Court and Congress have made

12   clear there is a strong public interest in favor of

13   arbitration or there is an agreement in place.  That has

14   been cited numerous times in the *Moses H. Cone* case as

15   well as numerous cases that have been cited in the brief as

16   well as the *Ehleiter* case and all the majority automatic

17   divestment cases.

18             The notion that a party can be forced to

19   litigate not just for 15 months or almost two years now

20   while a pending request for arbitration or arbitration is

21   continuing, there has been a request for a stay, but also to

22   be forced to go forward with the trial on an arbitrability

23   issue when there is a pending appeal in front of the Third

24   Circuit on that issue as well as a co-pending arbitration,

25   these are exactly the classic type of worst case scenario

1    which is a quote from the *Ehleiter* opinion, referring back

2    to the *Branford-Scott*, also *Levin* deals with this issue.

3    It is the classic case where somebody bargained for, in a

4    contract, a right to arbitrate and has lost the value of

5    that right.  If this case is litigated to the end on the

6    merits, any victory that we may have in the ITC or in the

7    Third Circuit will be hollow at best, if not pyrrhic.

8                So the public interest counsels for the defense

9    of arbitration agreements.  That is the whole reason why

10   the FAA was passed in the first place.  Although Gillette

11   may argue that the issue here is that there is some public

12   interest that they shouldn't be forced in an agreement to

13   arbitrate if they don't think that they agreed to arbitrate,

14   and that is the crux of the appeal, the fact is that if you

15   look at the Circuit opinions on these issues, the issue of

16   arbitrability is designed to be resolved quickly on an

17   interlocutory appeal in order to further the purposes of the

18   FAA, which as well as the presumption that we have discussed

19   before in the briefing under the FAA that the claims should

20   be assumed to be arbitrable if a contract is established or

21   else furthered by the immediate appeal, which is why we have

22   Section 16 rights defining immediate stay.

23                THE COURT:  One of the concerns Gillette raises

24   is maybe this isn't the only interrogatory appeal we'll have

25   in this case.

1              MR. WIT:  Yes.

2              THE COURT:  Can you given any reassurance, that

3    I suppose in this scenario that let's say we have the trial

4    and we find that the case is not arbitrable, that you could

5    then file yet another interlocutory appeal?

6              MR. WIT:  So that is an argument that they raised

7    is what they characterize as abuse.  That that somehow would

8    be an abuse of the process or of the defendants' appellate

9    rights under the FAA.

10             That is wrong for at least four different reasons

11   that I have mapped out here.

12             The first is, again, that the Court has

13   recognized there is at least some likelihood that we may

14   succeed at the trial as a result of the parties having

15   briefed it.  Some of the disputes before the Court are

16   arbitrable as well as the ITC having concluded those

17   disputes are arbitrable, which there won't be a need for a

18   second appeal if the facts prevail at trial.

19             Secondly, even if the defendants don't prevail

20   and then they decide to appeal at that point, the fact that

21   there is an availability of two appeals to the defendants is

22   not a situation of our making.  It's part of the structure

23   of the FAA in Section 16.

24             Section 16 makes very clear that any order

25   denying an appeal -- I'm sorry, any order denying a Section

1    3 mandatory stay is subject to an appeal.  Clearly, the

2    Court's August 7th motion denied the motion to stay.  It did

3    not ultimately resolve the issue of arbitrability but that

4    is not what the statute requires.

5             We are simply pursuing our statutory right to

6    appeal both because the ITC has reached the opposite

7    conclusion and because the Third Circuit may well, even if

8    it decides that this Court should decide arbitrability, even

9    if we somehow lose that appeal, it is entirely plausible

10   that the Third Circuit is going to remand with instructions

11   on the scope of what should be decided at the trial.  That

12   is why the reason we filed the appeal now, so we don't have

13   to go through trial blind without knowing what the Third

14   Circuit thinks about these issues and then have to repeat

15   the trial if it turns out the scope of the trial was not

16   correct for some reason.

17            The third reason that the notion of a second

18   trial is a red herring is that Gillette's own authority has

19   held that simply because there might be two interrogatory

20   appeals on the same issue at two different times in the case

21   is not a reason to prohibit either one of the appeals and

22   then explicitly held that was true even if the issue of

23   arbitrability wasn't yet decided when the first appeal was

24   decided.

25            If you look at the *Microchip Technology v U.S.*

1    *Phillips* in the Federal Circuit, they explicitly looked at

2    that issue where there was an initial appeal under the FAA,

3    arbitrability has not yet been decided, and it decided that

4    that that was not a reason not to allow the first appeal

5    even if there was going to be a second appeal.

6              Additionally, the Supreme Court case in *Behrens*

7    *v Pelletier*, which is cited by Gillette in its briefing,

8    made the same point, not in the FAA context but it was

9    serial interlocutory appeals in the qualified immunity

10   context, which is similar to that.  In that case, it was

11   the first in a motion to dismiss stage on the issue did they

12   have a right not to have a trial.  The second one came

13   after summary judgment.  Again, no problem with both of the

14   appeals happening.  That was just a function the law.

15             Finally, I would note that the notion that the

16   possibility of there being a second appeal means either that

17   the first appeal is not legitimate or there should not be a

18   stay in place is not consistent with the structure of the

19   FAA itself.

20             If you look at Section 16(a)(1)(A), which is

21   the section we're here about today, which is the one that

22   says that any rejection of a motion to stay is immediately

23   appealable.  That covers interrogatory orders.  It covers

24   nonfinal orders on is face.

25             If you look at Section 16(a)(3), which is later

1    in the statute, that is a separate appeal right for a final

2    order.  That would be an appeal right that would kick in,

3    for example, after there was an order at trial on

4    arbitrability.  So it can't be the case that the fact that

5    the fact there might be a right to a second appeal under

6    the FAA is a reason to deny or not have the first appeal or

7    to deny a stay.

8         And the Third Circuit noted that dichotomy in

9    a case called *Sandvik v Advent International*.  It was not

10   cited in our brief but it was cited in Gillette's *Microchip*

11   *Technology* brief as a reason for why it is not prohibitive

12   to have to appeal.

13        THE COURT:  Let me ask you just a couple other

14   questions, then we'll give you extra time for rebuttal, but

15   I may have sensed that another concern than Gillette may

16   have is if the arbitration proceeds more quickly than this

17   litigation, which, of course, would be more likely if we

18   stay, that perhaps there they will be deprived ultimately

19   of their litigation right even if the Courts were to decide

20   that there should be litigation.  Is that a possibility?  I

21   mean would something happen to litigation just by virtue of

22   the fact that the arbitration itself may become completed?

23        MR. WIT:  Well, I mean the first point I would

24   make is that the parties in the agreement agree to an

25   arbitration that should happen within 60 days.  So they had

1    always contemplated that arbitration would happen quickly,

2    and that was the purpose of having arbitration as a gating

3    mechanism before federal litigation was brought.  That is

4    the entire crux of the arbitration not to sue argument and

5    the arbitration clause, 10(c)(1), 10(c)(2).  So in some

6    ways, even if that "parade of horribles" were to happen,

7    it's a situation of Gillette's own making.

8            That said, on the hypothetical that you pose,

9    which is that the Third Circuit or somehow it is otherwise

10   resolved that these issues ae not arbitrable and we lose,

11   then the arbitration had continued to an end, it is

12   scheduled for a hearing on February 26th.  A week long,

13   three to five day trial.  Hopefully, a ruling soon after

14   that.

15           Some time after that point, there is a ruling by

16   the Third Circuit or some other ruling that indicates that

17   that proceedings was somehow in error.  Then the way that

18   that issue would be teed up presumably is that if Gillette --

19   number one, if Gillette wins the arbitration, then there

20   is no issue.  Because that shows that that means that the

21   products were covered, and they can proceed with this not

22   being covered by the case and proceed with this litigation.

23           Number two.  If Gillette loses that litigation,

24   then what the defendants are entitled to are the damages to

25   all the legal fees and all other expenses they have incurred

1    in this proceeding as well as the ITC.

2            They also, however, also entitled to an

3    injunction under 10(c)(2) of the settlement agreement.  That

4    power was given to the parties by the ITC.  Presumably, if

5    the ITC enters an injunction, and there is it a conflicting

6    ruling or even if there is not a conflicting ruling at that

7    point, Gillette may well come to federal court and challenge

8    whatever the ruling is that was issued by the ITC which

9    would be resolved by this court or whichever court is

10   hearing it at the time under standard procedures.  It

11   maintains its right to do that.  Nothing about a stay

12   impacts that.

13           THE COURT:  All right.  And then, finally,

14   for the arbitration trial, not the trial in front of the

15   arbitration tribunal but the arbitration trial I ordered.

16   If this case were to go forward, you say the parties have

17   agreed they're all available in January; and, of course, my

18   calendar is crazy but they now say they can be ready in

19   October or November.  Is there no way, if I order a trial to

20   happen in October or November, that your client can be ready

21   to proceed with that?

22           MR. WIT:  The way that -- just to be clear, the

23   way that those discussions were described in the papers is

24   not entirely accurate.  There is back and forth between the

25   parties.  We said we were available in December.  They

1    weren't available.  They said they were available late

2    November.  We had said we weren't available on those dates.

3    And ultimately everybody was available in January.

4              In any case -- and October wasn't discussed

5    presumably because of the continuing litigation and

6    everything that is going on here as well as what is going on

7    in the ITC, and also because I think candidly Gillette still

8    wants to try to take my deposition and they want to do that

9    before the trial.

10             That said, look, if the Court denies the stay,

11   and these proceedings aren't stayed, and we have to be here

12   for a trial, we will be ready for a trial.  We are a major

13   law firm.  We think in our view it is better to be organized

14   and to do it at a time that was mutually convenient for

15   everyone, also considering the Court's docket, and do it

16   in January, but we will do what we're ordered to do.

17             THE COURT:  And what is your estimate at the

18   moment as to how long a trial would be?  And is it a jury

19   or a bench trial?

20             MR. WIT:  Well, we think it should be a bench

21   trial.  I suspect that Gillette will take the position that

22   it should be a jury trial.

23             With respect to the length of it, in some ways

24   that depends on whether it is a bench or jury trial because

25   obviously you have the selection of the jury, instructions,

1    and all these other issues that you have to deal with in

2    a jury trial that you don't have to deal with in a bench

3    trial.

4              You know, my guess off the top of my head, maybe

5    two days, probably less than that.  We might even be able to

6    be done in one day.  These issues are particularly clear,

7    especially from our perspective, but in our experience, the

8    tendency is when we make an estimate taking a relatively

9    short period of time, Gillette thinks it should take longer.

10             THE COURT:  Okay.  We're several minutes over

11   your limit, but we will give you five minutes for rebuttal.

12             MR. WIT:  Okay.  Thanks, Your Honor.

13             THE COURT:  Thank you very much.  Let me hear

14   from Gillette.

15             Good afternoon.

16             MR. JAY:  Good afternoon, Your Honor.  Thank you

17   for hearing from us.  William Jay from Goodwin Procter for

18   Gillette.

19             I understood from Your Honor's questioning that

20   you would like us to begin with the point about the Third

21   Circuit.

22             THE COURT:  I think that would be most helpful,

23   yes.

24             MR. JAY:  Certainly.  What the we take from that

25   is simply that the Third Circuit wants to hear from this

1      Court.  That we had urged in our opposition that this Court

2      has scheduled a hearing, and that the ordinary procedure for

3      a stay motion on appeal was to hear from the District Court

4      first, in particular, on a complicated issue where the

5      Circuits are split.  And what we take from this is simply

6      that there is time for this Court to do that before the

7      Third Circuit rules.

8                THE COURT:  So do you think it has any

9      implication, though, for the underlying dispute that was

10     in the motion in front of me particularly whether I have

11     already been automatically divested of jurisdiction?

12               MR. JAY:  Well, I do agree with Mr. Wit that at

13     a minimum, this Court has jurisdiction to hear the pending

14     motion.  And that the Court, the Third Circuit I think would

15     not have waited to hear from Your Honor if it thought that

16     this Court had no authority even to grant the stay that the

17     other side had recognized.

18               We don't read into that a definitive view on the

19     merits of the stay question.  I think that would probably

20     be overreading the order that the Third Circuit has issued,

21     although we do think that what the effect of that order was

22     was to deny both the request for an interim stay and the

23     request for a stay.  So at the moment, we don't think there

24     is anything pending in the Third Circuit.

25               THE COURT:  No request for a stay.

1          MR. JAY:  Correct.  The appeal certainly remains

2    pending.  And as Mr. Wit said, no briefing schedule has been

3    set.

4          THE COURT:  Do you therefore think, is the

5    question of this *Ehleiter* case, or however we're going to

6    pronounce it, and whether or not there is an automatic stay

7    in these situations, is that an issue that is still before

8    the Third Circuit with the underlying appeal or is that

9    issue not even before them now?

10         MR. JAY:  I believe that because they have

11   denied for the time being the motion for a stay that the

12   only thing before the Third Circuit right now is the appeal,

13   the appeal itself, the Section 3 appeal from this Court's

14   order.  And Eh-light-er (phonetic) or El-Tee-a (phonetic),

15   we can each pick our own pronunciation, that I think is

16   collateral to that.  It does not, it's probably not going

17   to be litigated in the briefing on the merits of the stay

18   appeal that the defendants want to pursue.  I think it only

19   has to do with the question of what may happen in this court

20   while that appeal was pending.

21         THE COURT:  All right.  And I take it, it is

22   correct that you already said no briefing schedule is in

23   place and nobody has asked for an expedited appeal; correct?

24         MR. JAY:  No one has yet asked for that.  And

25   presumably after a ruling on a stay, the parties might

1    revisit that, and the Third Circuit's rules allow for a

2    motion to expedite to be filed after the basis to expedite

3    it arises.

4               THE COURT:  Okay.

5               MR. JAY:  If it would be helpful to the Court, I

6    can certainly talk about whether a discretionary stay should

7    be granted.  Obviously, I would like to address whether the

8    stay is automatic.

9               THE COURT:  Yes, you can do both, but why don't

10   you start with the discretionary stay, and you can argue

11   that I shouldn't have reached that issue, but I'm having a

12   hard time seeing how long I shouldn't reach that issue, but

13   go ahead.

14              MR. JAY:  Sure.  Well, we certainly think this

15   Court has jurisdiction over this case, and that this Court

16   had jurisdiction over the numerous previous requests for

17   discretionary stay that the defendants had filed.  And that

18   if defendants had wanted to make such a request in their

19   papers, this Court could have considered it.  And we indeed

20   briefed the stay factors in our opposition to the motion,

21   and the defendants didn't engage with that.

22              I agree with the factors that Mr. Wit outlined,

23   although, of course, not how he would apply them to the

24   facts of this case, that when the question is not just the

25   management of a docket but a stay pending appeal, in other

1    words, things should stop because an appeal is pending, that

2    really the first factor is a likelihood of success in that

3    appeal so that matters don't come to a halt unnecessarily

4    in the District Court based on an appeal that is not likely

5    to change the outcome.

6             And in assessing the likelihood of success on

7    appeal, it is important not to conflate the question whether

8    the defendants might ultimately prevail on the question of

9    arbitrability, which is something that this Court has set

10   for the trial on arbitrability but whether they are likely

11   to succeed on the appeal that they have noticed, which is

12   basically an argument that despite this Court's finding a

13   genuine issue of material fact on this point, they are

14   nonetheless entitled to a stay.

15            We think that for the reasons that we briefed

16   that they are not likely to prevail simply because this

17   Court, grounding its decision in the appropriate Circuit and

18   the New York precedent, has concluded there is a genuine

19   issue of material fact.  A fact-finder could conclude that

20   the dispute or a portion of it is not arbitrable under the

21   appropriate standard of proof, and the matter therefore

22   should be set for a trial as soon as possible.  We think the

23   Third Circuit is likely to agree with that.

24            THE COURT:  So the statement -- well, the fact

25   that the arbitration panel has said these disputes are

1    arbitrable, and that we said that was essentially a well

2    reasoned opinion and maybe we will come out that way after a

3    trial, are those irrelevant to the analysis on this first

4    factor of a discretionary stay?

5                MR. JAY:   I think they are for exactly the

6    reason Your Honor just gave.  That however they might bear

7    on what the Court might decide after a trial is not the

8    question.  The question is whether there is a likelihood of

9    success on appeal, because after all, the consequence of an

10   affirmance would be that the Court goes ahead with the trial

11   exactly as it has planned and it could take that into

12   account as it deems appropriate.  So we don't think that has

13   anything to do with the likelihood of success on appeal on

14   what my friends on the other side have referred to as the

15   threshold legal issues that they want to raise in that appeal.

16               Then, secondarily, there is the question of

17   irreparable injury which is the other side's burden as the

18   movant to show.  What my friends have focused on is the

19   litigation expense, and it's crystal clear from the Supreme

20   Court precedent and Circuit precedent that litigation

21   expense ordinarily is not irreparable injury warranting an

22   appeal.  We have cited I think to the Third Circuit on this

23   point, the Supreme Court's decision on *Renegotiation Board*,

24   which is 415 U.S. 1, saying that ordinarily litigation

25   expense is not irreparable injury.

1        We think that is equally true in the arbitration

2   context particularly because, as the Court knows, the Court

3   has not enjoined the arbitration.  The Court has determined

4   that the litigation and the arbitration are to move forward

5   for the time being on parallel tracks.

6        THE COURT:  And what about this worst of all

7   possibilities world that the cases contemplate?  Arguably,

8   the defendants are suffering from doing all of this fact and

9   soon expert discovery, potentially getting to a trial on the

10  merits here in federal court, but also an interim separate

11  trial on arbitrability when arguably from their perspective

12  they bargained to not have to deal with any of that.

13       MR. JAY:  This is sort of getting back to the

14  merits of whether the stay is automatic or whether the other

15  side has to demonstrate entitlement to it, but I think it is

16  responsive to Your Honor's question.

17       Section 3 of the FAA basically answers that

18  question.  Congress could have created a structure that

19  allowed defendants or parties who want to rely on the

20  arbitration clause, the moment they seek to stay a litigation

21  pending arbitration, to obtain an automatic stay until the

22  arbitrability question is worked out.

23       That is not the statute that Congress enacted.

24  Instead, Congress in Section 3 said that a stay is required

25  once the Court is satisfied that the dispute is referable to

1    arbitration, and so you don't get a stay simply by seeking a

2    stay.  You have to demonstrate entitlement to it by showing

3    that the dispute is referable to arbitration.

4           We think it does not make any sense and nothing

5    in the FAA supports the idea that once you failed to convince

6    the fact-finder that you are entitled to such a stay that you

7    can get one anyway for the duration of an appeal simply by

8    noticing an appeal to the Third Circuit.

9           So on the question of whether the alleged injury

10   is somehow extra biting in an arbitration case and we think

11   that the possibility of litigation will go forward until

12   entitlement to arbitrate is demonstrated, that is simply

13   baked into the FAA is how it is intended to work.  And in a

14   case like this one in which the Court has been proceeding to

15   diligently move the case forward, because of the possibility

16   that the Court will find some or all of it should proceed in

17   this court rather than in arbitration, it will be severely

18   prejudicial to Gillette to lose the trial date that this

19   Court has set.  To be clear, the trial date on the merits of

20   the action rather than the minitrial on arbitrability.

21          Mr. Wit suggested that it is Gillette's burden

22   to demonstrate irreparable injury in this stay calculus, but

23   really in a four factor test, it's a question of the balance

24   of equities and the movant must demonstrate irreparable

25   injury.  But once they have done that, then the question is

1  how to balance the equities and how to assess the public

2  interest.

3              And in this case, Gillette, a stay pending this

4  appeal, especially an appeal that is not likely to succeed,

5  and that might be followed by another appeal and another

6  stay following the minitrial on arbitrability, would cost

7  Gillette the trial date that this Court has set, and that

8  would be significantly prejudicial to Gillette in its

9  enforcement of its intellectual property rights.

10             THE COURT:  The briefing does talk about other

11  types of harm to your client that is seen in the nature of

12  what one might expect in a preliminary injunction brief.

13  Should I be considering the market share and the price

14  erosion argument?  And, if so, how do I factor in that you

15  didn't seek a preliminary injunction?

16             MR. JAY:  So on a preliminary injunction, our

17  burden would be different.  The Court is fairly familiar

18  with this.  Our burden would be to show that during the

19  course of the litigation, before the Court could resolve

20  the ligation on the merits, that Gillette would suffer

21  irreparable injury, and it would be Gillette's burden to

22  show that, including a likelihood of success on, for

23  example, infringement.  And Gillette made the decision

24  not to seek a preliminary injunction but to proceed with

25  litigating this dispute expeditiously to get to a final

1  judgment in good order.

2      In the stay calculus, the burdens are reversed

3  and they're different, so that the burden is on the other

4  side, and the balance of the equities includes harm to

5  Gillette separate and apart from irreparable injury.

6      So I think the prospect of a lengthy delay and

7  its affect on Gillette and its enforcement of its intellectual

8  property rights changes the calculus.  In particular, if

9  Gillette made a calculus based on how long the litigation was

10  going to take and did not seek a PI on that basis, then the

11  litigation is extended out by, it could be a year, maybe two

12  years if there are two appeals.  That changes the calculus as

13  well if we don't get to final judgment until after two trips

14  to the Third Circuit and the case comes back to this Court

15  finally to set a trial date on the merits.

16      THE COURT:  Is the outline I heard from your

17  friend about the interplay between the arbitration and the

18  federal litigation correct?  That is, even if the arbitration

19  gets out way ahead of the litigation and you are unhappy with

20  the result there, you still would have some right to proceed,

21  at least to challenge that arbitrability issue in federal

22  court?

23      MR. JAY:  That much is correct.  That we

24  certainly would challenge any such ruling, but I think that

25  my friend, if anything, may have understated the complexity

1    that would result in that situation, including fights about

2    which court has jurisdiction, and which prior rulings of the

3    federal courts are binding on the parties, those rendered

4    before the arbitration, those rendered in proceedings to

5    confirm or vacate the arbitrability award and so on.

6            I think that it certainly is correct that if

7    the arbitrators made such a decision that Gillette would

8    challenge it, but I fully expect that the other side would

9    say they can't, for one reason or another.

10           THE COURT:  How about his outline of the status

11   of discovery in this case, what is left in fact discovery,

12   and then that we're on the cusp of in about a month or so

13   expert discovery?  Is that all generally accurate?

14           MR. JAY:  It is.  There are several depositions

15   remaining in fact discovery, and then there is a schedule

16   set for expert discovery, and there is the pending

17   proceedings on the motion to quash in the Northern District

18   of California.  Yes, that is correct.

19           And as far as the trial goes, the trial on

20   arbitrability, that is correct as well.  There are some

21   additional dates that we could propose to the Court and to

22   the other side, based on changes in the scheduling on our

23   side.  You know, everyone has agreed that they're available

24   on January 15th, but I'm authorized to say, at least on our

25   side, we could appear for a trial the week of November 13th

1      or the week of January 8th as well.

2                  THE COURT:  And do you take the view that this

3      is a jury trial?

4                  MR. JAY:  We do.

5                  THE COURT:  So would I have to expect some

6      litigation over that issue in light of what you have heard?

7                  MR. JAY:  In light of what I heard, it does

8      sound like it, but we think that our entitlement to a jury

9      is clear in the text of the FAA, and there is a jury demand

10     complaint.  But our estimates of how long it would take I

11     think are not far off from each other.  Our estimate is

12     three days, factoring in the possibility of a jury trial.

13                 THE COURT:  And three days meaning for all

14     sides, including the issues relating to selecting a jury,

15     et cetera?

16                 MR. JAY:  Yes.

17                 THE COURT:  How about, are folks still over in

18     Korea or is all of that discovery done?

19                 MR. JAY:  The depositions that we referred to in

20     the letter briefing before Your Honor, in the ones in Korea.

21                 THE COURT:  Those are all completed?

22                 MR. JAY:  That's right.

23                 THE COURT:  All right.  Do you want to talk

24     about the automatic stay issue?

25                 MR. JAY:  I would like to.  Thank you, Your

1    Honor.  And I prefigured what I was going to say getting

2    into the text of Section 3 and why Congress -- and this is

3    one of the things that makes the FAA unlike something like

4    qualified immunity.  It is not a full blown immunity that

5    entitles a defendant to stop everything the moment it is

6    raised, which is true of qualified immunity but it is not

7    true of the FAA, which you see right in the text of Section

8    3.  And we think there is nothing in the FAA that mandates a

9    different rule once an appeal is noticed.

10                We think that you start with the first

11   principles that, in general, when an interrogatory appeal is

12   noticed, this Court, the District Court retains jurisdiction

13   over the rest of the case.  That is clear in the P.I. context

14   from the Third Circuit's decision in the *United States v*

15   *Price* in which the Court said:  It would be error to enter

16   an automatic stay based on the noticing of a P.I. appeal.

17   Yes, it's true in the 1292(b) context, it's true in the

18   23(f) context, both written right into the statute and the

19   rule that there is no automatic stay.

20                And we think that that is true even though in

21   theory a P.I. appeal or 1292(b) appeal could result in the

22   end of the case.  In other words, the Court of Appeals could

23   reverse and say this case should not go forward at all

24   anymore.  The court, in hearing a P.I. appeal, has the

25   authority to hold -- the appellate court has the authority

1    to hold that the complaint doesn't state a claim and the

2    litigation should end.

3              But, nevertheless, the fact that that issue is

4    pending on appeal doesn't undermine the District Court's

5    jurisdiction to continue moving the case forward.  Only the

6    issue on appeal is taken away from the District Court and

7    transferred to the Court of Appeals.

8              But no one has asked this Court to reconsider

9    the ruling that is on appeal.  That is what the transfer of

10   jurisdiction restricts the Court from doing.  That is why

11   there is now an indicative ruling rule in the Civil Rules,

12   Rule 62.1, for when a court really does want to reconsider

13   the ruling that is on appeal over which it has lost

14   jurisdiction, but the rest of the case is still securely

15   here in this court.

16             We thank that *Moses H. Cone* makes very clear

17   that questions of arbitrability and the merits are easily

18   severable from one another, and there is no reason why

19   litigation of the merits needs to stop just because the

20   defendants have noticed an appeal.  And we recognize that

21   one of the questions that this court has retained is an

22   arbitrability question, and we think the same answer holds

23   for the arbitrability question as well.

24             I think that the best analogy that I can draw is

25   to one of those other contests that I mentioned, the 1292(b)

1    question.  A Court can deny summary judgment and the denial

2    of summary judgment can go up to the Court of Appeals either

3    on a collateral order or a certified 1292(b) order, but that

4    doesn't stop the Court from proceeding toward resolution of

5    the merits because the two questions are different.  The

6    question on appeal in that circumstance and the question

7    on appeal here are, as a legal matter, has the movant

8    demonstrated an entitlement to stop the case irrespective

9    of any factual dispute whereas what remains here in the

10   court to resolve is a factual dispute.  Those are different

11   questions.

12              So this court has jurisdiction to retain it,

13   and there is nothing automatic about the fact that this

14   is an arbitration case that changes that.  It is true that

15   Congress has created a right to interrogatory appeal in

16   arbitration stay cases, but that is it.  That is the extent

17   to which the strong federal policy favoring arbitration

18   plays in here, but there are lots of interrogatory appeals

19   authorized by statute.  None of them create automatic rights

20   to stay simply by filing the Notice of Appeal irrespective

21   of the nature of the issues at stake.

22              There are other privately negotiated rights to

23   avoid litigation.  And we have cited the *Digital Equipment*

24   case from the Supreme Court, which was basically a covenant

25   not to sue.  That case relies on an earlier Supreme Court

1  case called *Lauro Lines*, which I think is also quite

2  analogous, which is about a privately negotiated forum

3  selection clause.  You are going to have to litigate, but

4  you want to litigate in Italy instead of the United States.

5  The Supreme Court held in both of those cases, those

6  privately negotiated rights not to be in the particular

7  federal court or even in the United States Courts at all are

8  not akin to the immunities that are at stake in cases like

9  qualified immunity, and they don't warrant collateral order

10  appeals at all.

11           So here we have a Congressionally authorized

12  right to appeal.  No one is disputing that.  And they can

13  appeal.  And if they want a stay pending that appeal, they

14  must justify it according to the standard that applies to

15  every other context.  They must satisfy the four part

16  standard for a stay pending appeal.

17           We think that is why the right resolution to

18  this is to side with courts like the Fifth Circuit, the

19  Ninth Circuit, and the Second Circuit that have concluded

20  that the stay is not automatic in this context.

21           THE COURT:  You cite the Supreme Court case that

22  I also can't pronounce, N-k-e-n I think.

23           MR. JAY:  My recollection, Your Honor, is that

24  it is N-Ken (phonetic).

25           THE COURT:  *Nken*.  Let's say *Nken*.

1            I'm not sure that the holding there can be as

2   broad as at least your papers suggest.  There are situations

3   at least where the statute does recreate an automatic stay;

4   isn't that correct?

5            MR. JAY:  Well, there are situations in which --

6   my friend on the other side has cited the bankruptcy stay,

7   for example.  There is no doubt that that is a form of

8   automatic stay, but it is created by statute in a section of

9   the code that is headed Automatic Stay.  You know, Congress

10  created no ambiguity about it, but when you are talking

11  about something that lacks that clarity, you are talking

12  about just a right to interrogatory appeal that makes no

13  mention of stays in any way, you read that against the

14  backdrop of ordinary equity practice, which is that a stay

15  is never an entitlement, it is not a matter of right.  In

16  order to establish a stay, an extraordinary remedy -- no

17  right to a stay, an extraordinary remedy, the movant must

18  satisfy the usual four factor test.

19            We think *Nken* stands for that proposition.  It

20  is not for the proposition that Congress could never create

21  a right to stay, but that the ordinary rule, the long

22  established rule of equity practice, the rule that was in

23  force at the time Congress adopted the relevant part of

24  the FAA are that stays are equitable, they're matters of

25  discretion, and they're not automatic unless Congress says

1    otherwise.

2            THE COURT:  Have any of the Circuits that have

3    addressed the automatic stay issue expressly discussed the

4    *Nken* case and what impact it may have?

5            MR. JAY:  They have not.  Both the Fourth

6    Circuit, as my friends have pointed out, and also the Fifth

7    Circuit which came out the other way, have come out, decided

8    their appeals after *Nken*.  And ultimately we think that even

9    if *Nken* didn't exist, we think that our position would still

10   be meritorious and that you should rule for us based on the

11   background principles that we have cited, but we do think

12   that it is very helpful as a starting point that that is the

13   backdrop against which Congress adopted these statutes that

14   a stay is not a matter of right.

15            And the Court, quite consciously, set out in

16   roman 4 of its opinion in that case to say, okay, what is

17   the ordinary standard for stays?  Not just immigration

18   stays, not just Supreme Court to Court of Appeals stays, but

19   stays in general, precisely because it was deciding that

20   Congress had not displaced the ordinary standard in that

21   case.  And it set out to write something perhaps broader

22   than the facts of the case made necessary.

23            But if you look at the cases cited in part 4 of

24   that opinion, you will see that they include habeas cases,

25   they include civil cases, they include immigration cases.

1    It is something that is basically crosscutting in appellate

2    practice.  And that is why we think it is relevant here.

3              THE COURT:  Now, you have your interpretation of

4    the *Ehleiter* case and whether it is binding or you say it is

5    not binding.  Have you found any case or any commentary that

6    interprets the status of Third Circuit law as being what you

7    say as opposed to them joining the majority which is what

8    Dollar Shave argued?

9              MR. JAY:  Right.  There are a handful of

10   decisions that upon finding that footnote have used it to

11   tally the Third Circuit with, for example, the Tenth Circuit

12   and the Fourth Circuit, but we think that that it's not

13   right and for reasons I'm happy to go through.

14             The Third Circuit has a strong rule expressed in

15   its IOB 5.7 that nonprecedential opinions are not precedent.

16   They're not citable as precedent because they're not

17   circulated to the full court before they're being released.

18             The order in question, the one that granted

19   the stay in *Ehleiter* was plainly nonprecedential, was not

20   published in the F3d.  And if my friends on the other side

21   had cited it, everyone would agree that it is not binding.

22             The footnote is what they point to.  But if you

23   look at the operative text of the footnote, the last

24   sentence is really the only thing that is doing any work.

25   And what the last sentence says is:  In that order --

1    meaning in the nonprecedential order that had been released

2    a couple months before.  In that order, we expressed -- past

3    tense -- we expressed our agreement with the majority side

4    of the Circuit split.

5            Now, in the order itself, only one side of the

6    Circuit split was acknowledged, and the Court may well have

7    wanted to put in its published opinion an acknowledgement

8    that there is in fact a Circuit split on this issue so that

9    the bench and the bar would be aware of this and able to

10   flesh it out in the future.  It was too late in that case

11   because the Court had already granted the stay, and at that

12   point it was moot.  There was no further reason to discuss

13   it and to take sides in the Circuit split.

14           But the text of the Third Circuit's opinion we

15   think is absolutely plain.  It is written in the past tense.

16   It says, in that order, we express our agreement.  But the

17   same thing would be true if that had been a prior opinion of

18   the Third Circuit that was designated nonprecedential.  If

19   it said, in our prior non-precedential opinion, we expressed

20   our agreement with XYZ.  That would not be precedential

21   either.

22           The Third Circuit has said several times,

23   including in the *Jamison* case that we cite, that it strongly

24   discourages District Courts from relying on unpublished

25   opinions as precedent.

1              THE COURT:  Would you say it is dicta then, the

2       footnote?

3              MR. JAY:  Well, I think that it acknowledges a

4       Circuit conflict, and so to call it dicta suggests that it,

5       even that it picks a side.  So either it is dicta or it is

6       purely historical, but either way it is not an operative

7       holding to bind this Court.  It is a correct observation

8       that there is a Circuit conflict but it doesn't pick sides

9       in a precedential opinion circulated to the full court.  And

10      the full court reading that opinion would not -- (The Court

11      sneezes.) -- bless you, Your Honor.  The full court reading

12      that opinion would not have concluded that we are now on

13      record on one side of the split and not the other.  I think

14      it is an open question in the Third Circuit for Your Honor

15      to decide.

16             THE COURT:  Now, all that said, I think it is

17      true you haven't found any case or commentator that has said

18      that about that footnote or about that case.

19             MR. JAY:  That is certainly true, but we also

20      haven't found one rejecting it.  It simply hasn't been made

21      and considered.  There have been a handful of decisions.

22      And we're talking a number that you can count on one hand

23      that look at it and attempt to apply it.  And several of

24      them have been in a context that don't need to apply it as a

25      holding.  They can assume it is true.  So, for example, one

1     of the decisions decides to ahead and proceed because it

2     certifies the appeal would be frivolous.  And you can assume

3     that *Ehleiter* joins one side of the split or not and still

4     reach the same conclusion because frivolous, everybody

5     agrees that frivolous appeals don't stop the District Court

6     from going forward.  So I think in that case, for example,

7     it would be dicta.

8                But, ultimately, we think that the issue is

9     joined in this case about the status of that footnote.  And

10    this Court, which is familiar with the Third Circuit's IOBs

11    and its practices, can make that decision.  We don't think

12    that it was joined in any of those other Circuits.  And

13    certainly the fact that some out-of-Circuit decisions may

14    have to touted it up in trying to count noses on each side

15    of the Circuit split we don't think is really probative at

16    all.

17                THE COURT:  Let's talk about maybe a worst

18    case scenario.  Let's say I deny the stay today and you all

19    finish fact discovery, you finish expert discovery, we get

20    to an arbitration trial November, December, January.  I say

21    it's not arbitrable.  In the meantime, this appeal is going

22    forward and the Third Circuit, lo and behold, says all that

23    was wrong, this is all arbitrable, and then they stop us.

24                Is that just too bad and those are the risks we

25    all take or is there some way to not be that concerned about

1    that?

2                MR. JAY:  Right, and I think that the way to

3    not be concerned about that is the same way that this Court

4    applies every time a P.I. or an interrogatory order goes up

5    to the Court of Appeals.  There could be wasted effort.  If

6    the Court of Appeals, some months later, says you got that

7    wrong, District Court, we are reversing you and this case is

8    over.

9                But the way to assess that is to, number one,

10   take account of who prevailed in the District Court because

11   the party that didn't prevail, the party that is appealing,

12   bears the burden of showing entitlement to the stay.  And,

13   number two, to apply the four part standard which looks at:

14               Number one, the likelihood of success.

15               Number two, what is that party going to suffer

16   during the pendency of the appeal, which can include

17   consideration of how long the appeal is going to last.  And,

18               Number three, what is the balance of the

19   equities, including the public interest.

20               That standard I think is the all purpose answer

21   to the possibility that an interrogatory appeal could result

22   in a reversal that says things that continue to go forward

23   in the District Court should not have, but the other side

24   hasn't attempted to make that showing except in response to

25   Your Honor's questions today.  And we think respectfully

1    that just as the Court found that they had not justified a

2    stay of this action in any of its previous rulings, they

3    haven't shown it just because they have noticed the appeal.

4                    THE COURT:  All right.  Is there anything else?

5                    MR. JAY:  Not from me, Your Honor.  Thank you

6    for your time.

7                    THE COURT:  Thank you.  We'll hear from

8    defendant again.

9                    MR. WIT:  Can I still take my five minutes, Your

10   Honor?

11                   THE COURT:  Yes.

12                   MR. WIT:  Okay.  Very, very briefly, and going

13   somewhat in reverse order.

14                   With respect to the *Ehleiter* case, it is not

15   accurate to say that there is only a handful of decisions

16   that have recognized that it's precedent.

17                   It is also inaccurate to say that no one

18   rejected the argument Gillette has made.  There are a dozen

19   courts cited in the brief:  two Circuits, four District

20   Courts in this Circuit, and six other District Courts cited

21   in the brief that all say that *Ehleiter* is precedent.  The

22   Third Circuit has adopted the automatic divestment rule.

23   They wouldn't say that if they didn't think it was true.

24                   THE COURT:  Do you know if any of those courts

25   heard an argument that it is not precedential?

1          MR. WIT:  Without looking at all the briefs and

2     all those papers, we don't know that for sure.

3          THE COURT:  Tell me, how could it be

4     precedential?  I mean it is simply an order from maybe a

5     motions panel like the one we got today that is really just

6     described in historical fashion later by a merits panel.

7          MR. WIT:  Respectfully, I think we disagree with

8     that characterization, although it is true that the minute

9     order most likely was not circulated to the rest of the

10    Circuit.  The final order that had the merits was presumably,

11    as is required to be precedent.  And I think that any -- in

12    our view, any reasonable reading of the footnote consistent

13    with a dozen other cases that have looked at that published

14    opinion say that it wasn't just deciding a procedural history.

15    It did that in Section 1 of the opinion.

16          If you go back and you look at Section 1, that

17    is where they had done a minute order.  It is at Page 211

18    of the opinion.  They had no reason to say that again in

19    Section 2, which is the section of the opinion that lays out

20    all of the binding rulings and has an elaborate and lengthy

21    discussion of why it is under the FAA there is an immediate

22    right to interrogatory appeal.  That is where the language is

23    that talks about the worst case scenario that I had talked

24    about before.  All of that language is in the body of the

25    opinion.  This footnote is in that section of the opinion.

1                And we think that that is the Third Circuit

2      reaching out by a panel saying:  By the way, we did this

3      earlier in the case.  There is a dispute about this in other

4      Circuits, and we think this is the right rule.

5                It's in the face of the dozen courts and other

6      commentators that have looked at this issue that we were

7      able to find even for this briefing, it seems to us to be

8      somewhat unreasonable to assume all of them got it wrong

9      and that everything hinges on whether it's a past tense in

10     the last sentence of the opinion when, in fact, it is a true

11     statement.  That was in the past tense that they recognized

12     it.  That does not mean the minute order doesn't become

13     precedential once they adopt it.

14               THE COURT:  You agree the minute order itself is

15     not precedential?

16               MR. WIT:  Yes.

17               THE COURT:  Why isn't it dicta by the time we

18     get to the precedential opinion?

19               MR. WIT:  Well, in our view, what the Third

20     Circuit was saying was this is our view of how the FAA appeals

21     should proceed, that there is an immediate interlocutory

22     right, that there are concerns about worst case scenario,

23     and that in order to avoid that, based on the cases in

24     *Bradford-Scott* and *Levin* and the majority of the Circuits that

25     have taken up the issue, our view is this should be how these

1    appeals are handled in the future, and here is our guidance on

2    that issue.

3              THE COURT:  All right.

4              MR. WIT:  With respect to the N-ken (phonetic)

5    or Nik-en (phonetic) case, as the case may be, my friend

6    across the aisle pointed out that no Circuits had discussed

7    that issue in response to Your Honor's question.

8              It is not that no other Circuits have discussed

9    the issue, including the *Levin* court that adopted the

10   majority rule, or the *Weingarten* court that adopted the

11   minority rule, it is that there are 11 courts that haven't

12   done that.  In fact, at least 11 courts, both at the

13   District and the Circuit level that have, since *Nken* came

14   out, issued automatic divestiture decisions, either making

15   it the law in the Fourth Circuit or a District Court making

16   it the law in other Circuits.

17             Indeed, if you look at the language that

18   Gillette quotes from *Nken* itself is merely a quote to the

19   *Virginia Railroad* case from 1926.  All the Supreme Court

20   was doing was referring back to long-standing precedent on

21   discretionary stays and restating the conclusion that it

22   made some 80 years before.  It was not announcing some new

23   rule that would impact the Circuit split, which is not

24   mentioned anywhere in that opinion, neither is the FAA.

25             As we note in our briefing in the *Shalala* case,

 1    which is easier to pronounce, the Supreme Court does not

 2    subsequent you and is happy to overturn its decisions.  It

 3    just simply doesn't work that way.  We think that that,

 4    especially in light of the 11 courts since then that haven't

 5    even mentioned *Nken*, should be conclusive of the issue

 6    whether that court somehow abrogated all of these other

 7    decisions in courts across the country.

 8            The last thing, since I know my time is

 9    limited -- actually two more things -- is with respect to

10    counsel's arguments, both with regard to 1292(b) as well as

11    talking about the collateral order type cases and sovereign

12    quality immunity as well as double jeopardy, those arguments

13    all follow pretty strictly to the letter the minority view

14    of the Circuit cases that were cited in the papers.  They're

15    simply making that argument.

16            We're on the other side.  We're making the

17    argument it is in the majority.  Even if this Court decides

18    that *Ehleiter* is not precedential, the Court is perfectly

19    free and able to make the determination that in this case

20    there should be a stay because of the reasoning that has

21    been adopted, it has been discussed at length.  In our view,

22    the minority view is just not persuasive because it takes an

23    overly narrow view of *Griggs* in addition to an overly narrow

24    view of *Moses H. Cone* and ignores the multiplicity of cases

25    that come out the other way in analyzing all these factors.

1              Lastly, on the 1292(b) argument, in referring
2    to the fact that the FAA doesn't explicitly talk about an
3    interim stay, unlike in the bankruptcy context, for example,
4    of course that is true.  This is a judge-made stay and the
5    majority of Circuits do consider the issue.  It is not
6    explicitly in the statute.  However, that doesn't change the
7    reasoning.  Nor does it change the fact that the *Digital*
8    *Equipment* case, which counsel referred to, which I referred
9    to in my opinion, explicitly talks about in the context of
10   collateral orders, the fact that Congress had elevated
11   recently, at the time that opinion was issued, the right to
12   an immediate appeal under the FAA.  And we think that that
13   is dispositive here.  That that case really doesn't help
14   Gillette in any way.

15             The last thing that I would point out and
16   something which I confess I'm not entirely sure about is that
17   there was at some point additional notices of deposition by
18   Gillette for additional Korean witnesses which I believe
19   have not yet been resolved.  If I'm mistaken and they have
20   withdrawn those notices, then perhaps that is a moot issue,
21   but just to make a fulsome record there.  It is entirely
22   possible with me, I'll be going back to Seoul.

23             Thank you, Your Honor.

24             THE COURT:  Thank you.  All right.  I need to
25   give this some thought.  I don't know whether I will be able

1   to given you a decision today or not but for sure you are

2   free until 4:45.  I will come back in as close to 4:45 as I

3   can to say something, but I don't know what it will be.  So

4   I will see you then.

5                    (Brief recess taken.)

6                    *     *     *

7                    (Proceedings reconvened after recess.)

8                    THE COURT:  Have a seat.

9                    Is there anything to be added from defendants?

10                   MR. WIT:  No, Your Honor.  We have spoken our

11  piece in addition to the papers.

12                   THE COURT:  Is there anything further from

13  plaintiff?

14                   MR. JAY:  No, Your Honor.

15                   THE COURT:  All right.  Well, I'm going to give

16  you my decision.  I should say I pretty much always wish

17  that I had more time but I rarely do have more time, and I

18  just think the nature of the dispute that you have all put

19  in front of me and the posture of the case, including the

20  Third Circuit decision today, and the truly excellent

21  argument from both sides today, really all suggests that I

22  should give you the best decision I can but to do it today,

23  and that is what I have decided to do.

24                   So having reviewed everything before coming in

25  and had a good discussion with you all on the motion, which

1    is the defendants' motion to recognize the automatic stay

2    pending appeal, my decision is to deny that motion.

3              The Court is simply not persuaded that it has

4    been deprived of jurisdiction or that the proceedings in

5    this Court were automatically stayed upon the defendants'

6    filing of a Notice of Appeal from this Court's denial of

7    their request for a stay, all of which arose from the

8    Court's regarding arbitrability.

9              *Ehleiter* -- I'll try to consistently pronounce

10   it -- the Third Circuit's decision, in this Court's view is

11   simply not a binding precedential decision on this issue of

12   law.  The Third Circuit resolved in that case the question

13   of an automatic stay undisputedly in a minute order that

14   was not circulated to the entire Third Circuit and which is,

15   itself, that is, the minute order, undisputedly not a

16   precedential opinion.  When the *Ehleiter* merits panel later

17   issued a precedential merits opinion, which discusses the

18   minute order, I don't read that later opinion as changing

19   the nonprecedential status of the earlier minute order, and

20   I don't further read that precedential opinion as otherwise

21   deciding in a binding precedential manner the holding of the

22   Third Circuit on this issue.

23              Although Gillette can cite no authority

24   articulating this interpretation of *Ehleiter*, and defendants

25   are correct that other courts, including District Courts

within this Circuit, have interpreted *Ehleiter* as binding
precedent, and they specifically interpreted it as binding
precedent of the Third Circuit saying it is joining the
majority view of this issue, I just simply am not persuaded
by those other courts or those other authorities.

It is also not clear to me that Gillette's
arguments about the legal status of *Ehleiter* were made to
any of those other courts or were recognized by any of the
commentators that interpreted *Ehleiter* in a different way
than this Court does.

Now, the Court's view on this point is further
supported by the Third Circuit's order today denying
defendants' request that the Third Circuit stay this Court's
proceedings for some or all of the time that defendants'
current appeal is pending in the Third Circuit.  It seems
more likely that if the motions panel thought that *Ehleiter*
was binding precedent on the issue of the automatic stay, it
would have granted the request to stay these proceedings
here in District Court.

If the stay is, as defendants say, automatic
under *Ehleiter* and I lack jurisdiction to proceed in this
case, I would have expected the stay request that the
Third Circuit had been granted or at least not to have been
denied, and not to have been denied today in particular.
And the fact that the order references the motions panel

1   awareness of today's hearing in this court, I would have

2   thought made it more likely that they would have granted the

3   stay to stop today's proceeding had the two judges reviewing

4   that motion thought that in *Ehleiter,* the Third Circuit as a

5   whole already in a binding precedential opinion decided that

6   an automatic stay exists in these circumstances.

7           So that is not what they did and, therefore, I

8   reach the conclusions that I do, and I deny the request to

9   recognize the automatic stay pending appeal because I don't

10  think there is an automatic stay pending the appeal.

11          Now, that still does leave for me the issue of a

12  discretionary stay, and I am going to address that.  I am

13  aware that the defendants have not, at least before today,

14  in response to my questioning, asked for a discretionary

15  stay.  They have not asked for a discretionary stay before

16  today.  That, of course, that decision not to ask for a

17  discretionary stay doesn't limit the Court's authority to

18  grant one.  It doesn't limit the Court's authority to

19  control its own docket or to balance the equities.  And,

20  anyway, I think the Third Circuit's decision today denying

21  their request for a stay from the Third Circuit is a new

22  fact, a new factor that even if one should have held against

23  them their failure to request a stay before today might give

24  them yet another chance to ask for one.

25          All that said, I think there is *every reason*

1    that I should consider a discretionary stay, and I have

2    considered it.  The factors that have to be applied in

3    considering a request for discretionary stay are undisputed.

4    And having considered them, I conclude that they do not

5    weigh in favor of a stay, so I will not be granting the

6    discretionary stay either.

7              The first factor, and really the one that is

8    dispositive here, is the likelihood of success on appeal.

9              It is the defendants' burden to show that in the

10   currently pending appeal, they are likely to succeed.  And

11   they have failed to do that.

12             I say that focused on how narrow and particular

13   the issues are that are the subject of the current appeal.

14   They are, as I understand it, basically twofold:

15             First, whether this Court or instead the

16   arbitration panel should decide the arbitration or

17   arbitrability issue.  And,

18             Second, whether it is this Court that is to

19   decide the arbitrability issue, did we apply the correct

20   standard for deciding it, which is something akin to a

21   summary judgment standard.  And in applying that standard,

22   relatedly, did we perhaps err in finding genuine disputes

23   of material fact?

24             That is all that I understand the appeal is

25   about, those issues I have just issued.  And I'm just not

1    persuaded that defendants are likely to prevail on appeal on

2    any of those issues.

3              Now, I do continue to think there is a real

4    chance that defendants will prevail at the forthcoming trial

5    on the arbitration issue.  That is, I think there is some

6    likelihood that the defendants will ultimately show that the

7    parties' disputes should be in arbitration.  And I recognize

8    that that is the decision the arbitrators have reached

9    already, but those are not the issues that are currently

10   before the Third Circuit in the current appeal.  So even if

11   I say that defendants have shown they're likely to succeed

12   in showing arbitrability, that does not help them meet their

13   burden on the current request for a stay pending appeal.

14             In fact, I think not only does all of that not

15   help the defendants, I think it hurts their request for a

16   stay today, because if I do think it is likely defendants

17   are, after the trial on arbitrability, to prevail in showing

18   that this case should be arbitrated, then it seems to me I

19   should be trying, as I am trying, to get to that trial as

20   quickly as I can so we can find out if it's true that the

21   case should be in arbitration and a stay would, among other

22   things, delay the time in which we would otherwise get to

23   the arbitration trial.

24             So having found that the defendants haven't met

25   their burden on the first requirement for discretionary

1    stay, it follows the Court must deny that stay.

2              I will briefly touch on the other factors.

3              Irreparable harm to the defendants from the

4    lack of a stay and harm to Gillette were I to enter a stay.

5              I recognize there is harm on both sides here

6    and there is risks to both sides no matter how I choose to

7    proceed.  It's possible given that I'm denying the stay that

8    defendants may incur millions of dollars of legal fees and

9    lose some portion of what they bargained for in terms of

10   arbitrability.  That may turn out to be the case if in fact

11   this all should have been arbitrated from the beginning or

12   the Third Circuit eventually says that.  That is a real risk.

13             On the other hand, there are risks to Gillette

14   if I were to stay the case and delay getting to trial and

15   delay them getting their day potentially to prove that

16   they're suffering every day in the market from unfair

17   competition based on infringement of their patent.

18             I need not decide which of these is the greater

19   harm or the greater risk or what might constitute irreparable

20   harm versus reparable harm.  The point is there are risks and

21   harms on both sides, substantial on both sides.  I can't

22   eliminate all of it by any stretch.  And the defendants have

23   failed to meet their burden on the first factor, so I don't

24   need to make any decision on the rest of it.

25             Similarly, on public interest.

1                    There is important public interest on both sides.

2     I think that almost goes without saying.  The public has an

3     interest in the patent system and enforcing patent rights.

4     They have an interest in enforcing arbitration agreements and,

5     of course, we talked about promoting arbitration.  I don't

6     need to again here unpack which interest is greater under the

7     circumstances here.  Either way, the defendants have failed to

8     meet their burden.

9                    So I will not be entering a stay.  I will issue,

10    probably tomorrow at this point, a very short oral order

11    that simply says the request for a stay is denied.

12                   I will also, and hereby do, order a joint status

13    report.  I would like it by Friday.  I want you to address,

14    among anything else you want to tell me, what is the

15    parties' availability for a trial on the arbitration issue

16    any time between October and the end of January.  Give me

17    again your requested amount of time.  Essentially I'm

18    hearing two to three days, and if that is what you are

19    requesting, that's fine, but put something in writing as to

20    what that request is.

21                   Also, provide me a proposal for how and when I

22    should resolve whether this trial is a bench trial or a jury

23    trial.  I'm guessing it's unavoidable we'll need some at

24    least limited briefing on that question.

25                   And I also want a further update on what

1    discovery disputes are ripe and if you are continuing to

2    request through the discovery matters procedure that I set

3    up a letter briefing and teleconference schedule.

4              That's it for me.  Are there any questions about

5    any of that, first, from defendants?

6              MR. WIT:  No, Your Honor.  Thank you, Your

7    Honor.

8              THE COURT:  And from plaintiff?

9              MR. JAY:  No, Your Honor.  Thank you.

10             THE COURT:  Thank you all very much.  We will be

11   in recess.

12             (Oral argument hearing ends at 5:08 p.m.)

13

14        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

15

16                      /s/ Brian P. Gaffigan
                        Official Court Reporter
17                       U.S. District Court

18

19

20

21

22

23

24

25