1              IN THE UNITED STATES DISTRICT COURT

2            IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -
   THE GILLETTE COMPANY,
4                                   :      CIVIL ACTION NO.
           Plaintiff,               :
5                                   :
              v.                    :
6                                   :
   DOLLAR SHAVE CLUB, INC., DORCO   :
7  COMPANY LTD., and PACE SHAVE, INC., :
                                    :      15-1158-LPS-CJB
8          Defendants.
                               - - -
9
                        Wilmington, Delaware
10              Monday, October 15, 2018
                    Telephone Conference
11
                          - - -
12
   BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge
13
   APPEARANCES:                 - - -
14

15           MORRIS NICHOLS ARSHT & TUNNELL, LLP
             BY:  RODGER D. SMITH, II, ESQ.
16
                     and
17
             GOODWIN PROCTER, LLP
18           BY:  MARK J. ABATE, ESQ., and
                  MICHAEL B. COTTLER, ESQ.
19                (New York, New York)

20                   and

21           GOODWIN PROCTER, LLP
             BY:  JENNIFER A. ALBERT, ESQ.
22                (Washington, District of Columbia)

23                 Counsel for The Gillette Company

24

25                         Brian P. Gaffigan
                           Registered Merit Reporter

1    APPEARANCES:   (Continued)

2

3                    SHAW KELLER, LLP
                     BY:  DAVID M. FRY, ESQ.

4                        and

5                    KIRKLAND & ELLIS, LLP
                     BY:  F. CHRISTOPHER MIZZO, P.C., and
6                         HELENA D. KIEPARA, ESQ.
                          (Washington, District of Columbia)

7
                              Counsel for Dollar Shave Club, Inc.,
8                             Dorco Company Ltd., and Pace Shave, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22                              - oOo -

23                     P R O C E E D I N G S

24               (REPORTER'S NOTE:  The following telephone

25   conference was held in chambers, beginning at 2:33 p.m.)

1    THE COURT:  Good afternoon, counsel.  This is

2    Judge Stark.  Who is there, please?

3    MR. SMITH:  Good afternoon, Your Honor.  It's

4    Rodger Smith at Morris Nichols on behalf of the plaintiff

5    Gillette, along with Mark Abate, Michael Cottler, and

6    Jennifer Albert from Goodwin Procter.

7    THE COURT:  Okay.

8    MR. FRY:  Good afternoon, Your Honor.  This is

9    David Fry from Shaw Keller on behalf of the defendants; and

10   with me on the line today are Christopher Mizzo and Helena

11   Kiepura from Kirkland & Ellis.

12   THE COURT:  I have my court reporter here with

13   me.  For the record, it is our case of The Gillette Company

14   versus Dollar Shave Club Inc., et al, Civil Action No.

15   15-1158-LPS.  And this is the time we set to talk about

16   discovery-related disputes that both sides have raised.  I

17   wanted to start first with the issue raised by Gillette

18   regarding the ████ blades.  So let me hear from Gillette on

19   that, please.

20   MR. ABATE:  Thank you, Your Honor.  This is Mark

21   Abate.

22   So during discovery, before the Third Circuit

23   entered the stay in this case, we saw some passing references

24   in the documents to ████  That was concerning to us because

25   ████ was not a search term used by the defendants in the

1    collection and production of their electronic documents in

2    this case.

3            So we requested additional discovery at that

4    time, including product samples.  In response, defendants

5    represented to us that ███████████████████████████████

6    ██████████████████████████████████████  and they refused to

7    give us that discovery.

8            So then we fast forward to we have the stay in

9    place.  The arbitration tribunal issues a decision, and the

10   Third Circuit lifts the stay; and we approached the defendants

11   to negotiate a new schedule, and the parties had competing

12   schedules.  We submitted them to Your Honor.  Your Honor

13   entered a schedule in August.  As part of that, we dropped

14   some patent claims, from 21 down to seven.

15           About a week later, the defendants produce a

16   product sample.  And we say what is this?  They say, well,

17   this is the ███ product; and it has been imported since

18   March of 2018.

19           So this is in August.  In August, then we again

20   asked for additional discovery concerning ███  At that

21   time, there was time in the schedule to deal with it, and

22   we could have dealt with it.  We specifically asked for the

23   same types of discovery that we had for the other products,

24   the two other classes of products that are accused in the

25   case.  We also asked for resumption of 30(b)(6) depositions

1    to be able to question about the documents; and defendants

2    refused.

3              That brings us to today.  And what we propose

4    in our letter is sort of handling this one of two ways:

5    either grant our motion for a protective order to keep it

6    out of the case so that there is no issue as to estoppel or

7    negative implications, things like that, or alternatively

8    grant discovery on it; and if there is discovery granted on

9    it, we would ask for certain accommodations, which I could

10   get into, such that we can actually complete the discovery

11   in time so we can keep our current trial schedule.

12             With respect to the protective order, our

13   thinking is simply that at some point in the case, discovery

14   has to end.  New products are always being introduced.  This

15   case has already been delayed over a year because of our

16   trip to the arbitrators; and a protective order would just

17   guarantee that this case can go forward, we can have our

18   April trial without any further delay.  Alternatively, we're

19   requesting more fulsome discovery on ▉▉

20             Let me address two aspects:  The one is

21   discovery.  And the second, why more fulsome discovery is

22   needed.

23             So in terms of the current status, the

24   production on ▉▉ is paltry.  They claim to have produced

25   ▉▉  documents, but, Your Honor, in this case, defendants

1    have produced over ███ documents.  So ██ amounts to

2    about two and-a-half percent of the production.  That's

3    clearly not a commensurate production that we have for the

4    other products in the case.

5            Dollar Shave Club in particular produced a

6    single document, a fully formed 48 page report, but no other

7    documents.  I mean there has got to be some other backup

8    that occurred leading up to the creation of this ████

9            There were the product samples I mentioned and

10   also additional ██ documents produced after the stay was

11   lifted.  That is, of course, after all the witnesses were

12   deposed.  So we have no depositions on those documents.  And

13   I think by virtue of the fact that they were produced at

14   the end of discovery, it's fair to assume that these are

15   probably very important documents that defendants would rely

16   on if ██ was in the case.

17           So how could we possibly be expected to accuse

18   the product and go to trial on it when we haven't had any

19   deposition testimony on these new documents or the new

20   product samples?  How could our expert rely on any of these?

21   How could we possibly cross-examine on them?  It's just not

22   feasible.

23           Now, there were some ██ documents produced

24   before the stay, that is true, but they're mostly in the

25   nature of what I would call ██ documents as opposed to

1    documents stating █████████████████████████████

2    ████████████████████    And, importantly, the pre-stay

3    documents only reference work on ████ in passing, and that

4    is I think largely because the search terms didn't use the

5    term ███████   We used the names of the other products in the

6    search terms.

7              There was one very technical document produced

8    before the stay on ████   We used that one at a deposition; and

9    the ████████████████████████████████████

10   ████████████████████████████████████████████

11   ██████████████████████████

12             So that is the status of where we are.   The

13   reason why we would request further discovery, if we're asked

14   to bring ████ into the case, is you can see in Exhibit 12 to

15   our letter brief is selected pages of our infringement

16   contentions.   What you see there, there are lots of ████████████

17   in the documents that go to infringement issues in the case.

18             So, for example, these are the documents in the

19   current infringement contentions, those are the documents

20   as to the two classes of products that we have accused.   So

21   the documents describe those products as having, for example,

22   ████████████████████████████████████

23   ████████████████████████████████████

24   ████████████████████████████████   which goes

25   to a dependent claim.

1     ████████████████████████████████████

2     ████████████████████████████████████████

3     █████████████████████████████████████████

4     █████     These are all things talked about in the patent, in

5     the specification as benefits of the invention.

6     ████████████████████████████

7     ██████████████████████████████

8     █████████████████████

9         So these are all attributes of the invention

10     described and claimed in the patent ██████████████

11     ████████████████████████████████████████████

12     ██████████████████████████████████████

13     ██████████████████████

14         It is absolutely inappropriate to expect us to

15     go to trial on a product merely having a product sample and

16     testing it, without having any background documents or without

17     any depositions.

18         Last point on this, Your Honor. Ironically,

19     the very best discovery I have on ████ is on page 1 of their

20     letter to the Court where they say -- it says that ████

21     ███████████████████████████

22         Interestingly, they don't actually have support

23     for that statement. ███████████████████

24     ██████████████████████████████

25     ████████████████████████████

1　　████　　That is Exhibit 1.  In their brief, they cite page

2　816 of that exhibit.

3　　　　　　One other thing.  On the documents they cite

4　████████████ which is documents 13 through 16, those

5　documents don't even reference ████  So there is no way I

6　can link those ████████████████████ unless I have

7　deposition testimony.  So if we're going to go forward

8　with ████ in this case, in fairness, we just need additional

9　discovery, and we can talk about some accommodations I would

10　ask for in the schedule if the Court is inclined to go that

11　way.

12　　　　　　But let me just turn to our motion for protective

13　order.

14　　　　　　In our view, it was a little underhanded the way

15　the negotiation on the schedule was treated and the dropping

16　of claims.  As I mentioned, they represented to us ████████

17　██████████████████████████████████████████████████████

18　And then we negotiated the whole schedule -- this was over the

19　course of about two months.  We're negotiating the schedule,

20　negotiating the dropped claims and dropped prior art

21　references, and at no time at all were they mentioning ████ or

22　that they wanted to bring ████ into the case.  And they wait

23　until a week after we drop claims and a week after the Court

24　entered the schedule in the case to tell us about ████

25　　　　　　In our view, it's just too late to interject it

1  into the case.  We're into expert discovery now.  We have

2  already exchanged the burden of proof of reports, and the

3  case has been delayed a year.  We just don't think we should

4  have to have the trial date pushed out because of their

5  conduct with respect to how they handled ██ and making it

6  known to us when the case resumed.

7          THE COURT:  Mr. Abate, let me interrupt you with

8  just a couple quick questions before we move on.

9          MR. ABATE:  Sure.

10          THE COURT:  They suggest that given the claims

11  you dropped, we can tell that you wouldn't have dropped

12  different claims if you knew ██ was going to be part of

13  this case.  Respond to that.

14          MR. ABATE:  I can't say that for certain.  We

15  have very little discovery on ██ so I can't say for

16  certain that we would not have dropped the claims that we

17  dropped if ██ were in the case.

18          Now, for example, they point to some claims that

19  had the doping limitation, but remember also there were some

20  method claims in the patent.  And we dropped those as part

21  of this.  There was an overall agreement we dropped those to

22  avoid certain plant discovery inspection, but had ██ been

23  in the case, perhaps we would have maintained that process

24  claim and would have gone forward with the plant inspection.

25          THE COURT:  All right.

1          MR. ABATE:  I cannot say categorically we would

2     have taken a different tact had we known about ██ and had

3     discovery on it because right know I don't know much about

4     that product.

5          THE COURT:  Okay.  Just briefly, if I don't do

6     the protective order, whatever accommodations you have in

7     mind, would they keep us on track for an April schedule, in

8     your view?

9          MR. ABATE:  Well, that is what we would want to

10     do.  I can tell you what they are quickly.

11          THE COURT:  I don't want to get into the details

12     of them.

13          MR. ABATE:  Yes.

14          THE COURT:  I just want to understand if you

15     thought the trial date was still possible?  It sounds like

16     you do think it is possible.

17          MR. ABATE:  Yes.  And the one point -- I think

18     the parties could negotiate a new schedule, but the one

19     thing we need the Court to do, you entered the dates for

20     completion of summary judgment and *Daubert* motions.  You

21     entered that in one of your orders, so that is not something

22     the parties can move, so we would have to have the Court

23     move that, and we can work with the other dates to make

24     everything happen.

25          THE COURT:  If I did the protective order, would

```
 1    you envision that, meaning at trial, the world would be as
 2    if ████ doesn't exist or could parties, for instance, still
 3    point to it for other purposes?  I don't know, if it's
 4    allegedly a noninfringing alternative or something like that
 5    or would it be it just doesn't exist?
 6              MR. ABATE:  It doesn't exist is how we would
 7    handle it.  And the reason why is we don't want a negative
 8    inference being drawn.  For example, the one you just
 9    mentioned, that there is a noninfringing alternative out
10    there.  I wouldn't want that to be drawn.  I think in
11    fairness, you either be able to accuse it or it has to be
12    out of the case altogether.
13              THE COURT:  All right.  Thank you.  Let me hear
14    from the defendants on this first dispute.
15              MS. KIEPURA:  Your Honor, Helena Kiepura for
16    defendants.
17              So just at the outset, one thing that we want
18    to point out is that Pace has asserted counterclaims of
19    noninfringement in this case.  This isn't really a motion
20    for a protective order, it's a motion to dismiss.  Pace
21    is entitled to have the Court decide whether ████ infringes,
22    even if Gillette is arguing that it wants to drop its
23    infringement claims against it, which it appears to have
24    done given its failure to provide any sort of proof
25    whatsoever despite having discovery.
```

1         So moving on to the second issue.  Even if it

2 was proper for them to be seeking some sort of protective

3 order, that should be denied as well because Gillette, they

4 are mischaracterizing the discovery that it had regarding

5 ██████ and they had all the discovery they needed to make an

6 infringement case against ████  They just simply have chosen

7 not to do so.

8         So prior to the stay, Gillette had all the core

9 technical documents it needed to accuse ████ of infringement.

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████

16 ██████████████████████████

17         They had over ████ documents.  This included R&D

18 reports and testing reports.  And to their point that that is

19 a smaller production than as to the other accused products,

20 that makes sense given that it is a newer product and the

21 amount of documents going back in time would be fewer given

22 that it's a newer product that was, at the time the case was

23 stayed, still not being sold in the United States, and it was

24 a new product.

25         THE COURT:  All right.  Let me interrupt you

1    there.

2              Can you represent that you produced the same

3    type and extent of documents for ███ as you have for the

4    other two accused blades?

5              MS. KIEPURA:  As to the core technical type

6    documents?  Yes, and to the extent that they existed.

7    Because, as I mentioned, the ███ product, it was not being

8    sold in the United States at the time of the stay, so there

9    were not certain types of documents, such as financial sales

10   documents, for example, showing they were sold in the United

11   States. ███████████████████████████████

12   ████████████████████████████████

13   ████████████████████████████████

14   ██████

15             THE COURT:  All right.  But if I don't limit my

16   question to core technical documents, can you say that you

17   have made the same type and extent of document production

18   for the ███ as for the other two accused blades?

19             MS. KIEPURA:  Mr. Abate is correct that ███ was

20   not a search term used in the searching for documents to be

21   produced because at the time, it was not a product being

22   sold in the United States.  But many of the documents that

23   hit on search terms are coextensive with the documents that

24   were produced for other types of products.

25             THE COURT:  Okay.  But that suggests to me

1    that either we don't know how many unique documents are

2    still left to be produced if we did search for ███ or you

3    do know and it's something more than zero.  Right?

4              MS. KIEPURA:  Our understanding is that it

5    would be -- if we were to search for ███ it would not be a

6    significant number of additional documents that would need

7    to be produced over what has already been.

8              THE COURT:  And with respect to the depositions,

9    did they have any incentive to fully explore with the

10   deponents issues related to ███ at the time that they were

11   taking the deposition?

12             MS. KIEPURA:  They did.  They deposed a Mr. Oh

13   whose entire job description is that he worked on the NTG

14   product, so given that they sought the deposition of the

15   specific person, they clearly had the incentive to ask him

16   questions about the ███ product.

17             THE COURT:  All right.  Well, first off, I guess

18   what is it that you propose on behalf of Pace?  That your

19   counterclaim for noninfringement will be part of this trial

20   or summary judgment process but no further discovery should

21   be permitted?  Is that the idea?

22             MS. KIEPURA:  Yes, that's correct.  Because

23   essentially Gillette received samples from us five weeks

24   before the close of fact discovery, eight weeks before the

25   opening expert report, and essentially they appear to have

1    just chosen not to accuse ████ despite having those samples.

2    Given that, it would not be fair to us given that we have

3    got expert reports due in about three weeks now.  It would

4    not be fair to us to have to continue on given the amount

5    of discovery that Gillette already had and their failure to

6    accuse it in light of the discovery they already had.

7              THE COURT:  How did the five weeks and eight

8    weeks line up when you disclosed to them that you have been

9    importing the ████ product?

10             MS. KIEPURA:  It was immediate.  We disclosed it

11   and provided samples immediately at five weeks was when we

12   disclosed and provided the samples, which was in line with

13   the agreement that the parties had come to regarding the

14   schedule.  We sat down when the case was unsaved.  We

15   negotiated a schedule, negotiated a timeline for when parties

16   were going to be providing updated discovery responses to

17   account for things that had occurred during the pendency of

18   the stay.

19             So that was five weeks when we provided the

20   sample and made the disclosure.  And then eight weeks is the

21   same, eight weeks from the time, expert reports.

22             THE COURT:  At the time you were negotiating the

23   schedule, and at the time they dropped some of the claims,

24   had you disclosed to them that you were importing the ████

25   If not, why should that not weigh heavily on my decision?

1                MS. KIEPURA:   The issue with regard to the

2  negotiation of the dropped claim, again, Gillette is making

3  this argument that they would have chosen different claims

4  to drop.   The █████ product, as Gillette was well aware from

5  the discovery that we had already provided on it, ████████████

6  ████████████████████

7            There is a misrepresentation made during

8  Gillette's argument which is that they mention that we

9  said in our letter that the ████████████████████   That is

10  not the case.   That is not what we said.   The ██████████

11  ████████████████████████████████████

12  ███████████████████████████████

13  ███████████████████████████████

14  ████████████████████████████████████

15  ██████████████████████████████

16  ██████   Frankly, they dropped the method claims because

17  they were trying to prevent discovery of their own

18  manufacturing process.

19            Then the other claims they dropped, which were

20  the doped claims, as noted in briefing, ██████████████

21  ████████████████████████████████████

22  █████████████████████████████████████

23  █████████████████████████████████████

24  ███████████████████████████

25            THE COURT:   If I --

1           MR. ABATE:  Your Honor, if I may.

2           THE COURT:  Hold on.

3           MR. ABATE:  I'm sorry.

4           THE COURT:  If I don't grant the protective

5    order and alternatively allow additional discovery, Ms.

6    Kiepura, can we keep this trial on track for April?

7           MS. KIEPURA:  Yes, absolutely.

8           THE COURT:  Okay.  Is there anything else you

9    want to say, Ms. Kiepura?

10          MS. KIEPURA:  Not at this point, Your Honor.

11          THE COURT:  Mr. Abate, briefly, you can respond.

12          MR. ABATE:  Yes.  So on the one point about, it

13   sounded like sort of a waiver argument that we didn't put it

14   in our expert reports, we didn't do that because the letter

15   was already before Your Honor about this issue.  And in the

16   expert reports, we noted that we would supplement, if allowed.

17          On the issue about the doped claims, a very

18   interesting point Ms. Kiepura made is there is a ███████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ██████    So I cannot say, and I don't think she can say,

22   whether the doped claims would have been relevant to this

23   product or not, categorically.  The fact that she says the

24   ███████████████████████████████    means that we certainly may have

25   asserted some of those claims.  As I mentioned earlier, we

1   may have asserted the method claims.

2           With the respect to the documents, ███ was not

3   a search term in the search terms string that was used.  The

4   fact that other product names were used, I mean that is

5   fine.  And maybe ███ gets picked up in passing, but you are

6   not going to get the ████████████████████████

7   ████████████████████████████████████

8   ████████████████████████████████

9   ████████████████████████████

10          Just at a fundamental level, I have a problem

11  with the idea that defendants are saying we're entitled to

12  tell you what documents you get; and for this product, you

13  are only getting core technical documents, and that is it.

14          That's what we get, Your Honor, when we are 90

15  to 120 days out when the case begins.  That is not what

16  we're getting in discovery and it is absolutely inappropriate

17  to have my expert come out and give an infringement opinion

18  without the full scope of the materials before her.

19          THE COURT:  What about the fact there is this

20  counterclaim for noninfringement?  What would you have me do

21  with that?

22          MR. ABATE:  Well, the counterclaim would apply

23  to the products in the case if you grant the protective

24  order.  If you grant the protective order, the counterclaim

25  applies to the products in the case, and the idea would be

1    that if the parties want to bring a separate suit, one of

2    the parties on this other product, they can.

3                One thing about these other products, Your

4    Honor, it seems to be ███████████████████████████████

5    ████████████████████████████████████████████ There

6    is no guarantee that either party is going to file a new

7    case on it, but the idea would be it's out of this case

8    for this purpose, and it is not in the case for the

9    counterclaims; but if the counterclaims are a sticking

10   point, then I guess we have to go the discovery route.

11   That's okay.  We'll have to work that out in the schedule;

12   and I think we have to extend the date for the final briefing.

13                The other accommodations I would ask for is

14   that the witnesses are being deposed in the U.S. rather than

15   Korea because that creates a lot more complications.

16                If they have any documents already translated

17   relating to ████    that they produce the translations.

18                The parties would work together to revise the

19   schedule.  And I would suggest that we push the schedule

20   on the summary judgment back, say, four to six weeks for

21   the final briefing.

22                Also, on deposition hours, I would request

23   12 hours with Dorco's witnesses and six hours with Dollar

24   Shave witnesses.  The reason why I make that request is

25   because we have 12 hours of our deposition time left in the

1    total that you gave us at the beginning of the case, so I

2    just wanted to make clear that we think we would need

3    18 hours to complete.

4            The reason why we need the extra time with Dorco

5    is just because the witnesses are deposed with a translator,

6    they speak Korean, so that takes a fair amount of time.  I

7    suspect with Dorco, there would be more than one witness,

8    but with Dollar Shave only one.

9            THE COURT:  Thank you.  I want to give you a

10   decision on this so we have some time to go on to the other

11   dispute.

12           My decision is that ███ is part of this case, and

13   I don't think the request for discovery from the plaintiff

14   is untimely under the totality of circumstances.  So you are

15   going to have to meet and confer and propose some reasonable

16   accommodations and modification to the schedule so that every-

17   one can have a full and fair opportunity to take discovery and

18   serve expert reports and take depositions and litigate whether

19   ███  in fact, infringes or not.

20           I think under the circumstances, it's clear to

21   me that plaintiff has reasonably relied on what it was told

22   by the defendants which before this day was essentially that

23   ████████████████████  and after the stay was lifted but

24   only after the schedule had been negotiated and, notably,

25   only after the plaintiff dropped some of its claims, as they

1    were required here to do, only then was the plaintiff told

2    about █████████████████

3           So I find from what I am understanding that

4    the plaintiffs have not received a production of documents

5    commensurate to the production for the other two accused

6    products, they have not received that for the ████  They

7    did not have the motivation or incentive to explore in

8    deposition or, frankly, the ability to fully explore in

9    deposition issues related to ███ because they didn't have

10    the documents, and they're entitled to all that.

11           Now, I think on the whole, it's better that we

12    not enter a protective order and in part create a fiction

13    that the ███ doesn't exist.  You always have to be concerned

14    about how that could cause bigger problems at trial when we

15    have to basically tell witnesses, pretend that ███ doesn't

16    exist.

17           Further, I think there is time in the schedule

18    between now and April, because I'm not moving the trial

19    date, to have everyone be fully and fairly heard and take the

20    necessary discovery to deal with the ████  Plus, there would

21    be the issue about what to do with the counterclaim, were I

22    to entertain the protective order.

23           I'm not ruling on the accommodations that

24    Mr. Abate has mentioned.  I want the parties to meet and

25    confer on those.  I can say on first pass they all sounded

1   reasonable to me, but that is not an order.  I have not

2   heard from the defendants on those.

3            As you all try to figure out how to modify the

4   schedule, I am definitely willing to give you more time for

5   getting the briefing in on the dispositive and the *Daubert*

6   motions.  I'll need at least a couple of weeks before any

7   hearing for the briefing to be completed, but I am willing

8   to move quickly in order to make this all happen.

9            So you all meet and confer.  I hope you can work

10  out a schedule.  If you can't, then let's say by Wednesday,

11  get me a joint letter with your disputes, and I will try to

12  resolve them as soon as I can.

13           Are there any questions about that, Mr. Abate?

14           MR. ABATE:  No, Your Honor.  Thank you.

15           THE COURT:  And Ms. Kiepura, any questions?

16           MS. KIEPURA:  No, Your Honor.

17           THE COURT:  Let's move on in our remaining time

18  to the issue raised by defendants.  The request for an

19  order to produce more documents related to the infringement

20  contentions.

21           Let me hear from defendants first, please.

22           MR. MIZZO:  Good afternoon, Your Honor.  Chris

23  Mizzo from Kirkland representing the defendants.

24           Yes.  By way of background, in October 2017,

25  defendants moved to compel production of documents that form

1    the basis of Gillette's infringement contentions because

2    those contentions relied on select images and results from

3    tests of the accused products.

4         When Gillette refused to produce documents

5    regarding those tests, we moved for relief.  The case was

6    stayed, but after the stay was removed, the Court issued

7    its order on July 23, 2018 granting defendants' motion to

8    compel.

9         The Court found that under the circumstances,

10   Gillette waived any potential privilege or protection that

11   they may want to apply to disclosed images, and that would

12   not further the interest of fairness or efficiency to make

13   defendants wait for expert discovery to learn Gillette is

14   relying on the images and only thereafter be in a position

15   to analyze and potentially take discovery of them.

16        So based on that order, on August 3rd, 2018,

17   Gillette made a partial production of testing documents,

18   but that production is deficient with notable gaps in the

19   production.

20        Further, defendants sought additional limited

21   deposition testimony by way of a 30(b)(6) notice of Gillette,

22   and Gillette refused to produce any additional deposition

23   testimony, or any deposition testimony on those tests.

24        So that leaves us or brought us to then file

25   this motion.  As part of this motion, we seek three different

1    types of materials, Your Honor:

2              The first are materials related to tests of

3    accused products not expressly cited in the infringement

4    contentions.

5              The second set of materials are materials

6    related to tests expressly cited in the infringement

7    contentions.

8              Then the third is a Gillette corporate witness

9    for deposition.

10             Taking them in turn, beginning with materials

11   related to tests of accused products not expressly cited in

12   the infringement contentions.

13             Gillette has admitted that it limited its

14   production in response to the Court's July 23rd order to

15   "cited tests."  It does not dispute there are tests of the

16   same accused products that it has withheld.

17             Defendant's original motion wasn't limited to

18   what was cited in the infringement contentions.  Rather,

19   they sought the materials that formed the basis for those

20   contentions which is broader.

21             We believe the plain language of that, which Your

22   Honor quoted in the decision that formed the basis, includes

23   not only what was expressly cited in their infringement

24   contentions but all of the tests that Gillette considered when

25   shaping its infringement narrative.  For example, if Gillette

1    tested a type of razor called the 4X, and it tested it ten

2    times and nine of those gave terrible results and one was less

3    terrible, and they decided to cite that less terrible result,

4    we believe that all ten form the basis for the contention and

5    should be produced.  Thus, we believe that Gillette should be

6    ordered to produce all the tests and related materials

7    concerning the accused products whether or not expressly cited

8    in the contentions.

9            Now, in their opposition, Gillette refers to

10   uncited testing in a time that seems to suggest that what

11   we're seeking is information related to unaccused blades.

12           To be clear, Your Honor, we are not seeking

13   production of testing related materials for unaccused products.

14   This request is simply for the products that have been accused

15   for which they did submit tests, and it's stuff they would

16   have considered when formulating their infringement contentions.

17           On to the second category of documents or

18   materials.  Materials related to tests that are expressly

19   cited in the infringement contentions.

20           Gillette contends in its opposition that it has

21   complied with the Court's Order, but it did not do so.  Its

22   production remains deficient.  There are types of documents

23   that we would expect to see that relate to the test expressly

24   cited that they have not produced.

25           For example, inspections given to their

1    third-party testing company, EAG, whether correspondence or

2    otherwise.  They haven't produced any instructions.  We would

3    expect those instructions, for example, to include the types

4    of tests and the scope requested, the locations, the tests

5    for each sample, including which locations might be relied

6    upon.  Who ordered the test to be done?  The directions for

7    sample preparation, and so on.

8              There is also, it's also clear based on the

9    documents that they produced that EAG has a job folder for

10   the different tests that it conducts.  Those job folders may

11   have but we don't know because they haven't been produced,

12   but we guestimate that the job folders would hold things

13   like analytical protocols, analysis locations, results,

14   interpretation results.  They haven't produced those.  They

15   have only produced reports, finished reports.

16             In that regard, we also haven't seen any raw

17   data or raw images.  We haven't seen things that were not

18   included in the reports that were taken of the exact accused

19   products that are included in their infringement contention.

20             So, for example, if they took images of the

21   same blade from different magnification, and they weren't

22   included in the document that they produced, even though

23   it's from the same exact test, they haven't produced them.

24             They haven't produced verifications regarding

25   calibration of the equipment or dates when any of this stuff

1    was done.  So there is a lot of material that we would expect

2    to see there for the tests that even they expressly cite in

3    their infringement contentions and we have not seen in their

4    production.  That is the second category of materials that we

5    are seeking to compel disclosure of.

6            The third request, Your Honor, concerned a

7    Gillette corporate witness.  Now, Gillette admits it has

8    refused to provide a 30(b)(6) deposition on the testing

9    that is taking place; its primary argument that a deposition

10   of Gillette would be wasteful because really EAG, that third

11   party, has the information that we want.

12           But Gillette is mistaken.  And even if EAG has

13   that information or knows that information, that does not

14   allow Gillette or shouldn't allow it to dodge a deposition.

15           First, there is no dispute that the information

16   that is being sought is relevant, and that deposition

17   testimony is appropriate.

18           Second, there is no dispute that Gillette has

19   or should have some information responsive to the topics

20   served on Gillette.  In fact, based on Gillette's working

21   relationship with EAG and greater familiarity with the

22   tests done by EAG, we believe that Gillette played a role

23   in the tests done by EAG that led to the tests cited and

24   that form the basis of their infringement contentions.  And

25   we believe we should be allowed to explore that role and

1    the facts regarding those tests as part of the deposition.

2                   THE COURT:  All right.

3                   MR. MIZZO:  That way --

4                   THE COURT:  All right.  Mr. Mizzo, right, we're

5    starting to run out of time.

6                   So with respect to EAG in this request, are you

7    asking me to order something directly from EAG or you are

8    only looking for whatever you can get from Gillette?

9                   MR. MIZZO:  Your Honor, the parties have agreed

10   that EAG is going to sit for a deposition.  This particular

11   motion that is before you concerns the scope of discovery

12   that we're going to obtain from Gillette which will also

13   inform the scope of discovery that we would get from EAG.

14                  So, for example, if Your Honor rules that they

15   have withheld the materials and should produce the materials

16   that concerns tests of the accused products that are not

17   expressly cited, then that would also be testimony that EAG

18   would provide on those tests that were done.

19                  However, the motion that is before you, Your

20   Honor, concerns compelling discovery from Gillette and

21   concerning the tests.

22                  THE COURT:  Okay.  And if I don't agree with

23   your interpretation of the earlier motion and order, do you

24   have an argument that I should nonetheless grant the relief

25   that you are seeking today?

1          MR. MIZZO:  I guess the question -- I guess

2     it's difficult, Your Honor, because I'm not sure, when you

3     say that you may not -- if you do not agree, what would that

4     disagreement be, because I'm in a situation right now where

5     their expert cites this testing that was done by Gillette.

6          They said that this testing was directed by

7     counsel, not by a testifying expert.  That is why they moved

8     in front of you and said they should be protected because it

9     has nothing to do with their testifying expert.

10          It turns out the testifying expert relies on the

11    testing that has now been done.  We believe it is appropriate

12    under the Court's order, and we believe that the appropriate

13    order, the scope of it would concern not only what was

14    expressly cited but what form the basis for those contentions.

15          So I guess it would be depending on how you

16    disagree with our reading of the order as to how I would

17    respond, but I believe that the scope encompassing test of

18    accused products is appropriate.  And I believe that their

19    withholding of additional materials related to even the

20    stuff that they have disclosed is also inappropriate under

21    the Court's order.

22          THE COURT:  Okay.  Thank you.

23          Let me hear from plaintiff, please.

24          MR. COTTLER:  Good afternoon, Your Honor.  This

25    is Michael Cottler from Goodwin Procter.

1              So let me address the first issue, which is what

2    does the Court's prior order require?  That is D.I. 564.

3    That, of course, is the question that the parties presented

4    to Your Honor.  It was not whether there was waiver over

5    tests that Gillette did not cite in its contentions.

6              Gillette's response to defendants' letter

7    directly answered that question; and in stark contrast,

8    defendant's letter pretty much danced around it.

9              Going back to Docket No. 526, that was the

10   parties' joint letter to the Court that had the parties ask

11   the Court to set briefing on this issue.  And the issue was

12   Gillette's refusal to produce documents related to its

13   testing of defendants' products relied upon by Gillette in

14   its infringement contentions.

15             It is pretty clear that the parties were looking

16   to address whether they should have to produce the documents

17   relating to those tests that Gillette relied upon in its

18   contentions and nothing more.

19             The defendants' opening motion was consistent

20   with that.  They said that Gillette should have to produce

21   the documents that form the basis for its contention.  And

22   nowhere in their letter do they ever talk about tests that

23   Gillette never relied upon.  In fact, the whole point of

24   defendants' letter, the harm they alleged was they didn't

25   know how Gillette performed the testing that allegedly shows

1   infringement.

2             Now, Your Honor, once the defendants got that

3   discovery from Gillette, they said, oh, we want more.  Now

4   they want all the tests from July 6th.  That wasn't what

5   they asked for.

6             THE COURT:  Mr. Cottler, let's start there then.

7   Why shouldn't I give them that at this point?  I mean I

8   have the same concern Mr. Mizzo raised.  What if you all

9   did ten tests and nine out of ten were not consistent with

10  infringement?  Shouldn't the defendant know that at this

11  point in the case?

12            MR. COTTLER:  With respect, no, Your Honor.  So

13  the testing done by a nontestifying expert, here EAG, is

14  protected under Rule 26(b)(4)(D), and that was formerly

15  (b)(4)(D).  In our response, Your Honor, Gillette cited

16  the *Holinger* case, which addresses the protection covered

17  by 26(b)(4)(D), and that governs discovery of facts known

18  and obtained, held by experts and acquired or developed in

19  anticipation of litigation or for trial.

20            The Court there explains that this rule forbids

21  discovery of the facts found or the opinions formulated by

22  an opponent nontestifying expert with the exception of

23  certain exceptional circumstances, which defendants have not

24  shown here.

25            The Court further noted that while the rule

1    itself does not address waiver, it identified that courts

2    have generally held that partial disclosure of a

3    nontestifying expert's work product does not waive rights

4    to withhold undisclosed work product.  That is at page 522

5    of the decision, and it goes on to cite several examples

6    of such cases, including ones from Delaware and New York.

7              At issue in *Holinger* was a report prepared by a

8    non-testifying expert from which particular portions were

9    disclosed in what I will call a committee report.  The

10   opposing side wanted the entirety of that report produced,

11   arguing that producing part of it waived protection over

12   the entirety of it.  And the Court disagreed, holding that

13   the disclosure of certain findings from the report did not

14   automatically forfeit protection as to withheld information

15   or place the entirety of the work at issue.

16             THE COURT:  All right.  Mr. Cottler, we're

17   getting short on time.

18             MR. COTTLER:  Sure.

19             THE COURT:  So what about here, Dr. Ross

20   apparently has told us now that she is the one that ordered

21   the tests, and she is the one who relies on them in her

22   infringement analysis.  Doesn't that create a different

23   situation here?

24             MR. COTTLER:  No, Your Honor.  It does not.

25             To start, Rule 26 also governs the discovery

1    that must be produced with an expert testifying report, and

2    the rule requires that Dr. Ross produce all the materials

3    that she consider, and Dr. Ross has done so, and any test

4    reports from EAG that she considered were produced.

5             Now, Dr. Ross did dictate the protocol that

6    was employed by EAG to carry out the tests that are cited

7    in Gillette's contentions.  It was ultimately its law firm

8    that hired EAG as a nontestifying expert.  So defendants,

9    in their opening letter, try to make hay out of the fact

10   that, well, Gillette said on the one hand that Gillette

11   retained EAG.  Now they're saying that Dr. Ross hired EAG or

12   something to that effect.  But the reality is that Gillette

13   had to give the go ahead to EAG, or its counsel did, to do

14   its testing, and EAG used its protocol that Dr. Ross provided.

15   And to the extent she relied on or considered any testing by

16   EAG, those were produced.

17            THE COURT:  And so help me understand what you

18   mean by "relied or considered."  Do the defendants -- yes.

19   Do the defendants have all of the test results that she has

20   seen throughout this case?

21            MR. COTTLER:  Yes, Your Honor.

22            THE COURT:  Did they have all the test results

23   that EAG conducted?

24            MR. COTTLER:  Pardon me, Your Honor?

25            THE COURT:  Let me put it this way:  Has Dr.

1    Ross seen all of the test results that EAG produced?

2            MR. COTTLER:  Yes.  So produced to defendants,

3    Your Honor?

4            THE COURT:  If EAG did ten tests, did all ten go

5    to Dr. Ross or did somebody in between Dr. Ross and EAG say

6    which of the ten were going to go to Dr. Ross?

7            MR. COTTLER:  Hold on one moment, Your Honor.

8            THE COURT:  Sure.

9            (Pause.)

10           MR. COTTLER:  I apologize, Your Honor.

11           There may have been some tests that Dr. Ross did

12    not see, including some unaccused products.  But one point

13    I want to make is as a matter of fairness, defendants now

14    have the complete testing that Dr. Ross considered and that

15    Gillette relied on in its infringement contentions, including

16    a protocol for how those tests were carried out.  Defendants

17    are capable of hiring an expert, if they hadn't already, and

18    duplicating that protocol and comparing the results of their

19    testing with the results that Gillette relied upon in its

20    infringement contentions, and that Dr. Ross considered in her

21    expert report.

22           THE COURT:  Well, putting aside the non-accused

23    products, I guess what this seems to be maybe turning on is

24    are we all talking about the same thing when we say what

25    Gillette, in its infringement contentions, or what Dr. Ross,

1   in her report, considered, formed the basis for and/or relied

2   on?  Do you see a distinction among those three things:

3   considered, formed the basis, or rely?

4              MR. COTTLER:  Sitting here today, Your Honor, I

5   don't think I see a distinction.  I know that the federal

6   rules have changed a bit and maybe -- and I know it now says

7   "materials considered," at one point maybe it said "relied."

8   In my mind, it's all pretty similar.

9              THE COURT:  And under any of those three,

10  again, your representation is at least every test result

11  that Dr. Ross has been exposed to with respect to the

12  accused products has been provided to the defendants; is

13  that right?

14             MR. COTTLER:  That's correct, Your Honor.

15             THE COURT:  But if I ask the same question

16  about when Gillette prepared its infringement contentions

17  that was the subject of the earlier order, it sounds like

18  even if I am limiting it to accused products, you are not

19  in a position to say that every test result that Gillette

20  had had been provided to the defendants; is that right?

21             MR. COTTLER:  By "Gillette," you are referring

22  to Gillette's counsel?

23             THE COURT:  Yes, as a representative of

24  Gillette.  Yes.

25             MR. COTTLER:  There may have been such tests,

1  that's correct.  By EAG.

2           THE COURT:  Is there anything else you want to

3  add, Mr. Cottler?

4           MR. COTTLER:  Yes.  To answer that question,

5  Your Honor, I think I made my point.  Now I can move on to

6  the 30(b)(6) issue?

7           THE COURT:  Yes, just briefly, please.

8           MR. COTTLER:  Briefly.  Okay.  Well, briefly, I

9  think that the Court should quash defendants' 436 notice of

10  Gillette.  As we represented to defendants, Gillette has

11  no direct knowledge about the testing that EAG did.

12           EAG, in response to a subpoena from defendants,

13  has agreed to be deposed, and so defendants look at that

14  discovery from EAG.  Any deposition of Gillette will be

15  unreasonably cumulative; and Rule 26(b)(2)(C) gives the

16  Court power to limit discovery if the discovery sought is

17  unreasonably cumulative.

18           Parties hire experts all the time to do testing

19  for trial, and those parties are never required to provide

20  30(b)(6) testimony regarding the substance of the expert's

21  testing or opinion, nor should they have to because they

22  won't have direct knowledge of that information.

23           While Gillette does have access to some of the

24  files that EAG has that was the result of Gillette paying

25  the bills, that does not make Gillette an agent of EAG, and

1    so Gillette does not have to be knowledgeable about

2    everything that EAG has knowledge about.

3            THE COURT:  Is Gillette going to interpose

4    any objection to EAG disclosing to defendants all the test

5    results that EAG provided to Gillette?

6            MR. COTTLER:  It would be the same amount of

7    objection, Your Honor, the same Rule 26(b)(4)(D) protection.

8            THE COURT:  Right.  Meaning, yes, you do object

9    to EAG providing this testimony and evidence; right?

10           MR. COTTLER:  Yes, Your Honor.

11           THE COURT:  All right.  Thank you.

12           Mr. Mizzo, is there anything you want to respond

13   to?

14           MR. MIZZO:  Yes, Your Honor.  I think the e-mail

15   hit the nail on the head because we have learned that Dr.

16   Ross conveyed a protocol to EAG.  EAG used that to conduct a

17   number of tests of the accused products.  And then there has

18   been cherrypicking for the infringement contentions that

19   have been provided as well as what was shown to Dr. Ross.

20           We believe that when we sought what was the

21   relief regarding the infringement contentions, this is

22   before Dr. Ross had been identified as a testifying expert

23   on infringement, we did seek the results and the tests that

24   form the basis for the contentions, now this is made even

25   more prejudicial by the fact that Dr. Ross was relying on

some subset of tests based on the testing protocol given by the third-party testing agency.  So for the reasons I stated in the past, we would request enforcement of the Court's July 23 order.

With regard to the 30(b)(6) deposition, again, they haven't represented and nor would now be the time, that Gillette doesn't have any personal information regarding it, which is what I think they would need to do in order to say it wouldn't be appropriate to have a Gillette witness testify.

Their argument is simply that EAG has more information where we will take the deposition of EAG.  If they want to designate EAG as a 30(b)(6) deposition or a witness, they are allowed to under the rules, but if they choose not to, then that is a choice of their own making, not of defendant.

So for those reasons, we would request that the Court grant our motion.

THE COURT:  All right.  I'm granting the defendants' motion.  I think that that is consistent with, if not directly ordered by, the earlier order that I entered that we have been discussing.

I think whether you say produce the tests that EAG or Dr. Ross or Gillette considered or formed the basis for the contentions on which they relied, I think that all

1    of this was within the scope of what was at stake in

2    connection with the prior motion.

3              We have now learned.  What we have learned since

4    I think only strengthens the basis of that ruling.  That is,

5    we have now learned that Dr. Ross is the one who set out the

6    protocol for the tests.  We learned that she is also the

7    testifying expert in this case.  To the extent it would be

8    required, I think there is good cause to modify and expand

9    the earlier offer so as to avoid a situation where under

10   the totality of the circumstances here, it could be that

11   numerous tests were done according to that same protocol and

12   came up with materially different results, and that someone

13   is somehow keeping those results from the very expert who

14   designed the test protocol and is going to be testifying

15   ultimately in front of a jury and opining as to infringement.

16             That does not seem consistent with the purposes

17   of the whole process of discovery and trial that we're all

18   engaged in under the circumstances here.

19             It follows that a deposition of Gillette is not

20   cumulative or otherwise unduly burdensome.  Therefore, I

21   order that that deposition go forward as well.

22             So the ruling is for the defendants.

23             We're already past the time I had set for the

24   call.  But any questions about any of that, Mr. Mizzo?

25             MR. MIZZO:  No, Your Honor.  Thank you for your

1     time.

2                    THE COURT:  Mr. Cottler?

3                    MR. COTTLER:  No, Your Honor.  Thank you.

4                    THE COURT:  Thank you all very much.  Good-bye.

5                    (Telephone conference 3:18 p.m.)

6

7          I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.

8

9                              /s/ Brian P. Gaffigan
                             Official Court Reporter
10                             U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25